**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| LEI JIN, derivatively on behalf of APPLIED OPTOELECTRONICS, INC., | |
| Plaintiff, | C.A. No. _____ |
| vs. | |
| CHIH-HSIANG ("THOMPSON") LIN, STEFAN J. MURRY, WILLIAM H. YEH, ALEX IGNATIEV, RICHARD B. BLACK, MIN-CHU CHEN, ALAN MOORE, and CHE-WEI LIN, | DEMAND FOR JURY TRIAL |
| Defendants, | |
| and | |
| APPLIED OPTOELECTRONICS, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### INTRODUCTION

Plaintiff Lei Jin ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Applied Optoelectronics, Inc. ("Applied Optoelectronics" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Chih-Hsiang ("Thompson") Lin, Stefan J. Murry, William H. Yeh, Alex Ignatiev, Richard B. Black, Min-Chu Chen, Alan Moore, and Che-Wei Lin (collectively, the "Individual Defendants" and together with Applied Optoelectronics, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Applied Optoelectronics, unjust enrichment, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge

as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Applied Optoelectronics, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Applied Optoelectronics's directors and officers starting on February 23, 2017 and continuing through the present (the "Relevant Period").

2.      Applied Optoelectronics is a provider of fiber-optic networking products, primarily for four networking end-markets: internet data center, cable television, telecommunications, and fiber-to-the-home.  The Company designs and manufactures a range of optical communications products at varying levels of integration, from components, modules, and subassemblies, to complete turn-key equipment.  One of the key products that Applied Optoelectronics manufactures is optical transceivers, components of fiber optic communication systems that connect computer servers at data centers.

3.      Applied Optoelectronics generates almost all of its revenue from a limited number of customers, including tech powerhouses Amazon, Microsoft, and Facebook.  For the Company's 2017 and 2016 fiscal years, its top five customers represented 86.1% and 87.8% of the Company's revenue, respectively.  In 2017, specifically, Amazon was the Company's biggest customer in terms of providing revenue, representing 35.4% of the Company's revenue for that

Verified Shareholder Derivative Complaint

year.  On December 31, 2016, Amazon represented 62.1% of the Company's total accounts receivable.

4.      During the Relevant Period, the Company represented that it had a considerable competitive advantage over other manufacturers of transceivers and thus would be in a superior position to fulfill customers' increasing demands for such products.  Applied Optoelectronics frequently praised itself as a company that was "vertically integrated" and that could transition easily to new technology from older technology due to possessing the ability to manufacture transceiver components in the Company's own facilities, as opposed to acquiring components from suppliers, which in turn would allow the Company to seamlessly transition from 40 gigabits per second ("Gs" or "Gbps") transceivers to faster 100G transceivers.

5.      On August 3, 2017, the Company held an earnings call for their second fiscal quarter ended June 30, 2017, therein revealing that that the Company's "change-over time" on product lines was six weeks.  This was not in line with Relevant Period representations of a speedy transition from 40G to 100G transceivers.  The Company also noted that sales from Amazon had decreased considerably, and that Amazon was continuing to buy 40G transceivers from the Company instead of its faster 100G transceivers.

6.      On October 12, 2017, the Company held an earnings call for the third fiscal quarter ended September 30, 2017, during which Defendant Stefan J. Murry disclosed that Amazon had lowered its overall demand for not only 100G transceivers, but also 40G transceivers—in stark contrast to the Company's prior repeated representations that Amazon's forecasted demand for 100G products was strong.  In fact, the Company's revenue derived from Amazon fell to just 10% of its total revenue.

Verified Shareholder Derivative Complaint

7.      On this news, the price per share of Applied Optoelectronics stock fell $11.83, or 20.1%, from its closing price on October 12, 2017 price, closing at $47.01 on October 13, 2017.

8.      On February 21, 2018, Applied Optoelectronics announced that, as a result of "customer-specific" issues, it had fallen behind in its transition from 40G to 100G.  Such "customer-specific" issues were actually a significant decrease in purchases from Amazon.  The Company also disclosed that its 100G data center revenue fell from 56% of data center revenues in the third quarter of 2017 to 35% in the fourth quarter of 2017, despite being the purported future of the Company, and that its 40G data center revenue rose from 41% of data center revenues in the third quarter of 2017 to 58% in the fourth quarter of 2017.

9.      On this news, the price per share of Applied Optoelectronics stock fell $7.04, or 20.4%, from its closing price on February 21, 2018, closing at $27.51 on February 22, 2018.

10.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to fail to maintain internal controls.

11.     Also during the Relevant Period, the Individual Defendants personally made and/or caused the Company to make a series of materially false and misleading statements regarding the Company's business, operations, prospects, and legal compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (1) the Company did not have the capability nor capacity to quickly transition from 40G manufacturing to 100G manufacturing; (2) the Company could not meet customer demand; (3) to increase manufacturing totals, lower costs, and maintain high gross margins, the Company took manufacturing and quality assurance shortcuts, resulting in undisclosed product quality issues and decreased demand from key customers, including Amazon; (4) due to adoption of the

"merchant model"[1] by its customers, the Company was losing market share to rising competition; (5) based on product issues and its customers' minimum purchase obligations and forecasted requirements, demand for the Company's 100G transceivers would not grow at the rate represented; and (6) the Company failed to maintain internal controls.  As a result of the foregoing, the Company's public statements, including its financial statements, were materially false and misleading at all relevant times.

12.     In light of the Individual Defendants' misconduct, which has subjected Applied Optoelectronics, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to being named as defendants in a consolidated federal securities fraud class action lawsuit pending in this Court (the "Securities Class Action"), the need to undertake internal investigations, and losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

13.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

14.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action, the substantial likelihood of the Company CEO's and CFO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested or independent directors, a majority of the Applied Optoelectronics Board

---

[1] The "merchant model" is where end-users direct the custom assembly of transceivers utilizing parts obtained from a variety of suppliers.

of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

18.     Venue is proper in this District because Applied Optoelectronics is located in this District.  Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

19.     Plaintiff is a current shareholder of Applied Optoelectronics. Plaintiff has continuously held Applied Optoelectronics common stock at all relevant times.

### Nominal Defendant Applied Optoelectronics

20.     Applied Optoelectronics is a Delaware corporation with its principal executive offices at 13139 Jess Pirtle Blvd., Sugar Land, Texas 77478. Applied Optoelectronics's shares trade on the NASDAQ under the ticker symbol "AAOI."

**Defendant T. Lin**

21.     Defendant Chih-Hsiang "Thompson" Lin ("T. Lin") is the founder of the Company and has served as its President and CEO since its inception.  He has also served as Chairman of the Board since January 2014.  According to the Company's Schedule 14A filed with the SEC on April 28, 2017 (the "2017 Proxy Statement"), as of April 10, 2017, Defendant T. Lin beneficially owned 875,791 shares of the Company's common stock, which represented 4.45% of the Company's total common stock.  Given the price per share of the Company's common stock at the close of trading on April 10, 2017 was $44.46, T. Lin owned over $38.9 million worth of Applied Optoelectronics common stock.

22.     For the fiscal year ended December 31, 2017, Defendant T. Lin received $5,407,716 in compensation from the Company.  This included $453,342 in salary, a $404,332 bonus, $4,508,400 in stock awards, and $41,641 in all other compensation.

23.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant T. Lin made the following sales of Company stock, and made no purchases of Company stock.  On November 16, 2017, Defendant T. Lin sold 1,300 shares of Company stock for $45.30 per share.  On November 20, 2017, Defendant T. Lin sold 2,300 shares of Company stock for $45.20 per share. Thus, in total, before the fraud was exposed, he sold 3,600 Company shares on inside information, for which he received $162,850. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

24.     The Company's Schedule 14A filed with the SEC on April 27, 2018 (the "2018 Proxy Statement") stated the following about Defendant Lin:

*Chih-Hsiang (Thompson) Lin, Ph.D.*,[2] founded Applied Optoelectronics, Inc. in February 1997 and has served as President and Chief Executive Officer since our inception. He currently serves as the Chairman of our Board, a position he has held since January 2014. He has served as a director on our Board since 1997, and he served as Chairman of our Board from May 2000 through September 2002, and again from June 2008 through October 2009. Since May 2015, Dr. Lin has served on the University of Missouri's Chancellor's Advisory Group and since November 2016 he has served as a chair on the University of Missouri's Industrial Advisory Board for the College of Engineering. Dr. Lin also served as a research associate professor from 1998 to 2000 and as a senior research scientist from 1994 to 1998 at the University of Houston. Dr. Lin holds a BS degree in Nuclear Engineering from National Tsing Hua University in Taiwan and a MS degree and a Ph.D. in Electrical and Computer Engineering from University of Missouri—Columbia. The Board believes that Dr. Lin is qualified to serve as a director based on his extensive background in business management, technological expertise, his role as founder, President and Chief Executive Officer and his years of service on our Board.

**Defendant Murry**

25.     Defendant Stefan J. Murry ("Murry") has served as the Company's CFO since August 2014.  According to the Company's 2017 Proxy Statement, as of April 10, 2017, Defendant Murry beneficially owned 64,166 shares of the Company's common stock.  Given the price per share of the Company's common stock at the close of trading on April 10, 2017 was $44.46, Murry owned over $2.8 million worth of Applied Optoelectronics common stock.

26.     For the fiscal year ended December 31, 2017, Defendant Murry received $1,410,919 in compensation from the Company.  This included $292,553 in salary, a $148,022 bonus, $939,250 in stock awards, and $31,094 in all other compensation.

27.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Murry made the following sales of Company stock, and made no purchases of Company stock.  On March 13, 2017, Defendant Murry sold 1,000 shares of Company stock for

---

[2] Emphasis in original unless otherwise noted throughout.

$50.95 per share.  On May 18, 2017, Defendant Murry sold 3,168 shares of Company stock for $63.51 per share.  On August 15, 2017, Defendant Murry sold 3,050 shares of Company stock for $70.21 per share.  Thus, in total, before the fraud was exposed, he sold 7,218 Company shares on inside information, for which he received over $466,289.  His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

28.     The Company's 2018 Proxy Statement stated the following about Defendant Murry:

> *Stefan J. Murry, Ph.D.*, has served as our Chief Financial Officer since August 2014. Previously, Dr. Murry served as our Chief Strategy Officer from December 2012, our Vice President of Sales and Marketing from June 2004 until December 2012, our Director of Sales and Marketing from January 2000 to June 2004 and as a Senior Engineer of Device Packaging from February 1997 to January 2000. He also previously served as Research Associate from 1991 to 1999 and Mission Control Specialist from 1992 to 1997 with the Space Vacuum Epitaxy Center in Houston, Texas. Dr. Murry has been issued multiple patents in the optoelectronics industry, as well as in various related and complimentary industries. Dr. Murry received BS and MS degrees in Physics and a Ph.D. in Electrical Engineering from the University of Houston.

### Defendant Yeh

Defendant William H. Yeh ("Yeh") has served as a Company director since May 2000. He also serves as lead independent director, Chair of the Compensation Committee, and a member of the Nominating and Corporate Governance Committee.  According to the Company's 2017 Proxy Statement, as of April 10, 2017, Defendant Yeh beneficially owned 81,167 shares of the Company's common stock.  Given the price per share of the Company's common stock at the close of trading on April 10, 2017 was $44.46, Yeh owned over $3.6 million worth of Applied Optoelectronics common stock.

29.     For the fiscal year ended December 31, 2017, Defendant Yeh received $130,000 in compensation from the Company.  This included $50,000 in fees earned or cash paid and $80,000 in stock awards.

30.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Yeh made the following sales of Company stock, and made no purchases of Company stock.  On February 28, 2017, Defendant Yeh sold 37,664 shares of Company stock for $47.15 per share.  On June 2, 2017, Defendant Yeh sold 10,000 shares of Company stock for $74.06 per share.  On May 31, 2017, Defendant Yeh sold 20,000 shares of Company stock for $71.16 per share.  Thus, in total, before the fraud was exposed, he sold 67,664 Company shares on inside information, for which he received over $3.9 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

31.     The Company's 2018 Proxy Statement stated the following about Defendant Yeh:

*William H. Yeh* has served as a director on our board of directors since May 2000. Since 1997, he has served as the Chief Executive Officer and President of Golden Star Management, Inc., a real estate investment and management company. He served as a Senior Vice President of United Central Bank (now Hanmi Bank) overseeing the Houston region from 1997 to 2012. Also, he served as the Vice Chairman of Central Bancorp, Inc. (the holding company of United Central Bank) from 1997 to 2014. He currently serves as an Advisor of Hanmi Bank for the Texas region. Mr. Yeh received a BS degree from National Cheng Kung University in Taiwan and a MS degree from University of Houston—Clear Lake. The Board believes that Mr. Yeh is qualified to serve as a director based on his business and financial management and leadership experience and his years of service on our Board.

**Defendant Ignatiev**

Defendant Alex Ignatiev ("Ignatiev") has served as a Company director since February 2013.  He also serves as a member of the Audit Committee.  According to the Company's 2017

Proxy Statement, as of April 10, 2017, Defendant Ignatiev beneficially owned 22,919 shares of the Company's common stock.  Given the price per share of the Company's common stock at the close of trading on April 10, 2017 was $44.46, Ignatiev owned over $1 million worth of Applied Optoelectronics common stock.

32.    For the fiscal year ended December 31, 2017, Defendant Ignatiev received $123,000 in compensation from the Company.  This included $43,000 in fees earned or cash paid and $80,000 in stock awards.

33.    The Company's 2018 Proxy Statement stated the following about Defendant Ignatiev:

> *Alex Ignatiev, Ph.D.,* has served as a director on our Board since February 2013, and previously served as a director on our board of directors from June 2008 to October 2009 and from May 2001 to August 2002. From 2005 until 2017 he served as a director of the Center for Advanced Materials at the University of Houston and has served since 2010 as the Hugh Roy and Lillie Cranz Cullen professor of physics, chemistry and electrical and computer engineering at the University of Houston. Dr. Ignatiev is now Emeritus Professor of Physics at the University of Houston. From March 2013 to September 2015, Dr. Ignatiev served as the Chief Science Officer of Smart Grid Intelligent Management, Inc., which develops operating systems and alternative energy source integration. Since February 2009, he has served as the Chief Technology Officer of Quarius Technologies, LP, a renewable energy company. Since February 2006, he has served as a vice president and Chief Technology Officer at Nano EnerTex, Inc., a nanomaterials company. From January 2005 to September 2015, he served as a Vice President of Virtual Vision LLP, which develops artificial retinas. Since May 2002, he has served as the Chief Technology Officer and Chief Science Officer of Metal Oxide Technologies, LLC, which develops, manufactures and sells superconducting wire. Dr. Ignatiev was a director of the Space Vacuum Epitaxy Center at the University of Houston from 1987 until 2002 after which he became director of the Texas Center for Superconductivity and Advanced Materials until 2005. Dr. Ignatiev also served as a task leader for the Texas Center for Superconductivity from 1987 to 2008, and has been elected to the International Academy of Astronautics and to the Kazakhstan National Academy of Sciences, and was awarded Russian American of the Year in 2015. Dr. Ignatiev received a Ph.D. in Materials Science from Cornell University. The Board believes that Dr. Ignatiev is qualified to serve as a director based on his business management experience, broad technology knowledge and industry experience and his past service on our Board.

**<u>Defendant Black</u>**

Defendant Richard B. Black ("Black") has served as a Company director since August 2001.  He also serves as Chairman of the Audit Committee and as a member of the Nominating and Corporate Governance Committee.  According to the Company's 2017 Proxy Statement, as of April 10, 2017, Defendant Black beneficially owned 50,404    shares of the Company's common stock.  Given the price per share of the Company's common stock at the close of trading on April 10, 2017 was $44.46, Black owned over $2.2 million worth of Applied Optoelectronics common stock.

34.     For the fiscal year ended December 31, 2017, Defendant Black received $136,000 in compensation from the Company.  This included $56,000 in fees earned or cash paid and $80,000 in stock awards.

35.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Black made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| April 6, 2017 | 1000 | 44.76 | $44,760 |
| May 11, 2017 | 1000 | 64.37 | $64,370 |
| June 8, 2017 | 1000 | 71.73 | $71,730 |
| July 6, 2017 | 1000 | 59.70 | $59,700 |
| August 10, 2017 | 1000 | 66.10 | $66,100 |
| September 7, 2017 | 1000 | 58.52 | $58,520 |
| October 12, 2017 | 1000 | 60.62 | $60,620 |
| November 9, 2017 | 1000 | 43.00 | $43,000 |
| December 7, 2017 | 1000 | 40.43 | $40,430 |
| January 11, 2018 | 1000 | 35.37 | $35,370 |

36.     Thus, in total, before the fraud was exposed, he sold 10,000 Company shares on inside information, for which he received $544,600. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

37.     The Company's 2018 Proxy Statement stated the following about Defendant Black:

> *Richard B. Black* has served as a director on our Board since August 2001. Since 1983, he has served as the Chairman and Chief Executive Officer of ECRM, Incorporated, a worldwide supplier of laser based imaging equipment. From 2014 to 2016, he also served as President and Chief Executive Officer and a director of CRON-ECRM LLC, a worldwide supplier of laser based imaging equipment. Beginning in 1989, Mr. Black served as a director of Oak Technology, Inc., a manufacturer of semi-conductors for optical storage and laser printers, and then became President in 1998 and Vice Chairman of the board of directors in 1999 until its merger with Zoran, Inc. in 2003. Mr. Black served as President and CEO of AM International from 1980 to 1982. He served as a Division President of Maremont Corporation, a manufacturer of auto parts and textile machinery, from 1967, then as Maremont's President and CEO from 1974 to 1979. When Maremont was acquired by Alusuisse in 1979, he served as President and CEO of Alusuisse of America until 1981. He served as a director and chairman of the audit committee of GSI Group, a manufacturer of lasers, laser systems, semi-conductor equipment, from 1998 to 2012, and was its chairman of its board of directors from 2006 to 2012. He served as a director and Chairman of the audit committee of Alliance Fiber Optics Products, Inc. (NASDAQ: AFOP) from 2002 until its acquisition by Corning in 2016. He serves as a director of TREX Enterprises, Inc., a defense technology company, a position he has held since 2000. Mr. Black has served as trustee of the Institute for Advanced Study at Princeton since 1990, and became its Vice Chairman in 2006, and Trustee Emeritus since 2012. He has served as a trustee of the American Indian College Fund, Beloit College, Bard College, and serves on the Dean's Council for the Physical Sciences Division of the University of Chicago. Mr. Black received a BS degree in Engineering from Texas A&M University, an MBA from Harvard University and an honorary Ph.D. from Beloit College. The Board believes that Mr. Black is qualified to serve as a director based on his extensive business and financial management and leadership experience, and his service on other private company and publicly-held company's boards of directors. He brings to the Board expertise in the fields of accounting and internal controls.

**<u>Defendant Chen</u>**

38.     Defendant Min-Chu Chen ("Chen") has served as a Company director since February 2013.  He also serves as Chairman of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee.  According to the Company's 2017 Proxy Statement, as of April 10, 2017, Defendant Chen beneficially owned 35,273 shares of the Company's common stock.  Given the price per share of the Company's common stock at the close of trading on April 10, 2017 was $44.46, Chen owned over $1.5 million worth of Applied Optoelectronics common stock.

39.     For the fiscal year ended December 31, 2017, Defendant Chen received $128,000 in compensation from the Company.  This included $48,000 in fees earned or cash paid and $80,000 in stock awards.

40.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Chen sold 5,000 shares of Company on inside information for $52.00 per share, for which he received $260,000. His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

41.     The Company's 2018 Proxy Statement stated the following about Defendant Chen:

> *Min-Chu (Mike) Chen, Ph.D.,* has served as a director on our Board since February 2013. Since 2003, he has served as a director of Seth Nanotechnology Inc., a nanotechnology patent portfolio company owning more than 10 patents in fullerene derivatives and related application technologies. Since September 2016, he has served as Vice Chairman of the board of directors of Shandong SicerKline Advanced Material Co., Ltd., a surface-etched silicon carbide and alumina mini-whisker manufacturing plant for ceramic applications. Since April 2014, he has served as a director of Harbin NeoTek Medical Devices Co., Ltd. Since January 2012, he has served as an executive director of FGel Nanotek, Inc., a food and beverage additive company based on

nanotechnology. Since November 2011, he has served as the Asia Pacific Director for U.S. Flow Control Group Pte. Ltd., a petroleum equipment manufacturer and services company. Since May 2010, he has served as executive director of C&C International Services, Inc., a petrochemical equipment services and marketing company. Since 2001, he has been a partner and member of the board of directors of EverRich Capital Inc., a financial consulting company. From September 2008 to April 2010, Dr. Chen served as the Chief Executive Officer of SilverPAC, Inc., a consumer electronics business, and from March 1994 to June 2002, Dr. Chen served as a board member of PCTEL, Inc. (NASDAQ: PCTI). Dr. Chen received a Ph.D. in Ocean Engineering from Oregon State University. The Board believes that Dr. Chen is qualified to serve as a director based on his business management experience, his service on other private company boards of directors and his prior service on the board of a publicly-held company.

**Defendant Moore**

42.     Defendant Alan Moore ("Moore") has served as a Company director since March 2013.  He also serves as a member of the Audit Committee.  According to the Company's 2017 Proxy Statement, as of April 10, 2017, Defendant Moore beneficially owned 222,542 shares of the Company's common stock, which represented 1.17% of the Company's outstanding common stock.  Given the price per share of the Company's common stock at the close of trading on April 10, 2017 was $44.46, Moore owned over $9.8 million worth of Applied Optoelectronics common stock.

43.     For the fiscal year ended December 31, 2017, Defendant Moore received $123,000 in compensation from the Company.  This included $43,000 in fees earned or cash paid and $80,000 in stock awards.

44.     The Company's 2018 Proxy Statement stated the following about Defendant Moore:

*Alan Moore* has served as a director on our Board since March 2013. Since 1995, he has served as the President of Red Oak Capital, a private equity-venture capital company. From 2007 to December 2017, Mr. Moore served as a Manager of Silver Tree Fund II Management, LLC, a real estate investment fund. From 1999 to 2016, Mr. Moore co-founded and served as the Treasurer of Silver Tree Partners, Inc., a real estate development and investment company. From March

1998 to October 1999, Mr. Moore served as the Chief Financial Officer of Window on Wall Street (sold to Trade Station Group, Inc. in 1999). Previously, Mr. Moore was a co-founder and served as the Chief Financial Officer of Fossil, Inc. from 1984 to 1995 (NASDAQ: FOSL). Mr. Moore received a MS degree in Accounting and a BA degree in Business Control Systems from the University of North Texas. The Board believes that Mr. Moore is qualified to serve as a director based on his extensive background in business and financial management and his role as co-founder of a publicly-held company.

**Defendant C. Lin**

45.      Defendant Che-Wei Lin ("C. Lin") has served as a Company director since January 2014.  He also serves as a member of the Compensation Committee.  According to the Company's 2017 Proxy Statement, as of April 10, 2017, Defendant C. Lin beneficially owned 83,717 shares of the Company's common stock.  Given the price per share of the Company's common stock at the close of trading on April 10, 2017 was $44.46, C. Lin owned over $3.7 million worth of Applied Optoelectronics common stock.

46.      For the fiscal year ended December 31, 2017, Defendant C. Lin received $120,000 in compensation from the Company.  This included $40,000 in fees earned or cash paid and $80,000 in stock awards.

47.      During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant C. Lin made the following sales of Company stock, and made no purchases of Company stock.  On May 18, 2017, Defendant C. Lin sold 7,500 shares of Company stock for $64.00 per share.  On September 11, 2017, Defendant C. Lin sold 7,000 shares of Company stock for $58.00 per share.  Thus, in total, before the fraud was exposed, he sold 14,500 Company shares on inside information, for which he received $886,000.  His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

48.     The Company's 2018 Proxy Statement stated the following about Defendant C. Lin:

> *Che-Wei Lin* has served as a director on our Board since January 2014, and previously served as a director on our Board from December 2006 to October 2009. Since November 2007, Mr. Lin has served as the President of ASMedia Technology Inc., a chipset manufacturer. Since November 2009, Mr. Lin has also served as the Corporate Vice President of the Motherboard Business Unit of the Open Platform Business Group of ASUSTek Computer Inc., a computer hardware and electronics company. Mr. Lin was employed at VIA Technologies, Inc., a manufacturer of integrated circuits and motherboard chipsets, from 1993 to 2007 in various positions, including President of the Desktop Platform Business Unit, Vice President of the System Platform Division and Vice President of OEM and Chipset Product Marketing. Mr. Lin received a BS in Electrical Engineering from Fu Jen University in Taiwan and a MS in Electrical Engineering from the University of Missouri. The Board believes that Mr. Lin is qualified to serve as a director based on his business and financial management and leadership experience and his years of service on our Board.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

49.     By reason of their positions as officers, directors, and/or fiduciaries of Applied Optoelectronics and because of their ability to control the business and corporate affairs of Applied Optoelectronics, the Individual Defendants owed Applied Optoelectronics and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Applied Optoelectronics in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Applied Optoelectronics and its shareholders so as to benefit all shareholders equally.

50.     Each director and officer of the Company owes to Applied Optoelectronics and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

51.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Applied Optoelectronics, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

52.     To discharge their duties, the officers and directors of Applied Optoelectronics were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

53.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Applied Optoelectronics, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Applied Optoelectronics's Board at all relevant times.

54.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the

Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

55.     To discharge their duties, the officers and directors of Applied Optoelectronics were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Applied Optoelectronics were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Texas, Delaware, and the United States, and pursuant to Applied Optoelectronics's own Code of Business Conduct and Ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Applied Optoelectronics conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Applied Optoelectronics and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Applied Optoelectronics's operations would

comply with all applicable laws and Applied Optoelectronics's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

56.     Each of the Individual Defendants further owed to Applied Optoelectronics and the shareholders the duty of loyalty requiring that each favor Applied Optoelectronics's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

57.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Applied Optoelectronics and were at all times acting within the course and scope of such agency.

58.     Because of their advisory, executive, managerial, and directorial positions with Applied Optoelectronics, each of the Individual Defendants had access to adverse, non-public information about the Company.

59.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Applied Optoelectronics.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

60.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

61.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price while several Individual Defendants engaged in insider trading.

62.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Applied

Optoelectronics was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

63.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

64.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Applied Optoelectronics, and was at all times acting within the course and scope of such agency.

## APPLIED OPTOELECTRONICS'S CODE OF BUSINESS CONDUCT AND ETHICS

65.     Applied Optoelectronics's Code of Business Conduct and Ethics (the "Code of Conduct") provides that it "applies to all Company employees, officers, consultants and members of the Board of Directors."

66.     The Code of Conduct provides, as to "Compliance with Company Policies, Laws, Rules and Regulations," that:

> All employees, officers and directors are required to comply with Company policies, the laws, rules and regulations of the U.S. and other countries, and the states, counties, cities and other jurisdictions, in which the Company conducts its business or the laws, rules and regulations of which are applicable to the Company, including, without limitation, all prohibitions on "insider trading" and trading while in possession of material non-public information applicable to the Company and its employees, officers, directors and consultants. For more information, please see the various Company policies located on the Company Intranet with a particular focus on the Employee Policy Handbook (including, but not limited to, Operating Policies and Employment Policies) and Forms and Policies (including, but not limited to, Insider Trading Policy and Disclosure Policy).

The Company's operations are subject to laws and regulations both in the United States and in foreign countries. Our core values demand that we ensure diligent adherence to the requirements of all applicable laws, rules and regulations. Significant areas of law that could be applicable to the activities of the Company include, but are not limited to (i) import/export controls; (ii) patent and trademarks laws; (iii) anti-trust laws governing free and open competition; (iv) health, safety and environmental laws; and (v) federal securities laws.

67.     The Code of Conduct provides, as to "Full, Fair and Accurate Disclosure in

Public Filings and Communications," that:

The Company's commitment to its stockholders demands that we provide full, fair, accurate, timely and understandable disclosure in the reports, documents and communications filed with the Securities and Exchange Commission and in other public communications. Although certain personnel are more directly involved in the preparation of such reports, documents and communications than others, the Company expects all members of our community to accept this responsibility to our stockholders. Accordingly, all employees, officers, directors and consultants have an ethical responsibility to provide prompt, complete and accurate information in response to inquiries related to preparation of the Company's public disclosure documents and public communications. In addition and in order to ensure accurate financial reporting to our stockholders, those personnel who participate in the maintenance and preparation of the Company's books, records and accounts must ensure that the transactions and events recorded therein are done so in an accurate and complete manner in compliance with required accounting principles and Company policies.

68.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of Section 14(a) of the Exchange Act.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

69.     Applied Optoelectronics holds itself out as the leading, vertically-integrated provider of fiber-optic networking products.  The Company designs and manufactures at varying levels of integration—from components, subassemblies and modules, to complete turn-key equipment.  The Company states that as a result of its vertically-integrated manufacturing model, the Company has advantages in rapid product development, response to customer requests, and control of manufacturing costs and product quality.

70.     Applied Optoelectronics operates manufacturing facilities in Texas (Sugarland), Taiwan, and China (Ningbo).

71.     The Company's primary end-markets are internet data center, telecommunications, cable television, and fiber-to-home.  Applied Optoelectronics's most established market is the cable television market, and the Company supplies transceivers, lasers, and transmitters to it.  The Company's fastest and largest growing market is the internet data center market, for which the Company provides products to large internet-based data ("hyperscale") center operators.

72.     Sales in each of the Company's primary end-markets are driven by increasing demand of bandwidth as a result of the growth of network-connected devices, cloud computing, online social networking, and video traffic.  For the Company's customers to provide higher bandwidth to their own customers, they must improve the infrastructure of their networks—including specifically updating and improving the speeds of the equipment that transmit information.

73.     In 2016 and 2017, the internet data center end-market represented over 77% and 80%, respectively, of the Company's revenues, making it the Company's largest end-market.

74.     The Company's internet data center market business is essentially dependent on the sales of optical transceivers to Amazon, Facebook, and Microsoft—its largest three internet data center customers prior to and during the Relevant Period.  Applied Optoelectronics's sales to these three companies consisted almost wholly of optical transceivers.  The transmitters and receivers used in fiber optic communication systems are typically contained in a single component called the transceiver.

75.     The Company's transceivers are plugged into computer servers and switches within hyperscale data centers that store, process, and communicate gargantuan amounts of data. The data from hyperscale data centers is transmitted through network connections to internet service providers, and then to individual digital devices.  The majority of the Company's optical transceivers utilize Applied Optoelectronics's own lasers and subassemblies.

76.     The transmission speed of optical transceivers limits the speed at which a data center can communicate information.  Thus, data centers have sought faster, more energy-efficient, and smaller transceivers.  In 2013, transceivers that were able to transmit data at 1G were considered cutting-edge.  By 2015, 40G transceivers had almost completely superseded both 1G and 10G transceivers, and by late 2015, the market was introduced to 100G transceivers, albeit in limited supply.  Demand for 40G devices continued, however, and the majority of the Company's internet data center sales in 2016 were for 40G transceivers.  Customer interest had shifted by the beginning of the Relevant Period to the newly developed 100G transceivers.

77.     Each type of transceiver must be compatible with customers' existing equipment and structure.  As a result, the Company's products go through a "qualification process" for many of the Company's customers, which typically involves sampling of the product and reliability testing, in addition to collaboration with the engineering and product management

teams in the design and manufacturing stages.  Customers that are new for the Company can also audit the Company's manufacturing facilities and perform additional evaluations.

78.     According to the First Consolidated Amended Class Action Complaint filed in the Securities Class Action on March 6, 2018, certain Company employees who were interviewed indicated that Applied Optoelectronics suffered from supply chain issues that caused the Company to have difficulty accommodating large-scale production of an expanding array of products for its customers' increasing demand.   According to the Securities Class Action complaint, the Company's former employees indicated that the Individual Defendants had a clear picture of the upcoming demand for transceivers from customers and that the Company's senior executives were constantly monitoring all aspects of Applied Optoelectronics's operations. Moreover, according to the Securities Class Action complaint, these former employees reported incidents demonstrating that the Company's growth and transition were encumbered with serious issues with its manufacturing quality control and corporate operations, causing customers such as Amazon to turn elsewhere to fulfill their demand.  As the Company was facing issues meeting customer demand while maintaining low margins, it was known, according to the Securities Class Action complaint, per former employees, that the Company's customers were looking for 100G transceivers elsewhere, and by May 2017, at least, it was or should have been clear to the Individual Defendants that the Company's large data center customers, including Amazon, were pursuing alternatives to the Company's optical transceivers; such alternatives included using the "merchant model"—end-users directing the custom assembly of transceivers using parts from a variety of suppliers.

79.     An agreement with Facebook released by the Company reveals the Company's contracting practices with its large internet data center customers and describes the Company's

forecasting process.   The 2018 Facebook Supply Agreement designates specific minimum purchase commitments and requires that Facebook provide "accurate 6 month rolling forecasts to [Applied Optoelectronics], identifying . . . needs and delivery expectations on calendar quarter basis . . . ."  Moreover, for the 2019 and 2020 calendar years, Facebook will provide "demand forecasts for the subsequent year . . . in third calendar quarter of the current" calendar year and "the parties will finalize the actual [calendar year] 2019 support and purchase commitment by" a future specified date.  Moreover, "Facebook will purchase the balance of committed demand at the end of each respective quarter at the unit price agreed for the shortfall quarter pursuant to" a table of negotiated quarterly prices for the product for 2018 with the exact amounts hidden.

80.     On a February 21, 2018 earnings call, Defendant Murry provided further insight into this type of contracting, stating, in relevant part:

> And I mentioned earlier and in the 8-K that it is a minimum commitment.  This is how we operate with some of our other customers as well in the sense that [the Company] typically gets a share oftentimes a leading share with our customers as sort of a minimum commitment.  But oftentimes, depending on what competitors can actually produce and ship in a given quarter, we may have opportunities to take additional share.

81.     During an August 3, 2017 earnings call, Defendant Murry stated, "we do have a significant amount of committed orders and a good forecast from all 3 of our [large data center] customers."  Thus, the Individual Defendants were aware what the purchase commitments were from its large internet data center customers for both 40G and 100G prior to the disclosures of sales drops that were eventually made by the Company.

82.     As described in further detail herein, the Company faced competition from competitors who used the "merchant model."  One of the leaders in utilizing the "merchant model" to produce transceivers is MACOM Technology Solutions Holdings Inc. ("MACOM").

**Materially False and Misleading Statements Issued During the Relevant Period**

*February 23, 2017 Press Release*

83.     On February 23, 2017, the Company issued a press release titled, "Applied Optoelectronics Reports Fourth Quarter and Year 2016 Results." The press release touted the Company's "record year," stating, in relevant part:

> "AOI achieved another record year driven by strong demand for our market-leading datacenter products and continued execution by the AOI team. We believe our record performance further demonstrates our growing market share in advanced optics and our team's ability to generate manufacturing efficiencies that lead to margin improvement," said Dr. Thompson Lin, Applied Optoelectronics, Inc. founder, president and CEO. "Our ability to internally manufacture lasers and light engines provides us with cost-leadership advantages, a faster time to market, and the ability to quickly scale to demand. Looking ahead, as the 100G transition accelerates this year, we see the opportunity to build on our momentum and expand our market leadership."[3]

*February 23, 2017 Earnings Call*

84.     On February 23, 2017, the Company held an earnings call to discuss its financial results for the fourth quarter and fiscal year ended December 31, 2016.  During the call, Defendant T. Lin commented on the competitive position of the Company in the 100G market, stating, in relevant part: "In 100G we further extended the gap between AOI and the competition. Building upon our first-to-market advantage, we increased our 25G chip production by nearly 150% between January and December and expanded our customer footprint by earning a new large scale customer."

85.     Defendant Murry also discussed the Company's 40G to 100G market transition during the call, stating, in relevant part:

> [W]e believe we have many new opportunities ahead of us to drive further growth as datacenter operators transition to 100G and continue to expand their datacenters and upgrade their infrastructure to handle higher bandwidth needs.

---

[3] The Company alternatively refers to itself in its public filings and press releases as "AOI."

Our ability to internally manufacture lasers and light engines combined with our ability to quickly transition production between 40G and 100G products provides us with cost-leadership advantages, a faster time to market and the ability to quickly scale and adjust our throughput to meet growing demand.

And lastly, the added capacity from our new fab in Sugar Land enables us to expand our avenues to market for 100G. For example, as we demonstrated with 40G, we were able to expand our share and ramp quickly to the demand of our hyper-scale operators.

Based on our analysis, we believe we are now the leading supplier of 40G optics for hyper-scale datacenter operators and expect to maintain our leadership position as we continue the transition to 100G.

86.     During the call, Defendant Murry commented further on the Company's ability to manufacture all components of a transceiver "to meet demand," distinguishing the Company from its competitors.  He stated, in relevant part:

And I think when you are in a situation where supply of some of those components may be constrained, or the overall industry capacity is not what is needed to meet the demand, if the company that has the ability to ramp up quickly by virtue of being integrated in their production like we are that it will do better I think than others. And honestly I think that that's the situation that we're in right now, and I think we've been able to start to prove out the value of that vertical integration strategy.

87.     In response to a question from an analyst from Piper Jaffray Companies regarding the decline in demand for 40G transceivers, Defendant Murry assured that 100G demand would make up for lost 40G sales due to Applied Optoelectronics's vertical integration model, stating, in relevant part:

That decline, really, we don't expect to be problematic because we can transition our manufacturing from 40G to 100G and it just gives us additional capacity on the 100G product. So I will say also that we don't really expect a sharp decline in 40G.

I think others have maybe speculated that that decline was going to be swift. I think there's a lot of reasons why customers can't transition completely away from 40G in a short timeframe. So we expect it will be a gradual decline and that 100G will more than make up for that.

88.     Also during the call, Defendant Murry touted Applied Optoelectronics's ability to

efficiently move from production of 40G products to 100G products, stating, in relevant part:

> I think we can't emphasize enough that the light engines, the manufacturing of the subassembly that includes the lasers and the rest of the optical components - - having our own in-house capability to do that and having a significant manufacturing infrastructure for that by virtue of the similarity between 100G and 40G modules really gives us an advantage in terms of being able to ramp that up quickly.
>
> * * *
>
> Well, basically we're using the capacity that we have as we put it online. I think there's two ways of looking at it. There's capacity in terms of current equipment and manpower and we're constantly adding to that capacity. And so that's kind of a moving target. I think the bigger picture is that we spent, as you know, we spent heavily last year on new building infrastructure, particularly here in Sugar Land but also in our overseas operations as well.
>
> And that gives us an ability to have the physical infrastructure to put new equipment in to be able to continue that ramp. So on both those counts, I think we've been able to keep up with our customers' demand and actually I think we've been able to gain some incremental advantage over competitors who maybe didn't have that sort of latent capacity available to help customers when they saw a surge in demand.

89.     Defendant Murry also commented on demand and revenue for the Company's

data center segment, stating, in relevant part, during the call:

> Moving now to Q1. We expect Q1 revenue to be between $87 million and $91 million, representing 73% to 80% year-over-year growth. As we mentioned last quarter, we have fewer production days in Q1 as a result of the Chinese New Year holiday. However, strong customer demand for datacenter and solid execution by the AOI team will drive higher sequential datacenter revenue.

90.     During the call, Defendant Murry responded to a question from a Cowen and

Company, LLC ("Cowen") analyst regarding the Company's visibility into its 100G customers,

stating that he thought that the Company did have good visibility into its customers.  He stated,

in relevant part:

So there's a couple of questions in there, I guess. The first one is, do we have good visibility into our customers? And I think the answer is yes. I think we continue to see ourselves and I believe our customers see us as a key partner, as they rollout these new technologies.

And so as a key and value partner for them, I think they're giving us the best visibility that they possibly can into their future needs. So I think we have good very visibility there across all of our major customers, including the new ones.

The other question that you had was related to what Troy was asking about too in terms of the 100G ramp up. What I could say is we're tracking as expected on the 100G. I think there's always hiccups in the plan from time to time, but overall the customers are basically purchasing what they led us to expect that they would purchase. And we feel comfortable with their plans for the future in terms of our capacity and our ability to meet their needs.

***March 9, 2017 Form 10-K***

91.     On March 9, 2017, the Company filed its annual report on Form 10-K with the SEC for the fiscal quarter and year ended December 31, 2016 (the "2016 10-K"), signed by Defendants T. Lin, Murry, Yeh, Black, C. Lin, Ignatiev, Moore, and Chen.

92.     The 2016 10-K contained statements similar to those made in the Company's February 23, 2017 earnings call concerning the benefits of Applied Optoelectronics's vertical integration, 100G transition, and customer visibility, including that a "key competitive strength[]" of the Company was its "[v]ertically integrated, geographically distributed manufacturing model." The 2016 10-K also noted that the Company "expect[s] continued sales of [the Company's] 40 Gbps and 100 Gbps products in 2017, and . . . expect[s] that sales of 100Gbps products will eventually exceed sales of 40 Gbps products."

93.     Attached to the 2016 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants T. Lin and Murry, attesting to the accuracy of the 2016 10-K.

***March 22, 2017 Optical Fiber Communication Conference and Exhibition***

94.     On March 22, 2017, the Company participated in the Optical Fiber Communication Conference and Exhibition.  During the conference, Defendant Murry took part in an investor session, speaking on the benefits of the Company's vertically integrated manufacturing and its purported advantage as a transceiver manufacturer making its own chips, stating, in relevant part:

> So, we start with a wafer, a semiconductor material that basically devoid of active layers or active devices on there. Upon that substrate material, which we buy and other companies presumably buy as well, we do some process called epitaxy. That is we're growing additional layers on top of the substrate materials that actually form the laser itself, or in the case of the receiver, a photodiode. Those layers, essentially, are where all the action is. We do that in-house and as we mentioned in the video, we're one of relatively small number of companies that actually has the capability in-house to grow these wafers and to do the rest of the laser manufacturing process. And I think that's the key differentiator because as you may hear at the show, lasers not only define the performance [to date extent] of these modules, but they're also critical to on-time delivery schedule and being able to ramp up as customer demand increases, which of course we're seeing in some of the markets that we're in.

95.     Defendant Murry further touted the Company's vertical integration, stating, in relevant part:

> So what does vertical integration do for us? Faster time to market, because we don't have to rely on a very long supply chain of different suppliers that all have to align in terms of schedules, we can do most of that in-house. So, we tend to be faster time to market, perhaps more than -- in time to market, I should say, what we're really talking about here is time to volume.
>
> That is there maybe companies out there that can deliver a small quantity of transceivers in a very short time, but what really matters to our customers is how fast can we get them the volumes that they need within their applications. So in the data center, it's not about making the first few samples or the first 100 units, it's about how fast can you really scale the business. And I think vertical integration gives us a big advantage in terms of time to scale.
>
> * * *
>
> So one of the themes that AOI has promulgated throughout the years, especially in our data center business is we like to keep a great deal of commonality in terms of the way that products are designed and manufactured from one generation of

products to another. That gives us the ability to flexibly shift from -- for example in the data center world from 40 gigabits per second to 100 gigabits per second without having through radically change our production process or invest in massive amounts of new equipment or whatever. And we can also change back and forth flexibly as customer demand changes, again a very important aspect of vertical integration particularly to our customers.

And finally rapid response to the customer and market demand, so as we see these shifts and changes in the marketplace, the one thing I can say about the optical industry is that it's a very fast moving market. There's a lot of shifts and demand from time to time and as we bring our new customers, those demands change as well because not every customer needs exactly the same type of product. So, the ability to flexibly change or adapt to the customer demand I think is also key part of that vertical integration strategy.

96.     Also during the investor session at the conference, Defendant Murry commented that Applied Optoelectronics was prepared for increasing demand from data centers and that its customers had expressed their demands for the year, stating, in relevant part:

We do see a lot of pull from customers to add capacity. Fortunately, we made a lot
of investments last year and the year before that allow us to have -- at least AOI to have the ability to add that capacity relatively quickly and I think we're getting a pretty strong customer response, a positive customer response based on our – the plans that we've disclosed to them about how we plan to meet their upcoming increasing demand.

Some facts last year, we increased our production of data center transceiver products last year by about 70% from Q1 to Q4, but we didn't increase our headcount at all. And one of the things that we did last year was we spent a lot of money -- and actually the year before, but we spent a lot of money and time doing process automation, being able to do more of the production that we do in an automated fashion. That is much easier to scale than manual -- more manual processes, and so that investment along with the investment that we made in the fab, really gives us the ability to scale our production pretty rapidly and we think we're doing a reasonably good job of anticipating and meeting the demands of the customers have told us that they're going to need for this year and next year.

### April 28, 2017 Proxy Statement

97.     On April 28, 2017, the Company filed the 2017 Proxy Statement, which failed to disclose that: (i) the Company did not have the capability nor capacity to quickly transition from

40G manufacturing to 100G manufacturing; (2) the Company could not meet customer demand; (3) to increase manufacturing totals, lower costs, and maintain high gross margins, the Company took manufacturing and quality assurance shortcuts, resulting in undisclosed product quality issues and decreased demand from key customers, including Amazon; (4) due to adoption of the "merchant model" by its customers, the Company was losing market share to rising competition; (5) based on product issues and its customers' minimum purchase obligations and forecasted requirements, demand for the Company's 100G transceivers would not grow at the rate represented; and (6) the Company failed to maintain internal controls.

98.     Moreover, the 2017 Proxy Statement was false and misleading when it stated that the Code of Conduct applies to all of the Company's employees, officers, and directors given the Individual Defendants' failures to abide by it.

### May 4, 2017 Press Release

99.     On May 4, 2017, the Company issued a press release titled, "Applied Optoelectronics Reports First Quarter 2017 Results," announcing "record performance."  In the press release, Defendant T. Lin stated, "We are very pleased with the team's continued execution.  Our commitment to technology innovation, manufacturing excellence and customer satisfaction are qualities that continue to set AOI apart, and we believe our performance in the quarter further demonstrates our commitment to excellence in these areas."

### May 4, 2017 Earnings Call

100.     On May 4, 2017, the Company held an earnings call to discuss its financial results for the first fiscal quarter ended March 31, 2017.  During the call, the Company continued to praise its relationship and visibility with its data center customers, including Amazon, and denied any issues relating to competition because of the purported benefits of its vertical integration

model.  Despite the increase in 100G market share obtained by competitors and that MACOM, one of its largest competitors, was increasingly working with Amazon utilizing a "merchant model," Defendants T. Lin and Murry dismissed suggestions that such competition affected or could affect Applied Optoelectronics.  For instance, during the call, a Cowen analyst asked why investors should not be "concerned given that there certainly appears to be concern that [the Company is] going to be displaced to one extent or another, especially in the 100-gig arena." Defendant Murry responded by stating:

> well, that's a good question to start off with. So think first of all, as we said all along, the most important factor for our success with these customers has been our ability to scale rapidly to meet their needs and to have a very low cost structure that allows us to get high gross margin while still meeting their pricing expectations. We believe relative to any other technology out there that we maintain a significant differential in terms of cost, that is that we're the lowest-cost technology out there by a fairly wide margin. And this is particularly true when it comes to the CWDM products. As we mentioned in the prepared remarks, the CWDM products make up the majority. As a percentage of the overall revenue, it's more than doubled since last year. And that's because these datacenters are getting larger. And as a consequence of the larger size of the datacenters, there's more emphasis from these customers on the CWDM products which, for us, are more highly differentiated and carry a higher gross margin. So all the trends that we're seeing, I think, are very positive for our technology. And even on the relatively smaller PSM products, we still maintain that we have a significant edge in terms of cost, mainly due to our vertical integration and the amount of attention that we've paid to the manufacturing process, the automation that we put in place and the other factors that we've talked about a number of times that have really differentiated our manufacturing processes.

101.    The same analyst pressed the issue, asking about any concern regarding Applied Optoelectronics's largest customers specifically, to which Murry responded by saying he was not aware of anything that would cause concern.  The exchange between the analyst and Defendant Murry was as follows:

> [Cowen Analyst]
>
> All right. And guys, just to be clear, my last question on this. As of now, you don't see -- you don't foresee, you don't anticipate being intercepted in a

meaningful way at any of Amazon, Microsoft or Facebook. There's nothing you're aware of at this point that will cause you concern that there's a share shift to one or more other competitors?

[Defendant Murry]

That's correct.

102.    During the call, an analyst from Raymond James & Associates, Inc. asked about competition from competitors utilizing the "merchant model," to which Defendant Murry responded by touting the advantages of the Company's business model, including its vertical integration.  The exchange was as follows:

[Raymond James & Associates, Inc. Analyst]

So that actually nicely sets up my next question, is we've sort of heard this bear case of companies that would sell merchant elements. They would sell lasers and semiconductors to other manufacturers or to contract manufacturers that could then compete with you. So I guess one side of the bear case about your company is that there are other competitors taking share. The other side is this sort of unidentified competitor that would buy merchant elements. Can you help us understand the potential for that as a competitive threat? Hopefully that makes sense, and I can be more explicit if you want.

[Defendant Murry]

No, I understand what you're getting at. So we have a great deal of vertical integration, as we've talked about ever since we went public. We do a lot of these things in house. We make our own lasers, we build our own light engines, we do our own production, we do our own testings, okay? There are companies out there that have talked about sort of disaggregating that, if you will, and one company will grow the laser chip, somebody else will do the assembly, somebody else will do the test, somebody makes the chips, et cetera, et cetera, okay. Relative to our business model – I mean, this has been the big advantage of our business model. And I will point out to you, at this point, we've got a 5-plus year track record in the datacenter industry of high -- highly successful business, as evidenced by this quarter and our previous -- really, going back 4, 5 years, you can look at our results.  The vertically integrated business model, we believe, is the best way to economically manufacture these datacenter products. And there are competitors out there that are talking about doing different business models. But economically, that just doesn't make sense. If you have to add multiple companies' profit margins in there along with all the vagaries of the manufacturing that is yields and things that change over time and inventory

management, we've done the modeling and there's just no way that, that results in a product that's less expensive for the end customer than buying it from AOI even at the profit margins or gross profit levels that we're at today. So yes, it's possible to do it that way potentially, but it doesn't result in a lower-cost product.

\* \* \*

And all of that assumes that they would be as good as AOI is at all of those operations, which we don't think is possible given the fact that we are the demonstrated leader in this industry.

103.    Also during the call, Defendant Murry was asked if he believed that the Company was "the market share leader in the 100-gig web-scale transceivers."  Defendant Murry responded, "yes."

104.    Defendant Murry also commented during the call on Applied Optoelectronics's knowledge of its customers' needs and the ability of the Company to deliver on its customers' 100G demand, assuring investors that the Company, compared to its competitors, had an advantage.  He stated, in relevant part:

Based on current orders and forecasts from our customers, we believe that 2017 datacenter revenue should grow by more than 85% compared with 2016 and would include contributions from 3 hyperscale datacenter customers, each of whom will represent more than 10% of our annual revenue.

\* \* \*

So when you talk about for AOI, will 40G be higher in 2017 compared to 2016, the answer is probably yes. However, I would caution that, that doesn't necessarily mean that that's the same thing for the industry, right, because we added a significant new customer for 40G during the year. Overall, I would say in general terms, while I can't speak to the specifics of the industry, I think it's widely acknowledged and most people would agree that 100 gig is growing. We were first to market with 100-gig products, first to volume with those products and we believe we're the cost leader on those products. So I think we're going to be very successful in both 100G and 40G throughout the year.

105.    During the call, Defendant T. Lin also commented on Applied Optoelectronics's competition in the 100G space, stating, in relevant part:

Verified Shareholder Derivative Complaint

I want to emphasize in the 100G (inaudible), this is much tougher to design and manufacture (inaudible) than PSM4. So there are much less competitors. And for us, AOI has much stronger cost advantage (inaudible). So that's why we have updated the long-term model in last quarter earnings call. And we believe that's what we can maintain even for the long-term, or even higher.

106.    Defendant Murry also engaged in the following exchange with an analyst from

Roth Capital Partners, LLC ("Roth") concerning potential transition issues:

[Roth Analyst]

Obviously, there's been a fair amount of hand-wringing over the past couple of weeks. I'm wondering where we are in terms of that crossover and what your expectations are as we go through the year. Clearly 100 gig is ramping, but given your customer mix, are you still anticipating that you'll lag the industry in terms of
your crossover point?

[Defendant Murry]

. . . when you talk about crossover point, what exactly are you referring to?

[Roth Analyst]

Sorry. 100 gig versus 40 gig. And I'm talking revenues relative to units.

[Defendant Murry]

So you're asking, when do we expect the 100-gig revenue will overtake 40 gig revenue? I mean, if you're asking that, we don't really disclose that on a forward looking basis. We think that obviously 100 gig is growing. 40 gig for us is also very strong. It was -- we were actually -- we had another record quarter in 40-gig sales as well. It was pretty much flat over last quarter, but it was up ever so slightly. So we're expecting a good year both in 40 gig and 100 gig. But as far as when that crossover happens, we don't really talk about that.

107.    Defendant Murry also noted specifically that the Company's growth rate was "not

dependent on demand," and that it was "dependent on our ability to continue to ramp our

manufacturing," stating, in relevant part, during the call:

Right now, we're basically shipping everything we can manufacture. So the growth rate is not dependent on demand. It's dependent on our ability to continue to ramp our manufacturing. So we talked just a moment ago with Troy, he

mentioned some of the figures that we had projected in terms of laser sales. I think that you can draw some conclusions from there. But there's a limit to how fast we can increase our production capacity. So that's really the limiting factor to the growth rate.

### July 13, 2017 Press Release

108.    On July 13, 2017, the Company issued a press release titled, "Applied Optoelectronics Expects Second Quarter 2017 Results to Exceed Guidance."  The press release touted the Company's prospects, stating, in relevant part:

> "I'm pleased to announce that we expect to deliver another record quarter with our top and bottom-line results expected to exceed our guidance," said Dr. Thompson Lin, Applied Optoelectronics, Inc. founder, president and CEO. "Again this quarter, our results were driven by improvement in our manufacturing costs, capacity expansion and solid execution by our production team. We are pleased with our performance and look forward to sharing the additional details of our second quarter results on our conference call in August."

### The Truth Slowly Begins to Emerge

### August 3, 2017 Press Release

109.    On August 3, 2017, the Company issued a press release titled, "Applied Optoelectronics Reports Second Quarter 2017 Results," revealing a reduction in 40G product orders from one of the Company's large data center customers.  The press release stated, in relevant part:

> "AOI achieved another record performance driven by strong demand for our market-leading datacenter products and continued improvement in our manufacturing costs and capacity expansion," said Dr. Thompson Lin, Applied Optoelectronics, Inc. founder, president and CEO. "Our record gross margin and earnings demonstrate the strength of our business model and deep manufacturing know-how. We believe our ability to leverage our vertical integration and proprietary manufacturing processes to drive greater efficiencies and shorten our production cycle times sets AOI apart from others in the industry."

> Lin continued, "We are pleased with our team's continued solid execution in the quarter, which marked our ninth consecutive quarter of generating record datacenter revenue. However, as we look into the third quarter, we see softer than expected demand for our 40G solutions with one of our large customers that will

offset the sequential growth and increased demand we expect in 100G. We believe AOI has a leading position in the advanced optics market and we continue to expand within our existing customer base as well as engage with new customers for 100G technologies and beyond."

***August 3, 2017 Earnings Call***

110.   On August 3, 2017, the Company held an earnings call to discuss its financial results for the second fiscal quarter ended June 30, 2017, during which Defendant Murry reaffirmed weakening 40G demand, stating, in relevant part:

As we look into Q3, we see softer than expected demand for our 40G solutions with one of our large datacenter customers that will offset the sequential growth and increased demand we expect to see in 100G. This slowdown in 40G demand has been anticipated for some time, but the decline in Q3 is greater than previously expected.

111.   During the call, Defendant Murry engaged in an exchange with a Roth analyst, and stated that the decreasing demand for 40G products from Amazon was a "surprise," and that Applied Optoelectronics had only found out about it recently.  The exchange was as follows:

[Roth Analyst]

Right. Well, it seems as you clearly have a pretty good handle on what's going on with 100G and next generation type of designs with your customers. I'm curious as to how -- you seem to have been caught off-guard in terms of the decline on 40 gig. Is that something that transferred from your customer recently? Or is that something that was communicated in the middle of the quarter?

[Defendant Murry]

It's a recent development. And again, it's not that we didn't expect 40 gig to decline with this customer or the other customers, we knew it would. It's just coming a little bit faster which, in the end, means a faster transition to 100 gig, which is not a bad thing. But obviously, in this particular quarter, it's happened faster than we expected.

[Roth Analyst]

Understand. I think we all expect the transition to occur and we all think it's a positive, certainly for you guys, given your product portfolio. I guess where I'm going with this is, it's a bit unusual for a company to preannounce a very strong

beat and then to have something like this come in a couple of weeks later from that announcement. And I'm just -- it seems as though maybe you guys were informed of this after your positive preannouncement.

[Defendant Murry]

That is true, but just to be clear, the pre-announcement is made when we see the results of the quarter differing materially from the last guidance that we put out with The Street. That's why we preannounce. It's not an indication of future, it's an indication that the past has been very different from what we last guided The Street. In other words, we don't want – when we know that there is different information from what we've previously guided for, we want to get that information in the hands of investors as quickly as possible. That's what investors have asked us to do and that's what we think is the right thing to do. But that's not necessarily an indication of any particular thing about the future. In this case, the information that we got about the 40 gig actually did happen post the preannouncement, but that wouldn't necessarily change our thinking about whether or not to preannounce.

112.    During the call, it was revealed that the "change-over time" on the product lines was six weeks.  As stated during the call, "There's about a 6-week time from when we produce a laser to when [it] actually gets shipped out as a transceiver.  And so the time to actually shift over the production is not long, but the time to – between doing that shift and when you start to see the end product transceivers coming-out is about 6 weeks."

113.    Also during the call, Defendant Murry was questioned about 100G demand from Amazon, to which he responded that the Company had "meaningful 100 gig revenue with our largest customer as well as our other customers  . . . .  [W]e do have meaningful – meaningful 100 gig sales with all 3 of our large datacenter customers."

114.    Defendant Murry additionally noted during the call that Applied Optoelectronics had set prices, and occasionally price reductions, with customers, stating, "But these price negotiations that we have undergone are something we do in advance with the customer, and we know what those prices are expected to be on a go forward basis."

115.    During the call Defendant Murry also told investors that in December 2017 the Company would again see sequential improvement.  When he was asked how he could be so confident, Murry stated that "some committed orders [are] out there, not all of that expectation is committed at this point.  But we do have a significant amount of committed orders and a good forecast from all 3 of our customers."

116.    Defendant Murry also denied any competitive pressure facing the Company from a business alliance between MACOM and Fabrinet,[4] again choosing instead to tout the Company's vertical integration.  He stated, in relevant part:

> So first of all, we don't believe that the MACOM-Fabrinet alliance is actually producing anything or is likely to produce any products or any meaningful quantities, certainly, in the next quarter or 2, probably longer than that. In addition to that, in the long term, and in the short term, we don't see any cost advantage to this model. AOI, as we mentioned, is currently very highly vertical integrated on the most expensive components, meaning the lasers. As we announced in the call, we also intend to produce other optical components that we currently don't produce internally, which will further enhance the extent of our vertical integration, and we think this gives us a significant cost even against the MACOM-Fabrinet business model or any of the other competitive business models that we're aware of.

117.    On this news, the price per share of Applied Optoelectronics stock fell $28.60, or 30.7%, from its closing price on August 3, 2017, closing at $64.40 on August 4, 2017.

***October 12, 2017 Press Release***

118.    On October 12, 2017, the Company issued a press release titled, "Applied Optoelectronics Announces Preliminary Third Quarter 2017 Results," revealing additional information regarding weakening Amazon demand.  The press release stated, in relevant part:

---

[4] Fabrinet won a project in 2017 to provide Amazon with optical modules designed by MACOM—i.e., Amazon partnered with Fabrinet to create 100G optical transceivers for itself. *See* https://www.barrons.com/articles/an-existential-threat-to-fiberoptics-makers-1500695405 (last accessed July 20, 2018).

"Our preliminary results for the third quarter fell short of prior estimates and were negatively impacted by lower than expected sales to one of our large datacenter customers. Despite this shortfall, we maintained a strong gross margin profile in the quarter, and continued to experience solid demand with our other top datacenter customers," said Dr. Thompson Lin, Applied Optoelectronics, Inc. founder, president and CEO. "Although we are disappointed with these preliminary results, we continue to feel good about our leadership position in advanced optics and remain optimistic based on the customer traction we are seeing with our 100G products, especially our 100G CWDM transceivers."

### *October 12, 2017 Earnings Call*

119.    On October 12, 2017, the Company held an earnings call to discuss its preliminary financial results or the third fiscal quarter ended September 30, 2017.  The call revealed that Amazon's weakening demand was not only for the Company's 40G product, but also its 100G products.  Defendant Murry stated, in relevant part:

We are disappointed with our third quarter performance. We indicated last quarter that we expected to see softer 40G demand. However, we saw lower demand overall from one of our large customers. Revenue from this customer in the quarter was approximately 10% of total revenue compared with 47% last quarter. As a reminder, we have a vendor-owned inventory management model that we employ with this customer which can impact our revenue visibility. As previously discussed, this VOI program allows the customer to full inventory from a hub that AOI manages, and revenue is recorded at the time the inventory is pulled. We continue to have ongoing discussions with this customer and based on our conversations, we believe that the disruption in order flow is related to the ongoing transition from 40G to 100G and not specific to AOI. We also do not expect the inventory stock in our VOI hub to be impaired because forecasts indicate that this inventory will be consumed over time.

120.    When specifically asked about losing 100G Amazon market share, Defendant Murry stated, "yes, we don't believe that this disruption in the order flow is related to anything AOI-specific.  It's related to an ongoing transition from 40G to 100G."  When asked about his confidence in this regard, he stated, "As we mentioned, we continue to have ongoing discussions with this customer and our other customers as well, and those discussions have led us to believe that this is a – not – an event that's not specific to AOI."

121.    On this news, the price per share of Applied Optoelectronics stock fell $11.83, or

20.1%, from its closing price on October 12, 2017 price, closing at $47.01 on October 13, 2017.

***November 7, 2017 Press Release***

122.    On November 7, 2017, the Company issued a press release titled, "Applied

Optoelectronics Reports Third Quarter 2017 Results," confirming the previous month's

revelation of weakening Amazon demand.  The press release stated, in relevant part:

> "While our third quarter results were negatively impacted by lower demand from
> a large customer, we continued to experience solid demand from our other large
> datacenter customers, especially for our 100G CWDM transceivers, and revenue
> for our CATV products reached a new record," said Dr. Thompson Lin, Applied
> Optoelectronics, Inc. founder, president and CEO. "We remain confident in our
> leadership position in advanced optics. We are working diligently to diversify our
> customer base and are encouraged with the customer response so far, which led to
> nine design wins in the quarter, including three for our 100G products. We also
> continue to make progress on developing new innovative products and expanding
> our vertical integration to further extend the gap between AOI and the
> competition."

***November 7, 2017 Earnings Call***

123.    On November 7, 2017, the Company held an earnings call to discuss its financial

results for the third fiscal quarter ended September 30, 2017.  During the call, the Company

stated a $46.2 million loss in Amazon revenue compared to the previous quarter.  In commenting

on this topic, Defendant Murry noted that the reason was "not specific" to the Company, stating,

in relevant part:

> As discussed on our pre-announcement call, we saw lower demand overall from
> one of our large customers. And our revenue visibility in the quarter was impacted
> by the vendor-owned inventory management model that we employ with this
> customer. As previously discussed, this VOI program allows the customer to pull
> inventory from a hub that AOI manages, and revenue is recorded at the time the
> inventory is pulled. This arrangement can make revenue prediction difficult, but it
> allows us to maximize sales by ensuring that AOI products are available for
> customers when needed. For example, AOI has, in the past, been able to meet
> unexpected demand surges because we had available inventory in the hub for our
> customer to purchase with little to no lead time. We continue to have ongoing

discussions with this customer and based on those conversations, we believe the disruption in order flow is related to the ongoing transition from 40G to 100G and not specific to AOI. We believe there was some inventory buildup during the transition and based on conversations with this customer, we believe that inventory conditions will normalize within the first half of next year.

124.     During the call, Defendant Murry yet again touted the Company's purported ability to adapt to transitioning markets, stating in relevant part:

We believe that one of the strengths of our business model is our ability to flexibly adjust manufacturing to adapt to changing customer requirements, while maintaining industry-leading gross margin. As you know, we serve a customer base that is composed of some of the most dynamic, rapidly evolving companies in the world. As their needs change, we think our ability to adapt along with them gives us a long-term sustainable advantage.

125.     Also during the call, Defendant Murry had the following exchange with an analyst who pointed out that the Company's 100G sales were down sequentially:

The other thing is -- and I'm assuming I've entered formulas correctly, so apology if I botch this. But I think the 100 gig business was down sequentially. So given that the primary explanation is a pause of 40 to 100 gig, I would have imagined you'd sell every piece of 100-gig gear. So maybe help us understand if: one, I did the math correctly; and two, if so, why would 100 gig be down in your third quarter.

[Defendant Murry]

Well, I think we saw an overall decline -- as we mentioned in our prepared remarks, we saw an overall decline in business from one customer. So that included both 40 gig and 100 gig. On the other hand, the other customers that we had, were actually up for 100 gig, so that didn't quite balance out the overall decline from the one customer.

**The Truth Fully Emerges**

*February 21, 2018 Press Release*

126.     On February 21, 2018, the Company issued a press release titled, "Applied Optoelectronics Reports Fourth Quarter and Year 2017 Results," revealing the extent of the

impact that Amazon's weakening demand had on the Company.  The press release stated, in relevant part:

> "We achieved revenue in the fourth quarter of $79.9 million, which was slightly below our expectations due to lower demand from our datacenter customers as they continue to evolve their network architectures. While our revenue came in slightly below expectations, I am pleased with our ability to continue to generate strong gross margin even in a price sensitive market," said Dr. Thompson Lin, Applied Optoelectronics Inc. founder and CEO. "Even though we see inventory headwinds with one of our customers and the typical seasonality in Q1 due to fewer production days in China because of the Lunar New Year, we continue to expect the second half of 2018 to be stronger than the first half. We believe we have a strong leadership position in advanced optics, and this belief is bolstered by a large purchase commitment that we disclosed earlier today."

### *February 21, 2018 Earnings Call*

127.    On February 21, 2018, the Company held an earnings call to discuss its financial results for the fiscal quarter and year ended December 31, 2017, revealing further details on the extent of damage caused by Amazon's lack of 100G demand.  During the call, Defendant Murry stated, "Our datacenter revenue was $62 million, compared with $68.1 million in Q4 of last year. In the quarter, 35% of our datacenter revenue was derived from our 100G datacenter products and 58% was from our 40G products."

128.    When questioned during the call regarding the reasons for weakness in the fourth quarter, Defendant Murry stated:

> Yes, I can't really comment on the specific customers and their trends. But I think, it's not reasonable to expect that, in any given quarter, there can be a lot of things that affect a particular customer's purchasing patterns, timing of orders, specific things that they're doing within their datacenters, what type of products they're deploying to mix. So there's a lot of things that can affect that on a short-term basis. But longer-term, I think, we've seen strong growth from our hyperscale customers and we would expect to do continue to see their volume growth in the future.

129.    On this news, the price per share of Applied Optoelectronics stock fell $7.04, or 20.4%, from its closing price on February 21, 2018, closing at $27.51 on February 22, 2018.

130. The statements referenced in ¶¶ 83-125 above were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose that: (i) the Company did not have the capability nor capacity to quickly transition from 40G manufacturing to 100G manufacturing; (2) the Company could not meet customer demand; (3) to increase manufacturing totals, lower costs, and maintain high gross margins, the Company took manufacturing and quality assurance shortcuts, resulting in undisclosed product quality issues and decreased demand from key customers, including Amazon; (4) due to adoption of the "merchant model" by its customers, the Company was losing market share to rising competition; (5) based on product issues and its customers' minimum purchase obligations and forecasted requirements, demand for the Company's 100G transceivers would not grow at the rate represented; and (6) the Company failed to maintain internal controls.

## DAMAGES TO APPLIED OPTOELECTRONICS

131. As a direct and proximate result of the Individual Defendants' conduct, Applied Optoelectronics will lose and expend many millions of dollars.

132. Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its CEO, and its CFO, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

133. Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

134.    As a direct and proximate result of the Individual Defendants' conduct, Applied Optoelectronics has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

135.    Plaintiff brings this action derivatively and for the benefit of Applied Optoelectronics to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Applied Optoelectronics, unjust enrichment, violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

136.    Applied Optoelectronics is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

137.    Plaintiff is, and has been at all relevant times, a shareholder of Applied Optoelectronics. Plaintiff will adequately and fairly represent the interests of Applied Optoelectronics in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

138.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

139.    A pre-suit demand on the Board of Applied Optoelectronics is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following seven individuals: Defendants T.Lin, Yeh, Black, Chen, Ignatiev, Moore, and C. Lin (collectively, the

"Directors"). Plaintiff needs only to allege demand futility as to four of the seven Directors that were on the Board at the time this action was commenced.

140.     Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while five of them engaged in insider sales based on material non-public information, netting proceeds of over $5.6 million, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

141.     In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

142.     Additional reasons that demand on Defendant T. Lin is futile follow. Defendant T. Lin is a co-founder of the Company and has served as the Company's President and CEO since its inception.  He also serves as Chairman of the Board.  Thus, as the Company admits, he is a non-independent director. The Company provides Defendant T. Lin with his principal occupation, and he receives handsome compensation, including $5,407,716 in 2017.  Defendant T. Lin was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the foregoing earnings calls and press releases, all of which he personally made statements in, and the 2016 10-K, which he signed and signed a

SOX certification for. His large Company stock holding, worth at least $38.9 million before the fraud was fully exposed, reveals his interest in keeping the Company's stock price as high as possible. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales before the fraud was exposed, which yielded at least $162,850 in proceeds, demonstrate his motive in facilitating and participating in the fraud. Moreover, Defendant T. Lin is a defendant in the Securities Class Action. For these reasons, too, Defendant T. Lin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

143.    Additional reasons that demand on Defendant Yeh is futile follow. Defendant Yeh has served as a Company director since May 2000 and serves as lead independent director, Chair of the Compensation Committee, and as a member of the Nominating and Corporate Governance Committee.  Defendant Yeh receives handsome compensation, including $130,000 in 2017. As a long-time Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Yeh signed, and thus personally made the false and misleading statements in, the 2016 10-K. His insider sales before the fraud was exposed, which yielded over $3.9 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. His large Company stock holding, worth at least $3.6 million before the fraud was fully exposed, reveals his interest in keeping the Company's stock price as

high as possible.  For these reasons, too, Defendant Yeh breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

144.    Additional reasons that demand on Defendant Ignatiev is futile follow. Defendant Ignatiev has served as a Company director since February 2013 and serves as a member of the Audit Committee.  Defendant Ignatiev receives handsome compensation, including $123,000 in 2017. As a long-time Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Ignatiev signed, and thus personally made the false and misleading statements in, the 2016 10-K. His large Company stock holding, worth at least $1 million before the fraud was fully exposed, reveals his interest in keeping the Company's stock price as high as possible.  For these reasons, too, Defendant Ignatiev breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

145.    Additional reasons that demand on Defendant Black is futile follow. Defendant Black has served as a Company director since August 2001 and serves as Chairman of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Black receives handsome compensation, including $136,000 in 2017. As a long-time Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Black signed, and thus personally made the false

and misleading statements in, the 2016 10-K. His insider sales before the fraud was exposed, which yielded at least $544,600 in proceeds, demonstrate his motive in facilitating and participating in the fraud.  His large Company stock holding, worth at least $2.2 million before the fraud was fully exposed, reveals his interest in keeping the Company's stock price as high as possible.  For these reasons, too, Defendant Black breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

146.    Additional reasons that demand on Defendant Chen is futile follow. Defendant Chen has served as a Company director since February 2013 and serves as Chairman of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee.  Defendant Chen receives handsome compensation, including $128,000 in 2017. As a long-time Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Chen signed, and thus personally made the false and misleading statements in, the 2016 10-K. His insider sale before the fraud was exposed, which yielded at least $260,000 in proceeds, demonstrates his motive in facilitating and participating in the fraud.  His large Company stock holding, worth at least $1.5 million before the fraud was fully exposed, reveals his interest in keeping the Company's stock price as high as possible.   For these reasons, too, Defendant Chen breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

147.    Additional reasons that demand on Defendant Moore is futile follow. Defendant Moore has served as a Company director since March 2013 and serves as a member of the Audit Committee.  Defendant Moore receives handsome compensation, including $123,000 in 2017. As a long-time Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Moore signed, and thus personally made the false and misleading statements in, the 2016 10-K.  His large Company stock holding, worth at least $9.8 million before the fraud was fully exposed, reveals his interest in keeping the Company's stock price as high as possible.  For these reasons, too, Defendant Moore breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

148.    Additional reasons that demand on Defendant C. Lin is futile follow. Defendant C. Lin has served as a Company director since January 2014 and serves as a member of the Compensation Committee.  Defendant C. Lin receives handsome compensation, including $120,000 in 2017. As a long-time Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant C. Lin signed, and thus personally made the false and misleading statements in, the 2016 10-K. His insider sales before the fraud was exposed, which yielded at least $886,000 in proceeds, demonstrates his motive in facilitating and participating in the fraud.  His large Company stock holding, worth at least $3.7 million before the fraud was fully exposed, reveals his interest in keeping the

Company's stock price as high as possible.  For these reasons, too, Defendant C. Lin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

149.    Additional reasons that demand on the Board is futile follow.

150.    As described above, five of the Directors on the Board directly engaged in insider trading, in violation of federal law. Defendants T. Lin, Yeh, Black, Chen, and C. Lin collectively received proceeds of over $5.6 million as a result of insider transactions executed during the period when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to them, and thus excused.

151.    Demand in this case is excused because the Directors, all of whom are named as defendants in this action, control the Company and are beholden to each other. The Directors have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders.   These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

152.    In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act. In violation of the Code of Conduct, the Directors failed to comply with the law. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

153.    Applied Optoelectronics has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Applied Optoelectronics any part of the damages Applied Optoelectronics suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

154.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

155.    The acts complained of herein constitute violations of fiduciary duties owed by Applied Optoelectronics's officers and directors, and these acts are incapable of ratification.

156.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Applied Optoelectronics. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Applied Optoelectronics, there would be no directors' and

officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

157.    If there is no directors' and officers' liability insurance, then the Directors will not cause Applied Optoelectronics to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

158.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Securities Exchange Act of 1934

159.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

160.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

161.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate

commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

162.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

163.     Under the direction and watch of the Directors, the 2017 Proxy Statement failed to disclose that: (i) the Company did not have the capability nor capacity to quickly transition from 40G manufacturing to 100G manufacturing; (2) the Company could not meet customer demand; (3) to increase manufacturing totals, lower costs, and maintain high gross margins, the Company took manufacturing and quality assurance shortcuts, resulting in undisclosed product quality issues and decreased demand from key customers, including Amazon; (4) due to adoption of the "merchant model" by its customers, the Company was losing market share to rising competition; (5) based on product issues and its customers' minimum purchase obligations and forecasted requirements, demand for the Company's 100G transceivers would not grow at the rate represented; and (6) the Company failed to maintain internal controls.  As a result of the foregoing, the Company's 2017 Proxy Statement was materially false and misleading.

164.    Moreover, the 2017 Proxy Statement was false and misleading in stating that the Code of Conduct applies to all of the Company's employees, officers, and directors given the Individual Defendants' failure to abide by it.

165.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2017 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2017 Proxy Statement, including, but not limited to, election of directors, approval of officer compensation, and appointment of an independent auditor.

166.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2017 Proxy Statement.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

167.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

168.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Applied Optoelectronics's business and affairs.

169.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

170.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Applied Optoelectronics.

171.    In breach of their fiduciary duties owed to Applied Optoelectronics, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (i) the Company did not have the capability nor capacity to quickly transition from 40G manufacturing to 100G manufacturing; (2) the Company could not meet customer demand; (3) to increase manufacturing totals, lower costs, and maintain high gross margins, the Company took manufacturing and quality assurance shortcuts, resulting in undisclosed product quality issues and decreased demand from key customers, including Amazon; (4) due to adoption of the "merchant model" by its customers, the Company was losing market share to rising competition; (5) based on product issues and its customers' minimum purchase obligations and forecasted requirements, demand for the Company's 100G transceivers would not grow at the rate represented; and (6) the Company failed to maintain internal controls.  As a result of the foregoing, the Company's public statements, including its financial statements, were materially false and misleading at all relevant times.

172.    The Individual Defendants also failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

173.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

174.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual

knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Applied Optoelectronics's securities and disguising insider sales.

175.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Applied Optoelectronics's securities and engaging in insider sales.

176.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

177.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Applied Optoelectronics has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

178.   Plaintiff on behalf of Applied Optoelectronics has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

179.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

180.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Applied Optoelectronics.

181.    The Individual Defendants received bonuses, stock options, or similar compensation from Applied Optoelectronics that was tied to the performance or artificially inflated valuation of Applied Optoelectronics, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

182.    Plaintiff, as a shareholder and a representative of Applied Optoelectronics, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, excessive compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

183.    Plaintiff on behalf of Applied Optoelectronics has no adequate remedy at law.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Applied Optoelectronics, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that each of the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Applied Optoelectronics;

(c)     Determining and awarding to Applied Optoelectronics the damages sustained by it as a result of the violations set forth above from each of the Individual

Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Applied Optoelectronics and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Applied Optoelectronics and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Applied Optoelectronics to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Applied Optoelectronics restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

Dated: August 7, 2018                    Respectfully submitted,


                                         /s/ R. Dean Gresham
                                         R. Dean Gresham
                                         Texas Bar No. 24027215
                                         12720 Hillcrest Rd, Suite 1045
                                         Dallas, Texas 75230
                                         Telephone: (972) 387-4040
                                         Facsimile: (972) 387-4041
                                         Email: dean@stecklerlaw.com

                                         -and-

                                         **THE ROSEN LAW FIRM, P.A.**
                                         Phillip Kim, Esq. (not admitted)
                                         275 Madison Avenue, 34th Floor
                                         New York, NY 10016
                                         Telephone: (212) 686-1060
                                         Fax: (212) 202-3827
                                         Email: pkim@rosenlegal.com

                                         -and-

                                         **THE BROWN LAW FIRM, P.C.**
                                         Timothy W. Brown (not admitted)
                                         240 Townsend Square
                                         Oyster Bay, NY 11771
                                         Telephone: (516) 922-5427
                                         Facsimile: (516) 344-6204
                                         Email: tbrown@thebrownlawfirm.net

                                         *Attorneys for Plaintiff*

Verified Shareholder Derivative Complaint

## VERIFICATION

I, Lei Jin  am the plaintiff in the within action. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this   th day of July 2018.

8/1/2018 12:03:30 PM PDT

DocuSigned by:

*Lei Jin*

5D12B09865254BB...    Lei Jin