**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| In re Applied Optoelectronics, Inc. Derivative Litigation | **Lead C.A. No.** 4:18-cv-02713 |
| This Document Relates to:<br><br>ALL ACTIONS | **DEMAND FOR JURY TRIAL** |

## VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiffs Lei Jin ("Plaintiff Jin") and Yiu Kwong Ng ("Plaintiff Ng," and together with Plaintiff Jin, "Plaintiffs"), by Plaintiffs' undersigned attorneys, derivatively and on behalf of Nominal Defendant Applied Optoelectronics, Inc. ("AOI" or the "Company"), file this Verified Consolidated Amended Shareholder Derivative Complaint against Individual Defendants Chih-Hsiang ("Thompson") Lin, Stefan J. Murry, William H. Yeh, Alex Ignatiev, Richard B. Black, Min-Chu Chen, Alan Moore, and Che-Wei Lin (collectively, the "Individual Defendants" and together with AOI, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of AOI, unjust enrichment, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiffs' complaint against the Defendants, Plaintiffs allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding AOI, legal

filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet, and certain non-public documents produced by Defendants to Plaintiffs. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by AOI's directors and officers starting on February 23, 2017 and continuing through the present (the "Relevant Period").

2.     AOI touts itself as being a leading "vertically integrated" provider of fiber-optic networking products, primarily for four networking end-markets: internet data center, cable television, telecommunications, and fiber-to-the-home. The Company designs and manufactures a range of optical communications products at varying levels of integration, from components, modules, and subassemblies, to complete turn-key equipment. One of the key products that AOI manufactures is optical transceivers, components of fiber optic communication systems that connect computer servers at data centers.

3.     AOI generates almost all of its revenue from a limited number of customers, including tech powerhouses Amazon.com ("Amazon"), Microsoft Corporation ("Microsoft"), and Facebook, Inc. ("Facebook"). For the Company's 2017 and 2016 fiscal years, its top five customers represented 86.1% and 87.8% of the Company's revenue, respectively. In 2017, specifically, Amazon was the Company's biggest customer in terms of providing revenue, representing 35.4% of the Company's revenue for that year. By the end of the fiscal year on December 31, 2016, Amazon represented 62.1% of the Company's total accounts receivable. Amazon remained the Company's largest customer until the end of the fiscal year ended December

31, 2017, a fact that the investing public had no reason to believe would materially change at the time.

4.     From February 23, 2017 and continuing through February 21, 2018 (the "Initial Relevant Period"), the Company represented that it had a considerable competitive advantage over other manufacturers of transceivers and thus would be in a superior position to fulfill customers' increasing demands for such products.  AOI frequently praised itself as a company that was "vertically integrated" and that could transition easily to new technology from older technology due to possessing the ability to manufacture transceiver components in the Company's own facilities, as opposed to acquiring components from suppliers. The Company's purported in-house capabilities, as well as its visibility into its customer's needs, in turn, would allow it to seamlessly transition from manufacturing and supplying 40 gigabits per second ("Gs" or "Gbps") transceivers to faster 100G transceivers, the market demand of which began to explode towards the end of 2015.  These representations provided the investing public with a skewed image of the Company's capabilities, especially compared to its competitors, which the Individual Defendants falsely denied were negatively impacting the Company. In reality, certain of AOI's competitors, in particular, Fabrinet and MACOM Technology Solutions ("MACOM"), had begun increasingly working with Amazon by May 2017, and the budding business relationships subjected the Company to significant undisclosed competitive pressure.

5.     On August 3, 2017, investors began to receive some insight into the true state of the Company's operations and prospects. That day, the Company issued a press release and hosted an earnings call concerning its second fiscal quarter ended June 30, 2017, therein revealing that that the Company's "change-over time" on product lines was six weeks.  This was not in line with Initial Relevant Period representations of a speedy transition from 40G to 100G transceivers.  The

Company also reported that sales attributed to Amazon had decreased considerably. During the earnings call, the Individual Defendants continued to deny the impact competition was having on AOI's business and prospects.

6.       On this news, the price per share of AOI stock plummeted approximately 34%, from closing at $97.99 per share on August 3, 2017, to close at $64.60 per share on August 4, 2017.

7.       On October 12, 2017, the Company issued a press release and hosted an earnings call concerning its third fiscal quarter ended September 30, 2017. During the call, Defendant Stefan J. Murry ("Murry") disclosed that Amazon had lowered its overall demand for *both* 100G transceivers *and* 40G transceivers—in stark contrast to the Company's prior repeated representations that Amazon's forecasted demand for 100G products was strong.  In fact, for the quarter, the Company's revenue derived from Amazon fell to just 10% of its total revenue.  Still, the Individual Defendants deflected the causation behind the drop in business with Amazon.

8.       On this news, the price per share of AOI stock fell approximately 20.1%, from closing at $58.84 per share on October 12, 2017, to close at $47.01 on October 13, 2017.

9.       Finally, on February 21, 2018, AOI issued a press release and hosted an earnings call concerning the Company's fourth quarter and fiscal year ended December 31, 2017, in which Defendants announced that, as a result of "customer-specific" issues, AOI had fallen behind in its transition from 40G to 100G.  Such "customer-specific" issues were actually significant decreases in purchases from Amazon.  The Company also disclosed lower than expected revenues, including that its 100G data center revenue fell from 56% of data center revenues in the third quarter of 2017 to 35% in the fourth quarter of 2017, despite being the purported future of the Company, and that

its 40G data center revenue rose from 41% of data center revenues in the third quarter of 2017 to 58% in the fourth quarter of 2017.

10.     On this news, the price per share of AOI stock fell approximately 20.3%, from closing at $34.55 per share on February 21, 2018, to close at $27.51 on February 22, 2018.

11.     During the Initial Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make a series of materially false and misleading statements regarding the Company's business, operations, prospects, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company did not have the capability nor capacity to quickly transition from 40G manufacturing to 100G manufacturing; (2) the Company could not meet customer demand; (3) to increase manufacturing totals, lower costs, and maintain high gross margins, the Company took manufacturing and quality assurance shortcuts, resulting in undisclosed product quality issues and decreased demand from key customers, including Amazon; (4) due to adoption of the "merchant model"[1] by its customers, the Company was losing market share to rising competition; (5) based on product issues and its customers' minimum purchase obligations and forecasted requirements, demand for the Company's 100G transceivers would not grow at the rate represented; and (6) the Company failed to maintain internal controls.  As a result of the foregoing, the Company's public statements, including its financial statements, were materially false and misleading at all relevant times.

---

[1] The "merchant model" is where end-users direct the custom assembly of transceivers utilizing parts obtained from a variety of suppliers.

12.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact, while six of them engaged in lucrative insider sales, netting proceeds of approximately $8.3 million.

13.     Furthermore, the Individual Defendants breached their fiduciary duties by causing the Company to fail to maintain internal controls.

14.     In light of the Individual Defendants' misconduct, which has subjected AOI, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to being named as defendants in a consolidated federal securities fraud class action lawsuit pending in this Court, (the "Securities Class Action"), the need to undertake internal investigations, and losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars. Indeed, on August 3, 2020, plaintiffs to the Securities Class Action filed an unopposed motion for settlement, together with a stipulation of settlement, revealing that the Company had agreed to pay $15.5 million in cash to settle the claims in the Securities Class Action. The settlement was finally approved by the Court in the Securities Class Action on November 24, 2020.[1]

15.     Previously, in the Securities Class Action, District Judge Vanessa D. Gilmore denied defendants AOI, Chih-Hsiang ("Thompson") Lin ("T. Lin"), and Murry's motion to dismiss the First Consolidated Amended Class Action Complaint (the "FAC") in its entirety on March 27, 2019, finding that the defendants' statements between February 2017 and February 2018 regarding

---

[1] *Rougier v. Applied Optoelectronics, Inc. et al*, Case No. 4:17-cv-02399-VDG-CAB (S.D. Tex.), Dkt. Nos. 143, 157.

Verified Shareholder Derivative Complaint

the Company's manufacturing and quality control issues, declining demand from Amazon, and the Company's ability to transition from 40G to 100G transceivers were false and misleading. *See* Securities Class Action, Dkt. No.81 ("Securities Class Action Order"), at 15-23.

16.     Judge Gilmore also held that the FAC,[2] filed in the Securities Class Action on March 6, 2018, sufficiently pleaded loss causation, stating the following:

> (1) AOI's August 3, 2017, press release where it revealed for the first time that Amazon's demand for 40G transceivers was much less than the alleged previous misrepresentations . . . and AOI's admission that it took six weeks to produce new 100G transceivers; (2) AOI's October 12, 2017, press release and earnings call where it revealed for the first time that Amazon's softer than expected demand also included 100G products, resulting in a decline in Amazon revenue from 47% to 10% for both 40G and 100G transceivers; (3) AOI's disclosure on February 21, 2018, that the transition from 40G to 100G was not occurring as smoothly as Defendants had led investors to believe and that AOI was experiencing "inventory headwinds" with Amazon and that AOI's revenue, prior to previous representations, was primarily based on 40G products (58%), and its sales of 100G products had decreased from the previous quarter from 56% of revenue to 35%.

*Id.* at 29-30.

17.     Moreover, Judge Gilmore found that the allegations in the FAC upheld a strong inference of scienter as to Defendants T. Lin and Murry, stating the following:

> The First Amended Complaint goes beyond generally alleging the collective knowledge of AOI's officers. ***The First Amended Complaint relates how, during the Class Period, Defendants received oral and written reports and attended internal meetings with senior executives, salespeople, and engineers to discuss AOI's manufacturing problems and Amazon's forecast and sales.*** Plaintiff alleges that Defendant Lin received reports from AOI's R&D manager that detailed AOI's manufacturing problems, including low yield and production issues. Plaintiff further alleges that AOI's Texas facility held weekly meetings with various product engineers, engineers, senior engineers, and with Lin's special assistant David Chen, who was also in charge of corporate quality assurance. According to Plaintiff, AOI's yield issues at their facility in Taiwan were a frequent topic of discussion at these meetings in Texas. . . .

---

[2] On May 24, 2019, with the Court's permission, lead plaintiff in the Securities Class Action filed a Second Consolidated Amended Class Action Complaint ("SAC") to add an additional plaintiff. The SAC is otherwise substantively identical to the FAC.

The First Amended Complaint . . . contains **specific and strong circumstantial evidence of conscious misbehavior or recklessness by Murry. For instance, Plaintiff alleges that Murry was privy to and participated in the creation, development and reporting of AOI's financial condition. Murry's statements admit that he had active involvement in AOI's manufacturing capabilities and Amazon's forecasts and sales. The First Amended Complaint alleges that AOI's yield and quality issues were widely known and discussed among AOI senior officials. Amazon was also AOI's largest customer during the Class Period contributing over 50% of AOI's revenue immediately prior to and during the Class Period.** Plaintiff alleges that although Amazon had decreasing forecasted purchases of transceivers, Murry delayed in disclosing this information to investors. "The Fifth Circuit has held that material misstatements as to a company's most significant asset can give rise to a strong inference that those misstatements were made with knowledge of their falsity or severe recklessness in not knowing that they were false."

*Id.* at 26-28 (internal citations omitted, and emphasis added).

18.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

19.     Separate and apart from the aforementioned misconduct, the Individual Defendants also breached their fiduciary duties by, *inter alia*, falsely assuring the investing public in SEC filings, on the Company's website, and in corporate governance documents, that AOI is committed to workforce diversity—including with respect to board composition and selection as described herein, while acting in opposition to those statements.

20.      Only half a century ago, almost every single board of directors in America was solely comprised of Caucasian males. Since, most corporations have made gradual but steady progress to inculcate more diverse representation on their boards and within their executive management teams.

21.     In a recent post, published by *Calvert Research and Management* following civil unrest that coincided the killing of George Floyd, among others, John Streur stated the following, in relevant part:

We are a country suffering from racial inequality. And we want the inequality and suffering to end.

Enough people agree with these points that this issue has become a matter that will impact every corporation doing business in this country. Companies that are capable of understanding their roles in taking effective action to end inequality will benefit operationally and reputationally; those that refuse to acknowledge their exposure to this massive problem or that are incapable of swift and effective action will struggle to maintain their competitive positions as employers and with consumers.

22.    As a tech Company, AOI's responsibility to engage and address the lack of diversity in its Company leadership is especially important. Recently, the tech industry had received increased criticism for "the number of women and racial minorities in its workforce, as those totals remain significantly lower than in the overall U.S. workforce."[3] Tech companies— particularly those in Texas, where AOI is headquartered, have been taking measures over the past few years in response to these criticisms. In 2018, Chief Diversity Officer at Dell Technologies, Brian Reaves, stated in an interview: "I view this topic and what we're doing as important to the future business success of the company as anything we'll do technologically . . . . It's not something that's nice to do. It's really something one must do."

23.    Notwithstanding this societal imperative, while other companies have been dedicated to achieving a significant increase in diversity within their highest ranks, the Individual Defendants have caused AOI to violate federal and state laws regarding diversity and discrimination by repeatedly refusing to nominate, appoint, and/or hire Black individuals or other underrepresented minorities to the Board or AOI's executive management team (the "Discriminatory Misconduct"). Ironically, AOI holds itself out to be "committed to providing

---

[3]  https://www.statesman.com/news/20180827/tech-firms-said-they-wanted-to-improve-diversity-have-they-. Last visited December 4, 2020.

Verified Shareholder Derivative Complaint

equal opportunity in all of our employment practices[.]" Yet, *zero* Black individuals reside on the Company's Board or work on the Company's executive management team.

24.     As a result of this action having been initiated, AOI has made a translucent and feigned attempt to make good on its representations to create a diverse and inclusive corporate culture and leadership structure in order to placate its shareholders and mitigate the potential fallout from mounting social and market pressures[4] by just recently adding Elizabeth Loboa ("Loboa") to the Board. However, not only was the Board insufficiently diverse when this action was commenced, but the appointment of Loboa, although indeed a small step in the right direction, does not suffice since the Board continues to lack adequate diversity as it has *zero* Black individuals or other underrepresented minority individuals.

25.     Additionally, the Individual Defendants have attempted to save face by incorporating a few sentences in AOI's recent proxy statements related to diversity on the Board, in which the Company purports to consider diversity of "background" and "other demographic factors" as relevant factors in identifying nominees to serve on its Board. AOI's most recent proxy statements further profess that the Board has been "considering what approach to take" regarding diversity. However, contrary to the foregoing and in violation of the Company's stated commitment to providing a workplace that is "free of … unlawful discrimination" and certain federal and state laws, the Individual Defendants have caused the Company to make insufficient efforts to promote diversity on its Board and among its senior executives. In fact, the word "diversity" barely appears in the Company's SEC filings, website, and governance documents unless it is being used to refer to the Company's customer base.

---

[4]https://www.cnn.com/2020/12/01/investing/nasdaq-rule-board-of-directors-diversity/index.html. Last visited December 8, 2020.

Verified Shareholder Derivative Complaint

26.     Thus, in further breach of their fiduciary duties, the Individual Defendants permitted the Discriminatory Misconduct, engaged in and caused the Company to engage in the Discriminatory Misconduct, and continuously failed to maintain adequate controls.

27.     Moreover, the Individual Defendants have deceived investors by claiming to abide by certain antidiscrimination policies. By engaging in the Discriminatory Misconduct, the Individual Defendants have breached their duty of candor and have also violated the federal securities laws.

28.     Not only is the Discriminatory Misconduct immoral and illegal, it is also against the best interest of the Company, since the companies with the most ethnically or culturally diverse boards worldwide are 43% more likely to experience higher profits, according to a 2018 McKinsey & Company report.[5]

29.     The Individual Defendants also caused the Company to violate Section 14(a) of the Exchange Act, as the 2018, 2019, and 2020 Proxy Statements (defined below) were false and misleading for failing to disclose, *inter alia*, that: (1) the Company had engaged in the Discriminatory Misconduct; (2) the Company does not have term limits due to a desire to keep Black and other underrepresented individuals off of the Board; (3) the Company's Nominating and Corporate Governance Committee did not actually consider diversity of "background" and "other demographic factors" including racial and gender diversity when nominating Board candidates; and (4) the Company failed to maintain adequate internal controls.

30.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the

---

[5] https://www.mckinsey.com/~/media/mckinsey/business%20functions/organization/our%20insights/delivering%20through%20diversity/delivering-through-diversity_full-report.ashx, p.14. Last visited December 8, 2020.

Verified Shareholder Derivative Complaint

substantial likelihood of the directors' liability in this derivative action, the substantial likelihood of the Company CEO's and CFO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested or independent directors, a majority of the AOI Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

31.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

32.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

33.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

34.     Venue is proper in this District because AOI is located in this District.  Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiffs

35.     Plaintiff Jin is a current shareholder of AOI. Plaintiff Jin has continuously held AOI common stock at all relevant times.

36.     Plaintiff Ng is a current shareholder of AOI. Plaintiff Ng has continuously held AOI common stock at all relevant times.

**Nominal Defendant AOI**

37.     AOI is a Delaware corporation with its principal executive offices at 13139 Jess Pirtle Blvd., Sugar Land, Texas 77478. AOI's shares trade on the NASDAQ under the ticker symbol "AAOI."

**Defendant T. Lin**

38.     Defendant T. Lin is the founder of the Company and has served as its President and CEO since its inception.  He has also served as Chairman of the Board since January 2014. According to the Company's Schedule 14A filed with the SEC on April 24, 2020 (the "2020 Proxy Statement"), as of April 9, 2020, Defendant T. Lin beneficially owned 745,150 shares of the Company's common stock, which represented 3.64% of the Company's total common stock. Given the price per share of the Company's common stock at the close of trading on April 9, 2020 was $7.76, T. Lin owned approximately $5.8 million worth of AOI common stock.

39.     For the fiscal year ended December 31, 2018, Defendant T. Lin received $4,705,496 in compensation from the Company.  This included $533,333 in salary, a $338,869 bonus, $3,809,880 in stock awards, and $23,414 in all other compensation. For the fiscal year ended December 31, 2017, Defendant T. Lin received $5,407,716 in compensation from the Company.  This included $453,342 in salary, a $404,332 bonus, $4,508,400 in stock awards, and $41,641 in all other compensation.

40.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant T. Lin made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price ($) | Proceeds |
|---|---|---|---|
| May 12, 2017 | 8,586 | 66.00 | $566,676 |
| November 16, 2017 | 1,300 | 45.30 | $58,890 |
| November 20, 2017 | 2,300 | 45.20 | $103,960 |

41.     Thus, in total, before the fraud was exposed, he sold 12,186 Company shares on inside information, for which he received $729,526. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

42.     The Company's 2020 Proxy Statement stated the following about Defendant Lin:

*Chih-Hsiang (Thompson) Lin, Ph.D.*, founded Applied Optoelectronics, Inc. in February 1997 and has served as President and Chief Executive Officer since our inception. He currently serves as the Chairman of our Board, a position he has held since January 2014. He has served as a director on our Board since 1997, and he served as Chairman of our Board from May 2000 through September 2002, and again from June 2008 through October 2009. Since May 2015, Dr. Lin has served on the University of Missouri's Chancellor's Advisory Group and since November 2016 he has served as a chair on the University of Missouri's Industrial Advisory Board for the College of Engineering. Dr. Lin also served as a research associate professor from 1998 to 2000 and as a senior research scientist from 1994 to 1998 at the University of Houston. Dr. Lin holds a BS degree in Nuclear Engineering from National Tsing Hua University in Taiwan and a MS degree and a Ph.D. in Electrical and Computer Engineering from University of Missouri—Columbia. The Board believes that Dr. Lin is qualified to serve as a director based on his extensive background in business management, technological expertise, his role as founder, President and Chief Executive Officer and his years of service on our Board.

### **Defendant Murry**

43.     Defendant Murry has served as the Company's CFO since August 2014.  According to the Company's 2020 Proxy Statement, as of April 9, 2020, Defendant Murry beneficially owned 44,199 shares of the Company's common stock.  Given the price per share of the Company's common stock at the close of trading on April 9, 2020 was $7.76, Murry owned over $342,984 worth of AOI common stock.

44.     For the fiscal year ended December 31, 2018, Defendant Murry received $1,213,923 in compensation from the Company.  This included $331,361 in salary, a $136,921 bonus, $732,566 in stock awards, and $13,075 in all other compensation. For the fiscal year ended

December 31, 2017, Defendant Murry received $1,410,919 in compensation from the Company. This included $292,553 in salary, a $148,022 bonus, $939,250 in stock awards, and $31,094 in all other compensation.

45.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Murry made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price ($) | Proceeds |
|---|---|---|---|
| March 13, 2017 | 1,000 | 50.95 | $50,950 |
| May 18, 2017 | 3,168 | 63.51 | $201,200 |
| August 15, 2017 | 3,050 | 70.21 | $214,141 |

46.     Thus, in total, before the fraud was exposed, he sold 7,218 Company shares on inside information, for which he received over $466,289.  His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

47.     The Company's 2020 Proxy Statement stated the following about Defendant Murry:

> *Stefan J. Murry, Ph.D.*, has served as our Chief Financial Officer since August 2014. Previously, Dr. Murry served as our Chief Strategy Officer from December 2012, our Vice President of Sales and Marketing from June 2004 until December 2012, our Director of Sales and Marketing from January 2000 to June 2004 and as a Senior Engineer of Device Packaging from February 1997 to January 2000. He also previously served as Research Associate from 1991 to 1999 and Mission Control Specialist from 1992 to 1997 with the Space Vacuum Epitaxy Center in Houston, Texas. Dr. Murry has been issued multiple patents in the optoelectronics industry, as well as in various related and complimentary industries. Dr. Murry received BS and MS degrees in Physics and a Ph.D. in Electrical Engineering from the University of Houston.

**Defendant Yeh**

Defendant William H. Yeh ("Yeh") has served as a Company director since May 2000.  He also serves as lead independent director, Chairman of the Compensation Committee, and a member

of the Nominating and Corporate Governance Committee.  According to the Company's 2020 Proxy Statement, as of April 9, 2020, Defendant Yeh beneficially owned 67,744 shares of the Company's common stock.  Given the price per share of the Company's common stock at the close of trading on April 9, 2020 was $7.76, Yeh owned over $525,693 worth of AOI common stock.

48.    For the fiscal year ended December 31, 2018, Defendant Yeh received $169,655 in compensation from the Company.  This included $54,677 in fees earned or cash paid and $114,988 in stock awards. For the fiscal year ended December 31, 2017, Defendant Yeh received $130,000 in compensation from the Company.  This included $50,000 in fees earned or cash paid and $80,000 in stock awards.

49.    During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Yeh made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price ($) | Proceeds |
|---|---|---|---|
| February 28, 2017 | 37,664 | 47.15 | $1,775,858 |
| May 31, 2017 | 20,000 | 71.16 | $1,423,200 |
| June 2, 2017 | 10,000 | 74.06 | $740,600 |

50.    Thus, in total, before the fraud was exposed, he sold 67,664 Company shares on inside information, for which he received over $3.9 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

51.    The Company's 2020 Proxy Statement stated the following about Defendant Yeh:

*William H. Yeh* has served as a director on our Board of Directors since May 2000. Since 1997, he has served as the Chief Executive Officer and President of Golden Star Management, Inc., a real estate investment and management company. Since 2005, he has served as President of Pearlyeh Investments Inc., a real estate development and investment company. Since 2014, he has served as president of Stonemetal Capital, LLC, an equity financial company and as president of Pearl Yeh Charitable Foundation LLC, a charitable foundation focused on cultural

exchange and education programs. He served as the Vice Chairman of Central Bancorp, Inc. (the holding company of United Central Bank, now Hanmi Bank) from 1997 to 2014. He served as an Advisor of Hanmi Bank for the Texas region from 2014 to 2019. Mr. Yeh received a BS degree from National Cheng Kung University in Taiwan and a MS degree from University of Houston—Clear Lake. The Board believes that Mr. Yeh is qualified to serve as a director based on his business and financial management and leadership experience and his years of service on our Board.

**Defendant Ignatiev**

Defendant Alex Ignatiev ("Ignatiev") has served as a Company director since February 2013. He also serves as a member of the Audit Committee. According to the Company's 2020 Proxy Statement, as of April 9, 2020, Defendant Ignatiev beneficially owned 39,496 shares of the Company's common stock. Given the price per share of the Company's common stock at the close of trading on April 9, 2020 was $7.76, Ignatiev owned nearly $306,489 worth of AOI common stock.

52. For the fiscal year ended December 31, 2018, Defendant Ignatiev received $161,721 in compensation from the Company. This included $46,733 in fees earned or cash paid and $114,988 in stock awards. For the fiscal year ended December 31, 2017, Defendant Ignatiev received $123,000 in compensation from the Company. This included $43,000 in fees earned or cash paid and $80,000 in stock awards.

53. The Company's 2020 Proxy Statement stated the following about Defendant Ignatiev:

*Alex Ignatiev, Ph.D.*, has served as a director on our Board since February 2013, and previously served as a director on our Board of directors from June 2008 to October 2009 and from May 2001 to August 2002. Since May 2002, he has served as the Chief Technology Officer and Chief Science Officer of Metal Oxide Technologies, LLC, which develops, manufactures and sells superconducting wire. Since February 2006, he has served as a vice president and Chief Technology Officer at Nano EnerTex, Inc., a nanomaterials company. Since February 2009, he has served as the Chief Technology Officer of Quarius Technologies, LP, a renewable energy company. Since December 2017, he has also served as Chief

Technology Officer of Lunar Resources, Inc., which develops functional thin materials in the vacuum of space. From 2005 until 2017 he served as a director of the Center for Advanced Materials at the University of Houston and has served since 2010 as the Hugh Roy and Lillie Cranz Cullen professor of physics, chemistry and electrical and computer engineering at the University of Houston. Dr. Ignatiev is now Emeritus Professor of Physics at the University of Houston. From March 2013 to September 2015, Dr. Ignatiev served as the Chief Science Officer of Smart Grid Intelligent Management, Inc., which develops operating systems and alternative energy source integration. Dr. Ignatiev also has been elected to the International Academy of Astronautics and to the Kazakhstan National Academy of Sciences, and was awarded Russian American of the Year in 2015. Dr. Ignatiev received a Ph.D. in Materials Science from Cornell University. The Board believes that Dr. Ignatiev is qualified to serve as a director based on his business management experience, broad technology knowledge and industry experience and his past service on our Board.

**Defendant Black**

Defendant Richard B. Black ("Black") has served as a Company director since August 2001.  He also serves as Chairman of the Audit Committee and as a member of the Nominating and Corporate Governance Committee.  According to the Company's 2020 Proxy Statement, as of April 9, 2020, Defendant Black beneficially owned 57,981 shares of the Company's common stock.  Given the price per share of the Company's common stock at the close of trading on April 9, 2020 was $7.76, Black owned approximately $449,933 worth of AOI common stock.

54.     For the fiscal year ended December 31, 2018, Defendant Black received $175,344 in compensation from the Company.  This included $60,356 in fees earned or cash paid and $114,988 in stock awards. For the fiscal year ended December 31, 2017, Defendant Black received $136,000 in compensation from the Company.  This included $56,000 in fees earned or cash paid and $80,000 in stock awards.

55.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Black made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price ($) | Proceeds |
|---|---|---|---|
| April 6, 2017 | 1000 | 44.76 | $44,760 |
| May 11, 2017 | 1000 | 64.37 | $64,370 |
| June 8, 2017 | 1000 | 71.73 | $71,730 |
| July 6, 2017 | 1000 | 59.70 | $59,700 |
| August 10, 2017 | 1000 | 66.10 | $66,100 |
| September 7, 2017 | 1000 | 58.52 | $58,520 |
| October 12, 2017 | 1000 | 60.62 | $60,620 |
| November 9, 2017 | 1000 | 43.00 | $43,000 |
| December 7, 2017 | 1000 | 40.43 | $40,430 |
| January 11, 2018 | 1000 | 35.37 | $35,370 |

56.     Thus, in total, before the fraud was exposed, he sold 10,000 Company shares on inside information, for which he received $544,600. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

57.     The Company's 2020 Proxy Statement stated the following about Defendant Black:

*Richard B. Black* has served as a director on our Board since August 2001. Since 1983, he has served as the Chairman and Chief Executive Officer of ECRM, Incorporated, a worldwide supplier of laser based imaging equipment. From 2014 to 2017, he also served as President and Chief Executive Officer and a director of CRON-ECRM LLC, a worldwide supplier of laser based imaging equipment. Mr. Black served as a director and Chairman of the audit committee of Alliance Fiber Optics Products, Inc. (NASDAQ: AFOP) from 2002 until its acquisition by Corning in 2016. He serves as a director of TREX Enterprises, Inc., a defense technology company, a position he has held since 2000. Mr. Black has served as trustee of the Institute for Advanced Study at Princeton since 1990, and became its Vice Chairman in 2006, and Trustee Emeritus since 2012. He has served as a trustee of the American Indian College Fund, Beloit College, and Bard College. At the University of Chicago, he serves on the Dean's Council for the Physical Sciences Division and on the Board of Governors of the University's Smart Museum of Art. Mr. Black received a BS degree in Engineering from Texas A&M University, an MBA from Harvard University and an honorary Ph.D. from Beloit College. The Board believes that Mr. Black is qualified to serve as a director based on his extensive business and financial management and leadership experience, and his service on other private company and publicly-held company's boards of directors as both a chief executive officer and chairman of the audit committee. He brings to the Board expertise in the fields of accounting and internal controls.

**Defendant Chen**

58.     Defendant Min-Chu Chen ("Chen") has served as a Company director since February 2013.  He also serves as Chairman of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee.  According to the Company's 2020 Proxy Statement, as of April 9, 2020, Defendant Chen beneficially owned 51,850 shares of the Company's common stock.  Given the price per share of the Company's common stock at the close of trading on April 9, 2020 was $7.76, Chen owned over $402,356 worth of AOI common stock.

59.     For the fiscal year ended December 31, 2018, Defendant Chen received $167,344 in compensation from the Company.  This included $52,356 in fees earned or cash paid and $114,988 in stock awards. For the fiscal year ended December 31, 2017, Defendant Chen received $128,000 in compensation from the Company.  This included $48,000 in fees earned or cash paid and $80,000 in stock awards.

60.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Chen made the following sale of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price ($) | Proceeds |
|---|---|---|---|
| March 3, 2017 | 5,000 | 52.00 | $260,000 |

61.     His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

62.     The Company's 2020 Proxy Statement stated the following about Defendant Chen:

*Min-Chu (Mike) Chen, Ph.D.*, has served as a director on our Board since February 2013. Since 2001, he has been a partner and member of the board of directors of EverRich Capital Inc., a financial consulting company. Since 2003, he has served as a director of Seth Nanotechnology Inc., a nanotechnology patent portfolio company owning more than 10 patents in fullerene derivatives and related

application technologies. Since May 2010, he has served as executive director of C&C International Services, Inc., a petrochemical equipment services and marketing company. Since November 2011, he has served as the Asia Pacific Director for U.S. Flow Control Group Pte. Ltd., a petroleum equipment manufacturer and services company. Since January 2012, he has served as an executive director of FGel Nanotek, Inc., a food and beverage additive company based on nanotechnology. Since April 2014, he has served as a director of Harbin NeoTek Medical Devices Co., Ltd. Since September 2016, he has served as Vice Chairman of the board of directors of Shandong SicerKline Advanced Material Co., Ltd., a surface-etched silicon carbide and alumina mini-whisker manufacturing plant for ceramic applications. Since 2018, he has served as executive director of EABO Information Technology (Shanghai), Co. Ltd. From September 2008 to April 2010, Dr. Chen served as the Chief Executive Officer of SilverPAC, Inc., a consumer electronics business, and from March 1994 to June 2002, Dr. Chen served as a board member of PCTEL, Inc. (NASDAQ: PCTI). Dr. Chen received a Ph.D. in Ocean Engineering from Oregon State University. The Board believes that Dr. Chen is qualified to serve as a director based on his business management experience, his service on other private company boards of directors and his prior service on the board of a publicly-held company.

### Defendant Moore

63.     Defendant Alan Moore ("Moore") served as a Company director from March 2013 until he resigned on June 4, 2020.  According to the Company's 2020 Proxy Statement, as of April 9, 2020, Defendant Moore beneficially owned 261,519 shares of the Company's common stock, which represented 1.29% of the Company's outstanding common stock.  Given the price per share of the Company's common stock at the close of trading on April 9, 2020 was $7.76, Moore owned over $2.0 million worth of AOI common stock.

64.     For the fiscal year ended December 31, 2018, Defendant Moore received $161,721 in compensation from the Company.  This included $46,733 in fees earned or cash paid and $114,988 in stock awards. For the fiscal year ended December 31, 2017, Defendant Moore received $123,000 in compensation from the Company.  This included $43,000 in fees earned or cash paid and $80,000 in stock awards.

65.     The Company's 2020 Proxy Statement stated the following about Defendant Moore:

> *Alan Moore* has served as a director on our Board since March 2013 and is not standing for re-election in 2020. Since 1995, he has served as the President of Red Oak Capital, a private equity venture capital company. From 2007 to December 2017, Mr. Moore served as a Manager of Silver Tree Fund II Management, LLC, a real estate investment fund. From 1999 to 2016, Mr. Moore co-founded and served as the Treasurer of Silver Tree Partners, Inc., a real estate development and investment company. From March 1998 to October 1999, Mr. Moore served as the Chief Financial Officer of Window on Wall Street (sold to Trade Station Group, Inc. in 1999). Previously, Mr. Moore was a co-founder and served as the Chief Financial Officer of Fossil, Inc. from 1985 to 1995 (NASDAQ: FOSL). Mr. Moore received a MS degree in Accounting and a BA degree in Business Control Systems from the University of North Texas. The Board believes that Mr. Moore is qualified to serve as a director based on his extensive background in business and financial management and his role as co-founder of a publicly held company.

### Defendant C. Lin

66.     Defendant Che-Wei Lin ("C. Lin") has served as a Company director since January 2014.  He also serves as a member of the Compensation Committee.  According to the Company's 2020 Proxy Statement, as of April 9, 2020, Defendant C. Lin beneficially owned 56,538 shares of the Company's common stock.  Given the price per share of the Company's common stock at the close of trading on April 9, 2020 was $7.76, C. Lin owned approximately $438,735 worth of AOI common stock.

67.     For the fiscal year ended December 31, 2018, Defendant C. Lin received $158,721 in compensation from the Company.  This included $43,733 in fees earned or cash paid and $114,988 in stock awards. For the fiscal year ended December 31, 2017, Defendant C. Lin received $120,000 in compensation from the Company.  This included $40,000 in fees earned or cash paid and $80,000 in stock awards.

68.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant C. Lin made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price ($) | Proceeds |
|---|---|---|---|
| May 10, 2017 | 9,700 | 63.45 | $615,465 |
| May 11, 2017 | 5,300 | 65.00 | $344,500 |
| May 12, 2017 | 7,500 | 67.00 | $502,500 |
| May 18, 2017 | 7,500 | 64.00 | $480,000 |
| September 11, 2017 | 7,000 | 58.00 | $406,000 |

69.     Thus, in total, before the fraud was exposed, he sold 37,000 Company shares on inside information, for which he received over $2.3 million.  His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

70.     The Company's 2020 Proxy Statement stated the following about Defendant C. Lin:

> *Che-Wei Lin* has served as a director on our Board since January 2014, and previously served as a director on our Board from December 2006 to October 2009. Since November 2007, Mr. Lin has served as the President of ASMedia Technology Inc., a chipset manufacturer. Since November 2009, Mr. Lin has also served as the Corporate Vice President of the Motherboard Business Unit of the Open Platform Business Group of ASUSTek Computer Inc., a computer hardware and electronics company. Mr. Lin was employed at VIA Technologies, Inc., a manufacturer of integrated circuits and motherboard chipsets, from 1993 to 2007 in various positions, including President of the Desktop Platform Business Unit, Vice President of the System Platform Division and Vice President of OEM and Chipset Product Marketing. Mr. Lin received a BS in Electrical Engineering from Fu Jen University in Taiwan and a MS in Electrical Engineering from the University of Missouri. The Board believes that Mr. Lin is qualified to serve as a director based on his business and financial management and leadership experience and his years of service on our Board.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

71.     By reason of their positions as officers, directors, and/or fiduciaries of AOI and because of their ability to control the business and corporate affairs of AOI, the Individual

Defendants owed AOI and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage AOI in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of AOI and its shareholders so as to benefit all shareholders equally.

72.     Each director and officer of the Company owes to AOI and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

73.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of AOI, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

74.     To discharge their duties, the officers and directors of AOI were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

75.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of AOI, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company

has been ratified by the remaining Individual Defendants who collectively comprised AOI's Board at all relevant times.

76.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this consolidated amended complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

77.     To discharge their duties, the officers and directors of AOI were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of AOI were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Texas, Delaware, and the United States, and pursuant to AOI's own Code of Business Conduct and Ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how AOI conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of AOI and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that AOI's operations would comply with all applicable laws and AOI's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

78.     Each of the Individual Defendants further owed to AOI and the shareholders the duty of loyalty requiring that each favor AOI's interest and that of its shareholders over their own

while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

79.     At all times relevant hereto, the Individual Defendants were the agents of each other and of AOI and were at all times acting within the course and scope of such agency.

80.     Because of their advisory, executive, managerial, and directorial positions with AOI, each of the Individual Defendants had access to adverse, non-public information about the Company.

81.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by AOI.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

82.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

83.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price while several Individual Defendants engaged in insider trading.

84.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material

facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of AOI was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

85.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

86.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of AOI, and was at all times acting within the course and scope of such agency.

## AOI'S CODE OF BUSINESS CONDUCT AND ETHICS AND GOVERNANCE

### Code of Conduct

87.     AOI's Code of Business Conduct and Ethics (the "Code of Conduct") provides that it "applies to all Company employees, officers, consultants and members of the Board of Directors."

88.     The Code of Conduct provides, as to "Compliance with Company Policies, Laws, Rules and Regulations," that:

> ***All employees, officers and directors are required to comply with Company policies, the laws, rules and regulations of the U.S.*** and other countries, and the

states, counties, cities and other jurisdictions, in which the Company conducts its business or the laws, rules and regulations of which are applicable to the Company, *including, without limitation, all prohibitions on "insider trading" and trading while in possession of material non-public information applicable to the Company and its employees, officers, directors and consultants*. For more information, please see the various Company policies located on the Company Intranet with a particular focus on the Employee Policy Handbook (including, but not limited to, Operating Policies and Employment Policies) and Forms and Policies (including, but not limited to, Insider Trading Policy and Disclosure Policy).

The Company's operations are subject to laws and regulations both in the United States and in foreign countries. *Our core values demand that we ensure diligent adherence to the requirements of all applicable laws, rules and regulations. Significant areas of law that could be applicable to the activities of the Company include, but are not limited to* (i) import/export controls; (ii) patent and trademarks laws; (iii) anti-trust laws governing free and open competition; (iv) health, safety and environmental laws; and (v) *federal securities laws*.

(Emphasis added.)

89.     The Code of Conduct provides, as to "Full, Fair and Accurate Disclosure in Public

Filings and Communications," that:

*The Company's commitment to its stockholders demands that we provide full, fair, accurate, timely and understandable disclosure in the reports, documents and communications filed with the Securities and Exchange Commission and in other public communications*. Although certain personnel are more directly involved in the preparation of such reports, documents and communications than others, the Company expects all members of our community to accept this responsibility to our stockholders. Accordingly, all employees, officers, directors and consultants have an ethical responsibility to provide prompt, complete and accurate information in response to inquiries related to preparation of the Company's public disclosure documents and public communications. In addition and in order to ensure accurate financial reporting to our stockholders, those personnel who participate in the maintenance and preparation of the Company's books, records and accounts must ensure that the transactions and events recorded therein are done so in an accurate and complete manner in compliance with required accounting principles and Company policies.

(Emphasis added.)

**Corporate Social Responsibility Policy & Responsible Business Alliance's Code of Conduct**

90.      As stated on the Company's website,[6] AOI is committed to the "highest standards of integrity, ethical conduct and corporate governance."

91.      As stated on the Company's website,[7] AOI's commitment to "Corporate Social Responsibility" includes a "[c]ommitment to continuous improvement." Additionally, the Company's website states that "AOI's policy represents a statement of our commitment to [Corporate Social Responsibility] that is based on and consistent with the Responsible Business Alliance (RBA), formerly known as the Electronic Industry Citizenship Coalition (EICC), Code of Conduct" (the "CSR Policy"). The Responsible Business Alliance's Code of Conduct (the "RBA Code") establishes standards to ensure that "workers are treated with respect and dignity" and that business operations are "conducted ethically." Moreover, the RBA Code states that participants are committed to "treat [workers] with dignity and respect[.]"

92.      In a section titled "Non-Discrimination," the Responsible Business Alliance's Code of Conduct provides, in relevant part, that "Participants should be committed to a workforce free of harassment and unlawful discrimination. Companies shall not engage in discrimination based on race, color, age, gender, sexual orientation, gender identity and expression, ethnicity, or national origin…"

**Nominating and Corporate Governance Committee Charter**

93.      AOI's Nominating and Corporate Governance Committee Charter of the Board provides that the purpose of the Nominating and Corporate Governance Committee is to:

> [F]ocus on the issues surrounding the composition, practices and operation of the Board and to review and make recommendations to the Board on matters

---

[6] http://investors.ao-inc.com/corporate-governance. Last visited December 8, 2020.
[7] http://ao-inc.com/about-our-company/global-compliance. Last visited December 8, 2020.

concerning corporate governance; Board composition; identification, evaluation and nomination of director candidates; Board committees; Board compensation and conflicts of interest.

94.     The Nominating and Corporate Governance Committee Charter further provides that the committee's responsibilities include, "[m]ake recommendations to the Board regarding all nominees for Board membership, whether for the slate of director nominees to be proposed by the Board to the stockholders or any director nominees to be elected by the Board to fill interim director vacancies," "[c]onsider director candidates submitted by stockholders and determine the procedure to be followed by stockholders in submitting such recommendations," "[r]eview issues and developments related to corporate governance matters and recommend corporate governance standards to the Board," "[r]eview annually the effectiveness of the operation of the Board and Board committees, including the corporate governance and operating practices," and "[r]eview the disclosure included in the [Company's] proxy statement regarding the [Company's] nomination process."

95.     In violation of the Code of Conduct, the Nominating and Corporate Governance Committee Charter, the Company's CSR Policy, and the RBA Code, the Individual Defendants engaged in or permitted the Discriminatory Misconduct and conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of Section 14(a) of the Exchange Act.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

96.     AOI holds itself out as the leading, vertically integrated provider of fiber-optic networking products.  The Company designs and manufactures at varying levels of integration—

from components, subassemblies and modules, to complete turn-key equipment.  The Company

states that as a result of its vertically integrated manufacturing model, the Company has advantages

in rapid product development, response to customer requests, and control of manufacturing costs

and product quality.

97.    AOI operates manufacturing facilities in Sugar Land, Texas, Taipei, Taiwan, and

Ningbo, China.

98.    The Company's primary end-markets are internet data center, telecommunications,

cable television, and fiber-to-home.  AOI's most established market is the cable television market,

to which the Company supplies transceivers, lasers, and transmitters.  The Company's fastest and

largest growing market is the internet data center market, for which the Company provides

products to large internet-based data ("hyperscale") center operators.

99.    Sales in each of the Company's primary end-markets are driven by increasing

demand of bandwidth as a result of the growth of network-connected devices, cloud computing,

online social networking, and video traffic.  For the Company's customers to provide higher

bandwidth to their own customers, they must improve the infrastructure of their networks—

including specifically updating and improving the speeds of the equipment that transmit

information.

100.    In 2016 and 2017, the internet data center end-market represented over 77% and

80%, respectively, of the Company's revenues, making it the Company's largest end-market.

101.    The transmitters and receivers used in fiber optic communication systems are

typically contained in a single component called the transceiver. The Company's internet data

center market business is essentially dependent on the sales of optical transceivers to Amazon,

Facebook, and Microsoft—its largest three internet data center customers prior to and during the

Verified Shareholder Derivative Complaint

Initial Relevant Period.  AOI's sales to these three companies consisted almost wholly of optical transceivers.

102.    The Company's transceivers are plugged into computer servers and switches within hyperscale data centers that store, process, and communicate gargantuan amounts of data.  The data from hyperscale data centers is transmitted through network connections to internet service providers, and then to individual digital devices.   The majority of the Company's optical transceivers utilize AOI's own lasers and subassemblies.

103.    The transmission speed of optical transceivers limits the speed at which a data center can communicate information.  Thus, data centers have sought faster, more energy-efficient, and smaller transceivers.   In 2013, transceivers that were able to transmit data at 1G were considered cutting-edge.  By 2015, 40G transceivers had almost completely superseded both 1G and 10G transceivers, and by late 2015, the market was introduced to 100G transceivers, albeit in limited supply.  Demand for 40G devices continued, however, and the majority of the Company's internet data center sales in 2016 were for 40G transceivers.  Customer interest had increasingly shifted by the beginning of the Initial Relevant Period to the newly developed 100G transceivers.

104.    Each type of transceiver must be compatible with customers' existing equipment and structure.  As a result, the Company's products go through a "qualification process" for many of the Company's customers, which typically involves sampling of the product and reliability testing, in addition to collaboration with the engineering and product management teams in the design and manufacturing stages.  Customers that are new for the Company can also audit the Company's manufacturing facilities and perform additional evaluations.  As the market shifted from 40G to faster 100G transceivers, AOI repeatedly maintained that its vertical integration and

clear insight into its customer's needs, would just as seamlessly allow it to transition its manufacturing to meet the changing market demands.

105.    However, a number of statements made by two former Company employees cited to in the FAC and in the Securities Class Action Order indicate that prior to and continuing throughout the Initial Relevant Period, AOI suffered from supply chain issues that caused the Company to have difficulty accommodating large-scale production of an expanding array of products for its customers' increasing demand.

106.    One of these former Company employees, an engineer who worked at AOI from before the start of the Initial Relevant Period through mid-2017 ("CW 1"), and who was involved in the development of optical modules and transceivers, among other things, claimed that in 2015 or 2016, the Company was experiencing significant difficulties in meeting desired yield rates for its 40G transceivers, which was a simpler process than transitioning to 100G transceivers.

107.    According to CW 1, by mid-2017, the Company was "desperate" to increase chip production for its transceivers. However, the difficulty in switching from the chips used to produce 40G transceivers to the chips used to produce 100G transceivers resulted in serious manufacturing delays, with the yield rate for 100G transceivers likely falling as low as 40%. *See* Securities Class Action Order at 6.

108.    CW 1 also indicated that the Company's senior management was well aware that AOI's quality control department was unable to conduct adequate quality assurance testing and troubleshooting for the faulty transceivers that customers returned to the Company. As a result, the Company's management delegated transceiver testing responsibilities to the Company's research and development engineers, who were not sufficiently equipped to conduct transceiver testing in addition to carrying out their other job responsibilities. According to CW 1, this policy

led to the Company's Taiwan facility sending a defective set of test transceivers to Amazon on at least one occasion.

109.     The other former Company employee, a sales executive who worked at AOI from May 2017 through October 2017 ("CW 2"), stated that pursuant to AOI's supply agreements with its customers, customers were required to send the Company their projected requirements for a given year "before the beginning of each year." These projections were logged in a companywide database, which would have been accessible by the Individual Defendants. CW 2 further noted that changes in customer orders and in customer demand were monitored and discussed on a weekly basis at the Company's Texas office, including by at least one employee, non-party Fred Chang ("Chang"), who reported directly to Defendant T. Lin. These facts indicate that the Company's senior executives were constantly monitoring all aspects of AOI's operations, and that the Individual Defendants had a clear picture of the upcoming demand for transceivers from customers.

110.     As the Company was facing issues meeting customer demand while maintaining low margins, it was known that the Company's customers were looking for 100G transceivers elsewhere. By May 2017, at least, it was or should have been clear to the Individual Defendants that the Company's large data center customers, including Amazon, were pursuing alternatives to the Company's optical transceivers. Such alternatives included using the "merchant model"—end-users directing the custom assembly of transceivers using parts from a variety of suppliers.

111.     During an August 3, 2017 earnings call, Defendant Murry stated, "we do have a significant amount of committed orders and a good forecast from all 3 of our [large data center] customers."  Thus, the Individual Defendants were aware what the purchase commitments were

Verified Shareholder Derivative Complaint

from its large internet data center customers for both 40G and 100G prior to the disclosures of sales drops that were eventually made by the Company.

112.    A supply agreement with Facebook released by the Company in a current report filed with the SEC on a Form 8-K on February 21, 2018 reveals the Company's contracting practices with its large internet data center customers and describes the Company's forecasting process. *See* Exhibit A, attached hereto. The 2018 Facebook supply agreement designates specific minimum purchase commitments and requires that Facebook provide "accurate 6 month rolling forecasts to [AOI], identifying . . . needs and delivery expectations on calendar quarter basis . . . ." Moreover, for the 2019 and 2020 calendar years, Facebook will provide "demand forecasts for the subsequent year . . . in third calendar quarter of the current" calendar year and "the parties will finalize the actual [calendar year] 2019 support and purchase commitment by" a future specified date.  Moreover, "Facebook will purchase the balance of committed demand at the end of each respective quarter at the unit price agreed for the shortfall quarter pursuant to" a table of negotiated quarterly prices for the product for 2018 with the exact amounts hidden.

113.    On a February 21, 2018 earnings call, Defendant Murry provided further insight into this type of contracting, stating, in relevant part:

> And I mentioned earlier and in the 8-K that it is a minimum commitment.  This is how we operate with some of our other customers as well in the sense that [the Company] typically gets a share oftentimes a leading share with our customers as sort of a minimum commitment.  But oftentimes, depending on what competitors can actually produce and ship in a given quarter, we may have opportunities to take additional share.

114.    As described in further detail herein, the Company faced competition from competitors who used the "merchant model."  One of the leaders in utilizing the "merchant model" to produce transceivers during the Initial Relevant Period was MACOM. In the summer of 2017, Needham & Co. analyst Alex Henderson reported that Fabrinet won a project to supply Amazon

with 100G optical transceivers produced by MACOM. Pursuant to Item 303 of Regulation S-K, the Individual Defendants had a duty to disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations[]" in the Management's Discussion and Analysis of Financial Condition and Results of Operations section in the Company's Form 10-Qs and 10-Ks filed with the SEC during the Initial Relevant Period. The Individual Defendants failed to disclose material information regarding, *inter*, Amazon's declining business with the Company, and problems the Company was experiencing with production and manufacturing—in spite of its vertical integration model, which contributed to its largest customer's shift to adopting the merchant model with competitors like MACOM and Fabrinet.

███████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████████

115.   ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████

116.   ███████████████████████████████████

███████████████████████████████████████████

Verified Shareholder Derivative Complaint

███████████████████████████████████████████████████████████

███████████████████████████████████████████ These documents,

and other SEC filings described herein ██████████████████████████

███████████████████████████████████████████████████████████

████████ and contained false and misleading statements as detailed below. ██████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████ Thus, throughout the Initial Relevant Period, the

Individual Defendants were apprised of the information ultimately published in the Company's

SEC filings and were involved in the preparation of the false and misleading statements therein.

Moreover, █████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████

117.   █████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████

118.   █████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

Verified Shareholder Derivative Complaint

119.

Verified Shareholder Derivative Complaint

120. ██████████████████████████████████████████████████████

121. ██████████████████████████████████████████████████████

Verified Shareholder Derivative Complaint

██████████████████████████████████████████████████

██████  ████  ██  ███  ████  █████  ██  █████  ███  ████  ███  ████  ██

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████

122.   ████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████

123.   ████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

Verified Shareholder Derivative Complaint

124. ██████████████████████████████████████████████

Verified Shareholder Derivative Complaint

125.

Verified Shareholder Derivative Complaint

126. ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████

127. ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███   ██████████████████████████████████████████
████████████████████████████████████████████████

Verified Shareholder Derivative Complaint

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

128.   ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

129.   ████████████████████████████████████████████

████████████████████████████████

130.   ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████ ██████ ███ ██████████ ████ █████████ ██████████ ████ ████████

Nevertheless, the Individual Defendants consistently framed AOI's manufacturing facilities in China and Taiwan as reliable components of its vertical integration model during and after the Initial Relevant Period. *See* 2016 10-K at 5 (defined below); Form 10-K filed with the SEC on February 28, 2018.

131.   ████████████████████████████████████████████

████████████████████████████████████████████████

Verified Shareholder Derivative Complaint

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

**Materially False and Misleading Statements About AOI's Manufacturing and Resultant Customer Demand Issued During the Initial Relevant Period**

*February 23, 2017 Press Release*

132.    On February 23, 2017, the Company issued a press release titled, "Applied Optoelectronics Reports Fourth Quarter and Year 2016 Results." The press release touted the Company's "record year," stating, in relevant part:

> "AOI achieved another record year driven by strong demand for our market-leading datacenter products and continued execution by the AOI team. We believe our record performance further demonstrates our growing market share in advanced optics and our team's ability to generate manufacturing efficiencies that lead to margin improvement," said Dr. Thompson Lin, Applied Optoelectronics, Inc. founder, president and CEO. "Our ability to internally manufacture lasers and light engines provides us with cost-leadership advantages, a faster time to market, and the ability to quickly scale to demand. Looking ahead, as the 100G transition accelerates this year, we see the opportunity to build on our momentum and expand our market leadership."[8]

*February 23, 2017 Earnings Call*

133.    On February 23, 2017, the Company held an earnings call to discuss its financial results for the fourth quarter and fiscal year ended December 31, 2016.  During the call, Defendant

---

[8] The Company alternatively refers to itself in its public filings and press releases as "AOI."

T. Lin commented on the competitive position of the Company in the 100G market, stating, in relevant part: "In 100G we further extended the gap between AOI and the competition.  Building upon our first-to-market advantage, we increased our 25G chip production by nearly 150% between January and December and expanded our customer footprint by earning a new large scale customer."

134.   Defendant Murry also discussed the Company's 40G to 100G market transition during the call, stating, in relevant part:

> [W]e believe we have many new opportunities ahead of us to drive further growth as datacenter operators transition to 100G and continue to expand their datacenters and upgrade their infrastructure to handle higher bandwidth needs.
>
> Our ability to internally manufacture lasers and light engines combined with our ability to quickly transition production between 40G and 100G products provides us with cost-leadership advantages, a faster time to market and the ability to quickly scale and adjust our throughput to meet growing demand.
>
> And lastly, the added capacity from our new fab in Sugar Land enables us to expand our avenues to market for 100G. For example, as we demonstrated with 40G, we were able to expand our share and ramp quickly to the demand of our hyper-scale operators.
>
> Based on our analysis, we believe we are now the leading supplier of 40G optics for hyper-scale datacenter operators and expect to maintain our leadership position as we continue the transition to 100G.

135.   During the call, Defendant Murry commented further on the Company's ability to manufacture all components of a transceiver "to meet demand," distinguishing the Company from its competitors.  He stated, in relevant part:

> And I think when you are in a situation where supply of some of those components may be constrained, or the overall industry capacity is not what is needed to meet the demand, if the company that has the ability to ramp up quickly by virtue of being integrated in their production like we are that it will do better I think than others. And honestly I think that that's the situation that we're in right now, and I think we've been able to start to prove out the value of that vertical integration strategy.

136.    In response to a question from an analyst from Piper Jaffray Companies regarding

the decline in demand for 40G transceivers, Defendant Murry assured that 100G demand would

make up for lost 40G sales due to AOI's vertical integration model, stating, in relevant part:

> That decline, really, we don't expect to be problematic because we can transition
> our manufacturing from 40G to 100G and it just gives us additional capacity on the
> 100G product. So I will say also that we don't really expect a sharp decline in 40G.

> I think others have maybe speculated that that decline was going to be swift. I think
> there's a lot of reasons why customers can't transition completely away from 40G
> in a short timeframe. So we expect it will be a gradual decline and that 100G will
> more than make up for that.

137.    Also during the call, Defendant Murry touted AOI's ability to efficiently move from

production of 40G products to 100G products, stating, in relevant part:

> I think we can't emphasize enough that the light engines, the manufacturing of the
> subassembly that includes the lasers and the rest of the optical components - -
> having our own in-house capability to do that and having a significant
> manufacturing infrastructure for that by virtue of the similarity between 100G and
> 40G modules really gives us an advantage in terms of being able to ramp that up
> quickly.

* * *

> Well, basically we're using the capacity that we have as we put it online. I think
> there's two ways of looking at it. There's capacity in terms of current equipment
> and manpower and we're constantly adding to that capacity. And so that's kind of
> a moving target. I think the bigger picture is that we spent, as you know, we spent
> heavily last year on new building infrastructure, particularly here in Sugar Land but
> also in our overseas operations as well.

> And that gives us an ability to have the physical infrastructure to put new equipment
> in to be able to continue that ramp. So on both those counts, I think we've been able
> to keep up with our customers' demand and actually I think we've been able to gain
> some incremental advantage over competitors who maybe didn't have that sort of
> latent capacity available to help customers when they saw a surge in demand.

138.    Defendant Murry also commented on demand and revenue for the Company's data

center segment, stating, in relevant part, during the call:

Verified Shareholder Derivative Complaint

Moving now to Q1. We expect Q1 revenue to be between $87 million and $91 million, representing 73% to 80% year-over-year growth. As we mentioned last quarter, we have fewer production days in Q1 as a result of the Chinese New Year holiday. However, strong customer demand for datacenter and solid execution by the AOI team will drive higher sequential datacenter revenue.

139.    During the call, Defendant Murry responded to a question from a Cowen and Company, LLC ("Cowen") analyst regarding the Company's visibility into its 100G customers, stating that he thought that the Company did have good visibility into its customers.  He stated, in relevant part:

So there's a couple of questions in there, I guess. The first one is, do we have good visibility into our customers? And I think the answer is yes. I think we continue to see ourselves and I believe our customers see us as a key partner, as they rollout these new technologies.

And so as a key and value partner for them, I think they're giving us the best visibility that they possibly can into their future needs. So I think we have good very visibility there across all of our major customers, including the new ones.

The other question that you had was related to what Troy was asking about too in terms of the 100G ramp up. What I could say is we're tracking as expected on the 100G. I think there's always hiccups in the plan from time to time, but overall the customers are basically purchasing what they led us to expect that they would purchase. And we feel comfortable with their plans for the future in terms of our capacity and our ability to meet their needs.

### March 9, 2017 Form 10-K

140.    On March 9, 2017, the Company filed its annual report on Form 10-K with the SEC for the fiscal quarter and year ended December 31, 2016 (the "2016 10-K"), signed by Defendants T. Lin, Murry, Yeh, Black, Ignatiev, Moore, Chen, and C. Lin.

141.    The 2016 10-K contained statements similar to those made in the Company's February 23, 2017 earnings call concerning the benefits of AOI's vertical integration, 100G transition, and customer visibility, including that a "key competitive strength[]" of the Company was its "[v]ertically integrated, geographically distributed manufacturing model."  The 2016 10-K

also noted that the Company "expect[s] continued sales of [the Company's] 40 Gbps and 100 Gbps products in 2017, and . . . expect[s] that sales of 100Gbps products will eventually exceed sales of 40 Gbps products."

142.    Attached to the 2016 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants T. Lin and Murry, attesting to the accuracy of the 2016 10-K.

### March 22, 2017 Optical Fiber Communication Conference and Exhibition

143.    On March 22, 2017, the Company participated in the Optical Fiber Communication Conference and Exhibition.  During the conference, Defendant Murry took part in an investor session, speaking on the benefits of the Company's vertically integrated manufacturing and its purported advantage as a transceiver manufacturer making its own chips, stating, in relevant part:

> So, we start with a wafer, a semiconductor material that basically devoid of active layers or active devices on there. Upon that substrate material, which we buy and other companies presumably buy as well, we do some process called epitaxy. That is we're growing additional layers on top of the substrate materials that actually form the laser itself, or in the case of the receiver, a photodiode. Those layers, essentially, are where all the action is. We do that in-house and as we mentioned in the video, we're one of relatively small number of companies that actually has the capability in-house to grow these wafers and to do the rest of the laser manufacturing process. And I think that's the key differentiator because as you may hear at the show, lasers not only define the performance [to date extent] of these modules, but they're also critical to on-time delivery schedule and being able to ramp up as customer demand increases, which of course we're seeing in some of the markets that we're in.

144.    Defendant Murry further touted the Company's vertical integration, stating, in relevant part:

> So what does vertical integration do for us? Faster time to market, because we don't have to rely on a very long supply chain of different suppliers that all have to align in terms of schedules, we can do most of that in-house. So, we tend to be faster time to market, perhaps more than -- in time to market, I should say, what we're really talking about here is time to volume.

That is there maybe companies out there that can deliver a small quantity of transceivers in a very short time, but what really matters to our customers is how fast can we get them the volumes that they need within their applications. So in the data center, it's not about making the first few samples or the first 100 units, it's about how fast can you really scale the business. And I think vertical integration gives us a big advantage in terms of time to scale.

\* \* \*

So one of the themes that AOI has promulgated throughout the years, especially in our data center business is we like to keep a great deal of commonality in terms of the way that products are designed and manufactured from one generation of products to another. That gives us the ability to flexibly shift from -- for example in the data center world from 40 gigabits per second to 100 gigabits per second without having through radically change our production process or invest in massive amounts of new equipment or whatever. And we can also change back and forth flexibly as customer demand changes, again a very important aspect of vertical integration particularly to our customers.

And finally rapid response to the customer and market demand, so as we see these shifts and changes in the marketplace, the one thing I can say about the optical industry is that it's a very fast moving market. There's a lot of shifts and demand from time to time and as we bring our new customers, those demands change as well because not every customer needs exactly the same type of product. So, the ability to flexibly change or adapt to the customer demand I think is also key part of that vertical integration strategy.

145.    Also during the investor session at the conference, Defendant Murry commented

that AOI was prepared for increasing demand from data centers and that its customers had

expressed their demands for the year, stating, in relevant part:

We do see a lot of pull from customers to add capacity. Fortunately, we made a lot of investments last year and the year before that allow us to have -- at least AOI to have the ability to add that capacity relatively quickly and I think we're getting a pretty strong customer response, a positive customer response based on our – the plans that we've disclosed to them about how we plan to meet their upcoming increasing demand.

Some facts last year, we increased our production of data center transceiver products last year by about 70% from Q1 to Q4, but we didn't increase our headcount at all. And one of the things that we did last year was we spent a lot of money -- and actually the year before, but we spent a lot of money and time doing process automation, being able to do more of the production that we do in an automated fashion. That is much easier to scale than manual -- more manual

processes, and so that investment along with the investment that we made in the fab, really gives us the ability to scale our production pretty rapidly and we think we're doing a reasonably good job of anticipating and meeting the demands of the customers have told us that they're going to need for this year and next year.

### April 28, 2017 Proxy Statement

146.    On April 28, 2017, the Company filed its Schedule 14A with the SEC 7 (the "2017 Proxy Statement"). Defendants T. Lin, Yeh, Black, Chen, Ignatiev, Moore, and C. Lin solicited the 2017 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[9]

147.    With respect to the Company's Code of Conduct, the 2017 Proxy Statement stated "[w]e have adopted a Code of Business Conduct and Ethics (the "Code"), that applies to all of our employees, officers and directors."

148.    The 2017 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, the insider trading engaged in by six of the Individual Defendants, and the Individual Defendants' failures to report violations of the Code of Conduct.

149.    The Individual Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including equity awards designed to "incentivize [executive officers] to act to maximize longer-term stockholder value instead of short-term gain" while failing to disclose

---

[9] Plaintiffs' allegations with respect to the misleading statements in the 2017 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

150.     The 2017 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company did not have the capability nor capacity to quickly transition from 40G manufacturing to 100G manufacturing; (2) the Company could not meet customer demand; (3) to increase manufacturing totals, lower costs, and maintain high gross margins, the Company took manufacturing and quality assurance shortcuts, resulting in undisclosed product quality issues and decreased demand from key customers, including Amazon; (4) due to adoption of the "merchant model" by its customers, the Company was losing market share to rising competition; (5) based on product issues and its customers' minimum purchase obligations and forecasted requirements, demand for the Company's 100G transceivers would not grow at the rate represented; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements, including its financial statements, were materially false and misleading at all relevant times.

### May 4, 2017 Press Release

151.     On May 4, 2017, the Company issued a press release titled, "Applied Optoelectronics Reports First Quarter 2017 Results," announcing "record performance."  In the press release, Defendant T. Lin stated, "We are very pleased with the team's continued execution. Our commitment to technology innovation, manufacturing excellence and customer satisfaction are qualities that continue to set AOI apart, and we believe our performance in the quarter further demonstrates our commitment to excellence in these areas."

### May 4, 2017 Earnings Call

152.     On May 4, 2017, the Company held an earnings call to discuss its financial results for the first fiscal quarter ended March 31, 2017.  During the call, the Company continued to praise

its relationship and visibility with its data center customers, including Amazon, and denied any issues relating to competition because of the purported benefits of its vertical integration model. Despite the increase in 100G market share obtained by competitors and the fact that MACOM, one of its largest competitors, was increasingly working with Amazon utilizing a "merchant model," Defendants T. Lin and Murry dismissed suggestions that such competition affected or could affect AOI. For instance, during the call, a Cowen analyst asked why investors should not be "concerned given that there certainly appears to be concern that [the Company is] going to be displaced to one extent or another, especially in the 100-gig arena." Defendant Murry responded by stating:

> well, that's a good question to start off with. So think first of all, as we said all along, the most important factor for our success with these customers has been our ability to scale rapidly to meet their needs and to have a very low cost structure that allows us to get high gross margin while still meeting their pricing expectations. We believe relative to any other technology out there that we maintain a significant differential in terms of cost, that is that we're the lowest-cost technology out there by a fairly wide margin. And this is particularly true when it comes to the CWDM products. As we mentioned in the prepared remarks, the CWDM products make up the majority. As a percentage of the overall revenue, it's more than doubled since last year. And that's because these datacenters are getting larger. And as a consequence of the larger size of the datacenters, there's more emphasis from these customers on the CWDM products which, for us, are more highly differentiated and carry a higher gross margin. So all the trends that we're seeing, I think, are very positive for our technology. And even on the relatively smaller PSM products, we still maintain that we have a significant edge in terms of cost, mainly due to our vertical integration and the amount of attention that we've paid to the manufacturing process, the automation that we put in place and the other factors that we've talked about a number of times that have really differentiated our manufacturing processes.

153.    The same analyst pressed the issue, asking about any concern regarding AOI's largest customers specifically, to which Murry responded by saying he was not aware of anything that would cause concern. The exchange between the analyst and Defendant Murry was as follows:

[Cowen Analyst]

All right. And guys, just to be clear, my last question on this. As of now, you don't see -- you don't foresee, you don't anticipate being intercepted in a meaningful way at any of Amazon, Microsoft or Facebook. There's nothing you're aware of at this point that will cause you concern that there's a share shift to one or more other competitors?

[Defendant Murry]

That's correct.

154.    During the call, an analyst from Raymond James & Associates, Inc. asked about competition from competitors utilizing the "merchant model," to which Defendant Murry responded by touting the advantages of the Company's business model, including its vertical integration.  The exchange was as follows:

[Raymond James & Associates, Inc. Analyst]

So that actually nicely sets up my next question, is we've sort of heard this bear case of companies that would sell merchant elements. They would sell lasers and semiconductors to other manufacturers or to contract manufacturers that could then compete with you. So I guess one side of the bear case about your company is that there are other competitors taking share. The other side is this sort of unidentified competitor that would buy merchant elements. Can you help us understand the potential for that as a competitive threat? Hopefully that makes sense, and I can be more explicit if you want.

[Defendant Murry]

No, I understand what you're getting at. So we have a great deal of vertical integration, as we've talked about ever since we went public. We do a lot of these things in house. We make our own lasers, we build our own light engines, we do our own production, we do our own testings, okay? There are companies out there that have talked about sort of disaggregating that, if you will, and one company will grow the laser chip, somebody else will do the assembly, somebody else will do the test, somebody makes the chips, et cetera, et cetera, okay. Relative to our business model – I mean, this has been the big advantage of our business model. And I will point out to you, at this point, we've got a 5-plus year track record in the datacenter industry of high -- highly successful business, as evidenced by this quarter and our previous -- really, going back 4, 5 years, you can look at our results.  The vertically integrated business model, we believe, is the best way to economically manufacture these datacenter products. And there are competitors out there that are talking about doing different business models. But economically, that just doesn't make sense. If you have to add multiple companies' profit margins in there along with all the

vagaries of the manufacturing that is yields and things that change over time and inventory management, we've done the modeling and there's just no way that, that results in a product that's less expensive for the end customer than buying it from AOI even at the profit margins or gross profit levels that we're at today. So yes, it's possible to do it that way potentially, but it doesn't result in a lower-cost product.

\* \* \*

And all of that assumes that they would be as good as AOI is at all of those operations, which we don't think is possible given the fact that we are the demonstrated leader in this industry.

155.   Also during the call, Defendant Murry was asked if he believed that the Company was "the market share leader in the 100-gig web-scale transceivers." Defendant Murry responded, "yes."

156.   Defendant Murry also commented during the call on AOI's knowledge of its customers' needs and the ability of the Company to deliver on its customers' 100G demand, assuring investors that the Company, compared to its competitors, had an advantage. He stated, in relevant part:

> Based on current orders and forecasts from our customers, we believe that 2017 datacenter revenue should grow by more than 85% compared with 2016 and would include contributions from 3 hyperscale datacenter customers, each of whom will represent more than 10% of our annual revenue.

\* \* \*

> So when you talk about for AOI, will 40G be higher in 2017 compared to 2016, the answer is probably yes. However, I would caution that, that doesn't necessarily mean that that's the same thing for the industry, right, because we added a significant new customer for 40G during the year. Overall, I would say in general terms, while I can't speak to the specifics of the industry, I think it's widely acknowledged and most people would agree that 100 gig is growing. We were first to market with 100-gig products, first to volume with those products and we believe we're the cost leader on those products. So I think we're going to be very successful in both 100G and 40G throughout the year.

157.   During the call, Defendant T. Lin also commented on AOI's competition in the 100G space, stating, in relevant part:

I want to emphasize in the 100G (inaudible), this is much tougher to design and manufacture (inaudible) than PSM4. So there are much less competitors. And for us, AOI has much stronger cost advantage (inaudible). So that's why we have updated the long-term model in last quarter earnings call. And we believe that's what we can maintain even for the long-term, or even higher.

158.    Defendant Murry also engaged in the following exchange with an analyst from

Roth Capital Partners, LLC ("Roth") concerning potential transition issues:

[Roth Analyst]

Obviously, there's been a fair amount of hand-wringing over the past couple of weeks. I'm wondering where we are in terms of that crossover and what your expectations are as we go through the year. Clearly 100 gig is ramping, but given your customer mix, are you still anticipating that you'll lag the industry in terms of your crossover point?

[Defendant Murry]

. . . when you talk about crossover point, what exactly are you referring to?

[Roth Analyst]

Sorry. 100 gig versus 40 gig. And I'm talking revenues relative to units.

[Defendant Murry]

So you're asking, when do we expect the 100-gig revenue will overtake 40 gig revenue? I mean, if you're asking that, we don't really disclose that on a forward looking basis. We think that obviously 100 gig is growing. 40 gig for us is also very strong. It was -- we were actually -- we had another record quarter in 40-gig sales as well. It was pretty much flat over last quarter, but it was up ever so slightly. So we're expecting a good year both in 40 gig and 100 gig. But as far as when that crossover happens, we don't really talk about that.

159.    Defendant Murry also noted specifically that the Company's growth rate was "not

dependent on demand," and that it was "dependent on our ability to continue to ramp our

manufacturing," stating, in relevant part, during the call:

Right now, we're basically shipping everything we can manufacture. So the growth rate is not dependent on demand. It's dependent on our ability to continue to ramp our manufacturing. So we talked just a moment ago with Troy, he mentioned some of the figures that we had projected in terms of laser sales. I think that you can draw

some conclusions from there. But there's a limit to how fast we can increase our production capacity. So that's really the limiting factor to the growth rate.

**July 13, 2017 Press Release**

160.   On July 13, 2017, the Company issued a press release titled, "Applied Optoelectronics Expects Second Quarter 2017 Results to Exceed Guidance." The press release touted the Company's prospects, stating, in relevant part:

> "I'm pleased to announce that we expect to deliver another record quarter with our top and bottom-line results expected to exceed our guidance," said Dr. Thompson Lin, Applied Optoelectronics, Inc. founder, president and CEO. "Again this quarter, our results were driven by improvement in our manufacturing costs, capacity expansion and solid execution by our production team. We are pleased with our performance and look forward to sharing the additional details of our second quarter results on our conference call in August."

161.   The statements referenced in ¶¶ 132–145 and 151–160 above were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose that: (1) the Company did not have the capability nor capacity to quickly transition from 40G manufacturing to 100G manufacturing; (2) the Company could not meet customer demand; (3) to increase manufacturing totals, lower costs, and maintain high gross margins, the Company took manufacturing and quality assurance shortcuts, resulting in undisclosed product quality issues and decreased demand from key customers, including Amazon; (4) due to adoption of the "merchant model" by its customers, the Company was losing market share to rising competition; (5) based on product issues and its customers' minimum purchase obligations and forecasted requirements, demand for the Company's 100G transceivers would not grow at the rate represented; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements, including its financial statements, were materially false and misleading at all relevant times.

**The Truth About AOI's Manufacturing and Resultant Customer Demand Issues
Begins to Emerge as False and Misleading Statements Continue**

*August 3, 2017 Press Release*

162.   On August 3, 2017, the Company issued a press release titled, "Applied Optoelectronics Reports Second Quarter 2017 Results," revealing a reduction in 40G product orders from one of the Company's large data center customers.  The press release stated, in relevant part:

> "AOI achieved another record performance driven by strong demand for our market-leading datacenter products and continued improvement in our manufacturing costs and capacity expansion," said Dr. Thompson Lin, Applied Optoelectronics, Inc. founder, president and CEO. "Our record gross margin and earnings demonstrate the strength of our business model and deep manufacturing know-how. We believe our ability to leverage our vertical integration and proprietary manufacturing processes to drive greater efficiencies and shorten our production cycle times sets AOI apart from others in the industry."

> Lin continued, "We are pleased with our team's continued solid execution in the quarter, which marked our ninth consecutive quarter of generating record datacenter revenue. However, as we look into the third quarter, we see softer than expected demand for our 40G solutions with one of our large customers that will offset the sequential growth and increased demand we expect in 100G. We believe AOI has a leading position in the advanced optics market and we continue to expand within our existing customer base as well as engage with new customers for 100G technologies and beyond."

*August 3, 2017 Earnings Call*

163.   On August 3, 2017, the Company held an earnings call to discuss its financial results for the second fiscal quarter ended June 30, 2017, during which Defendant Murry reaffirmed weakening 40G demand, stating, in relevant part:

> As we look into Q3, we see softer than expected demand for our 40G solutions with one of our large datacenter customers that will offset the sequential growth and increased demand we expect to see in 100G. This slowdown in 40G demand has been anticipated for some time, but the decline in Q3 is greater than previously expected.

164.     During the call, Defendant Murry engaged in an exchange with a Roth analyst, and stated that the decreasing demand for 40G products from Amazon was a "surprise," and that AOI had only found out about it recently.  The exchange was as follows:

[Roth Analyst]

Right. Well, it seems as you clearly have a pretty good handle on what's going on with 100G and next generation type of designs with your customers. I'm curious as to how -- you seem to have been caught off-guard in terms of the decline on 40 gig. Is that something that transferred from your customer recently? Or is that something that was communicated in the middle of the quarter?

[Defendant Murry]

It's a recent development. And again, it's not that we didn't expect 40 gig to decline with this customer or the other customers, we knew it would. It's just coming a little bit faster which, in the end, means a faster transition to 100 gig, which is not a bad thing. But obviously, in this particular quarter, it's happened faster than we expected.

[Roth Analyst]

Understand. I think we all expect the transition to occur and we all think it's a positive, certainly for you guys, given your product portfolio. I guess where I'm going with this is, it's a bit unusual for a company to preannounce a very strong beat and then to have something like this come in a couple of weeks later from that announcement. And I'm just -- it seems as though maybe you guys were informed of this after your positive preannouncement.

[Defendant Murry]

That is true, but just to be clear, the pre-announcement is made when we see the results of the quarter differing materially from the last guidance that we put out with The Street. That's why we preannounce. It's not an indication of future, it's an indication that the past has been very different from what we last guided The Street. In other words, we don't want – when we know that there is different information from what we've previously guided for, we want to get that information in the hands of investors as quickly as possible. That's what investors have asked us to do and that's what we think is the right thing to do. But that's not necessarily an indication of any particular thing about the future. In this case, the information that we got about the 40 gig actually did happen post the preannouncement, but that wouldn't necessarily change our thinking about whether or not to preannounce.

165.    During the call, it was revealed that the "change-over time" on the product lines was six weeks.  As stated during the call, "There's about a 6-week time from when we produce a laser to when [it] actually gets shipped out as a transceiver.  And so the time to actually shift over the production is not long, but the time to – between doing that shift and when you start to see the end product transceivers coming-out is about 6 weeks."

166.    Also during the call, Defendant Murry was questioned about 100G demand from Amazon, to which he responded that the Company had "meaningful 100 gig revenue with our largest customer as well as our other customers  . . . . [W]e do have meaningful – meaningful 100 gig sales with all 3 of our large datacenter customers."

167.    Defendant Murry additionally noted during the call that AOI had set prices, and occasionally price reductions, with customers, stating, "But these price negotiations that we have undergone are something we do in advance with the customer, and we know what those prices are expected to be on a go forward basis."

168.    During the call Defendant Murry also told investors that in December 2017 the Company would again see sequential improvement.  When he was asked how he could be so confident, Murry stated that "some committed orders [are] out there, not all of that expectation is committed at this point.  But we do have a significant amount of committed orders and a good forecast from all 3 of our customers."

169.    Defendant Murry also denied any competitive pressure facing the Company from a business alliance between MACOM and Fabrinet,[10] again choosing instead to tout the Company's vertical integration.  He stated, in relevant part:

_____

[10] As noted above, Fabrinet won a project in 2017 to provide Amazon with optical modules designed by MACOM—i.e., Amazon partnered with Fabrinet to create 100G optical transceivers for itself.   *See*   https://www.barrons.com/articles/an-existential-threat-to-fiberoptics-makers-

So first of all, we don't believe that the MACOM-Fabrinet alliance is actually producing anything or is likely to produce any products or any meaningful quantities, certainly, in the next quarter or 2, probably longer than that. In addition to that, in the long term, and in the short term, we don't see any cost advantage to this model. AOI, as we mentioned, is currently very highly vertical integrated on the most expensive components, meaning the lasers. As we announced in the call, we also intend to produce other optical components that we currently don't produce internally, which will further enhance the extent of our vertical integration, and we think this gives us a significant cost even against the MACOM-Fabrinet business model or any of the other competitive business models that we're aware of.

170.     On this news, the price per share of AOI stock fell by $33.39 per share, or 34%, from closing at $97.99 per share on August 3, 2017, to close at $64.60 per share on August 4, 2017.

### *October 12, 2017 Press Release*

171.     On October 12, 2017, the Company issued a press release titled, "Applied Optoelectronics Announces Preliminary Third Quarter 2017 Results," revealing additional information regarding weakening Amazon demand.  The press release stated, in relevant part:

"Our preliminary results for the third quarter fell short of prior estimates and were negatively impacted by lower than expected sales to one of our large datacenter customers. Despite this shortfall, we maintained a strong gross margin profile in the quarter, and continued to experience solid demand with our other top datacenter customers," said Dr. Thompson Lin, Applied Optoelectronics, Inc. founder, president and CEO. "Although we are disappointed with these preliminary results, we continue to feel good about our leadership position in advanced optics and remain optimistic based on the customer traction we are seeing with our 100G products, especially our 100G CWDM transceivers."

### *October 12, 2017 Earnings Call*

172.     On October 12, 2017, the Company held an earnings call to discuss its preliminary financial results or the third fiscal quarter ended September 30, 2017.  The call revealed that

---

1500695405 (last accessed July 20, 2018).

Amazon's weakening demand was not only for the Company's 40G product, but also its 100G

products.  Defendant Murry stated, in relevant part:

> We are disappointed with our third quarter performance. We indicated last quarter
> that we expected to see softer 40G demand. However, we saw lower demand overall
> from one of our large customers. Revenue from this customer in the quarter was
> approximately 10% of total revenue compared with 47% last quarter. As a
> reminder, we have a vendor-owned inventory management model that we employ
> with this customer which can impact our revenue visibility. As previously
> discussed, this VOI program allows the customer to full inventory from a hub that
> AOI manages, and revenue is recorded at the time the inventory is pulled. We
> continue to have ongoing discussions with this customer and based on our
> conversations, we believe that the disruption in order flow is related to the ongoing
> transition from 40G to 100G and not specific to AOI. We also do not expect the
> inventory stock in our VOI hub to be impaired because forecasts indicate that this
> inventory will be consumed over time.

173.   When specifically asked about losing 100G Amazon market share, Defendant

Murry stated, "yes, we don't believe that this disruption in the order flow is related to anything

AOI-specific.  It's related to an ongoing transition from 40G to 100G."  When asked about his

confidence in this regard, he stated, "As we mentioned, we continue to have ongoing discussions

with this customer and our other customers as well, and those discussions have led us to believe

that this is a – not – an event that's not specific to AOI."

174.   On this news, the price per share of AOI stock fell by $11.83 per share, or

approximately 20.1%, from closing at $58.84 per share on October 12, 2017, to close at $47.01 on

October 13, 2017.

***November 7, 2017 Press Release***

175.   On November 7, 2017, the Company issued a press release titled, "Applied

Optoelectronics Reports Third Quarter 2017 Results," confirming the previous month's revelation

of weakening Amazon demand.  The press release stated, in relevant part:

> "While our third quarter results were negatively impacted by lower demand from a
> large customer, we continued to experience solid demand from our other large

datacenter customers, especially for our 100G CWDM transceivers, and revenue for our CATV products reached a new record," said Dr. Thompson Lin, Applied Optoelectronics, Inc. founder, president and CEO. "We remain confident in our leadership position in advanced optics. We are working diligently to diversify our customer base and are encouraged with the customer response so far, which led to nine design wins in the quarter, including three for our 100G products. We also continue to make progress on developing new innovative products and expanding our vertical integration to further extend the gap between AOI and the competition."

### November 7, 2017 Earnings Call

176.     On November 7, 2017, the Company held an earnings call to discuss its financial results for the third fiscal quarter ended September 30, 2017.  During the call, the Company stated a $46.2 million loss in Amazon revenue compared to the previous quarter.  In commenting on this topic, Defendant Murry noted that the reason was "not specific" to the Company, stating, in relevant part:

> As discussed on our pre-announcement call, we saw lower demand overall from one of our large customers. And our revenue visibility in the quarter was impacted by the vendor-owned inventory management model that we employ with this customer. As previously discussed, this VOI program allows the customer to pull inventory from a hub that AOI manages, and revenue is recorded at the time the inventory is pulled. This arrangement can make revenue prediction difficult, but it allows us to maximize sales by ensuring that AOI products are available for customers when needed. For example, AOI has, in the past, been able to meet unexpected demand surges because we had available inventory in the hub for our customer to purchase with little to no lead time. We continue to have ongoing discussions with this customer and based on those conversations, we believe the disruption in order flow is related to the ongoing transition from 40G to 100G and not specific to AOI. We believe there was some inventory buildup during the transition and based on conversations with this customer, we believe that inventory conditions will normalize within the first half of next year.

177.     During the call, Defendant Murry yet again touted the Company's purported ability to adapt to transitioning markets, stating in relevant part:

> We believe that one of the strengths of our business model is our ability to flexibly adjust manufacturing to adapt to changing customer requirements, while maintaining industry-leading gross margin. As you know, we serve a customer base that is composed of some of the most dynamic, rapidly evolving companies in the

world. As their needs change, we think our ability to adapt along with them gives us a long-term sustainable advantage.

178.    Also during the call, Defendant Murry had the following exchange with an analyst who pointed out that the Company's 100G sales were down sequentially:

> The other thing is -- and I'm assuming I've entered formulas correctly, so apology if I botch this. But I think the 100 gig business was down sequentially. So given that the primary explanation is a pause of 40 to 100 gig, I would have imagined you'd sell every piece of 100-gig gear. So maybe help us understand if: one, I did the math correctly; and two, if so, why would 100 gig be down in your third quarter.

> [Defendant Murry]

> Well, I think we saw an overall decline -- as we mentioned in our prepared remarks, we saw an overall decline in business from one customer. So that included both 40 gig and 100 gig. On the other hand, the other customers that we had, were actually up for 100 gig, so that didn't quite balance out the overall decline from the one customer.

179.    The statements referenced in ¶¶ 162-169, 171–173, and 175-178 above were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose that: (1) the Company did not have the capability nor capacity to quickly transition from 40G manufacturing to 100G manufacturing; (2) the Company could not meet customer demand; (3) to increase manufacturing totals, lower costs, and maintain high gross margins, the Company took manufacturing and quality assurance shortcuts, resulting in undisclosed product quality issues and decreased demand from key customers, including Amazon; (4) due to adoption of the "merchant model" by its customers, the Company was losing market share to rising competition; (5) based on product issues and its customers' minimum purchase obligations and forecasted requirements, demand for the Company's 100G transceivers would not grow at the rate represented; and (6) the Company failed to maintain internal controls. As a result of the foregoing,

the Company's public statements, including its financial statements, were materially false and misleading at all relevant times.

### The Truth About AOI's Manufacturing and Resultant Customer Demand Issues Fully Emerges

*February 21, 2018 Press Release*

180.    On February 21, 2018, the Company issued a press release titled, "Applied Optoelectronics Reports Fourth Quarter and Year 2017 Results," revealing the extent of the impact that Amazon's weakening demand had on the Company.  The press release stated, in relevant part:

> "We achieved revenue in the fourth quarter of $79.9 million, which was slightly below our expectations due to lower demand from our datacenter customers as they continue to evolve their network architectures. While our revenue came in slightly below expectations, I am pleased with our ability to continue to generate strong gross margin even in a price sensitive market," said Dr. Thompson Lin, Applied Optoelectronics, Inc. founder and CEO. "Even though we see inventory headwinds with one of our customers and the typical seasonality in Q1 due to fewer production days in China because of the Lunar New Year, we continue to expect the second half of 2018 to be stronger than the first half. We believe we have a strong leadership position in advanced optics, and this belief is bolstered by a large purchase commitment that we disclosed earlier today."

*February 21, 2018 Earnings Call*

181.    On February 21, 2018, the Company held an earnings call to discuss its financial results for the fiscal quarter and year ended December 31, 2017, revealing further details on the extent of damage caused by Amazon's lack of 100G demand.  During the call, Defendant Murry stated, "Our datacenter revenue was $62 million, compared with $68.1 million in Q4 of last year. In the quarter, 35% of our datacenter revenue was derived from our 100G datacenter products and 58% was from our 40G products."

182.    When questioned during the call regarding the reasons for weakness in the fourth quarter, Defendant Murry stated:

Yes, I can't really comment on the specific customers and their trends. But I think, it's not reasonable to expect that, in any given quarter, there can be a lot of things that affect a particular customer's purchasing patterns, timing of orders, specific things that they're doing within their datacenters, what type of products they're deploying to mix. So there's a lot of things that can affect that on a short-term basis. But longer-term, I think, we've seen strong growth from our hyperscale customers and we would expect to do continue to see their volume growth in the future.

183.    On this news, the price per share of AOI stock fell by $7.04 per share, or approximately 20.3%, from closing at $34.55 per share on February 21, 2018, to close at $27.51 on February 22, 2018.

184.    The Company continued to lag in its ability to swiftly keep pace with the demands of the internet data market during 2018 and 2019. The Individual Defendants, most of whom continue to serve as Company directors and/or officers have failed to appropriately manage AOI, to the Company's detriment. Indeed, as the below chart[11] reflects, the Company's revenues, free cash flow, and operating margin continued to decline following the Initial Relevant Period:



---

[11]  Chart taken from: https://www.fool.com/investing/2019/09/25/is-applied-optoelectronics-a-buy.aspx. Last visited July 27, 2020.

**Discriminatory Misconduct**

185.   During the Relevant Period, the Individual Defendants allowed multiple violations of AOI's corporate governance policies to occur that injured the company. These violations included, but were not limited to, engaging in or allowing the Discriminatory Misconduct and engaging in or allowing widespread violations of the Company's Code of Conduct.

186.   The following are photographs of the Company's six-person executive management team as depicted on AOI's website[12]:





---

[12]   http://investors.ao-inc.com/index.php/corporate-governance/management.   Last   visited December 9, 2020.

187.    AOI is on a shrinking list[13] of publicly traded companies in the United States with exactly *zero* Black or other racially underrepresented individuals on its Board, or amongst the ranks of its executive management either. Further, AOI's executive management team contains exactly *zero* female members and, prior to the Company's recent appointment of Loboa, which conveniently occurred after and in response to this action, AOI's Board also was, and substantially remains, a boys only club. Notably, although Loboa's appointment to the Board was indeed a small step in the right direction, Loboa's presence on the Board does not constitute an adequately diverse Board, since *zero* Black individuals or other underrepresented minority individuals have been integrated to date. Similarly, AOI's executive management team and workforce lacks diversity due to the Company's discriminatory conduct and failure to abide by its antidiscrimination governance policies.

188.    The Company's Board assumes accountability for confirming that AOI follows federal and state laws that prohibit racial discrimination. While diversity is a strong indication of a lack of discrimination, a lack of diversity is a compelling signal that the Company does, in fact, discriminate. Here, not one member of the Company's seven-person Board or six-person executive management team listed on its website is Black. Instead, the overwhelming majority are, in fact, Asian men.

189.    Regarding AOI's corporate culture, the Company has received numerous complaints via reviews left by former and current employees of AOI on websites such as Glassdoor and Indeed. For instance, employee reviews have stated the following:

---

[13] In 2019, a record 59% of the directors added to the boards of S&P 500 companies were women or were men belonging to a racial or ethnic minority group.

Verified Shareholder Derivative Complaint

| PLATFORM & DATE | EMPLOYEE REVIEW |
|---|---|
| Glassdoor,  April 25, 2018 | "Low diversity…"<br>"**Advice to Management**[:] "Create more diversity." (Emphasis in original.) |
| Glassdoor, December 20, 2018 | "Asians are the majority. There is no AOI culture there is only [true] Asian culture. There is [favoritism] towards Asians. If you [don't] know or [don't] want to conduct yourself the Asian way then you have absolutely no future here. |
| Glassdoor, August 25, 2019 | "Biased opinions and discrimination based on cultural background, gender and age are publicly displayed. Female workers have to face sexism from managers. Equal employment opportunity is not truly practiced." |
| Indeed, January 2, 2020 | "Very few non-Chinese/non-Taiwanese Managers[.]" |
| Glassdoor, February 5, 2020 | "… Asian company culture."<br>"Either pay for [C]hinese lessons to all non[-C]hinese employees or pay for English lessons to all [C]hinese [employees] [sic] especially those in positions of power." |
| Glassdoor, March 5, 2020 | "…[N]o other good reason to work there unless you [are] Chinese that is loved by the top management."<br>"…[The Company] need[s] a new set of manager[s] from different ethnic[] [backgrounds,] if not the company is [losing] [its] best [workers] |
| Glassdoor, April 29, 2020 | "If you are [C]hinese and Taiwanese [descent] you have lots of pros." |
| Glassdoor, October 12, 2020 | "Few Non-English [s]peaking people…" |

190.    The Individual Defendants have known for a long time that AOI has been violating federal and state laws regarding diversity and discrimination and yet the Individual Defendants have repeatedly refused to nominate, appoint, or hire a Black or other underrepresented minority individual to the Board or executive team.

*The Individual Defendants Have Breached Their Duties by Continually Re-Hiring Grant Thornton LLP ("Grant Thornton") as the Company's Auditor Even Though Grant Thornton Has Failed to Perform its Job*

191.    Grant Thornton is the Company's independent auditor, and has been so since at least 2014, since the Company's inception. This has clearly given rise to a close relationship between AOI and Grant Thornton which is not conducive to effective auditing. Instead, the Company's compliance with its policies regarding diversity, inclusion, and antidiscrimination are severely deficient and inadequate. Rather than ensure that the Company's internal controls are effective, Grant Thornton has repeatedly failed to point out that AOI clearly lacks internal controls to prevent discrimination against Black individuals or other underrepresented minorities, at least with respect to the Company's nomination and appointment process for AOI's Board and executive management team and keep the Company in compliance with applicable laws.

192.    As AOI's 2020 Proxy Statement disclosed, the following table sets forth the approximate aggregate fees billed to AOI by Grant Thornton for fiscal years 2018 and 2019:

|  | Fiscal 2019 | Fiscal 2018 |
|---|---|---|
| Audit fees[1] | $1,134,143 | $1,263,631 |
| Audit-related fees[2] | $    — | $    — |
| Tax fees[3] | $    9,526 | $   58,953 |
| All other fees[4] | $    7,706 | $    7,553 |
| Total | $1,151,375 | $1,330,137 |

193.    Despite billing AOI approximately $1.3 million and $1.1 million in fees in 2018 and 2019, respectively, Grant Thornton has completely failed to properly audit and assess the Company's internal controls. The Audit Committee Defendants (defined below) are responsible for selecting and monitoring Grant Thornton and have therefore breached their fiduciary duty by failing to ensure that an adequate audit was being performed of the Company's internal controls regarding diversity and antidiscrimination.

### *Recent Social Justice Corporate Initiatives*

194.    While the Individual Defendants have caused AOI to adopt discriminatory policies and fail to keep up with the times, the rest of corporate America, including the tech industry,[14] has been publicly condemning racism as well as implementing social justice initiatives at a rapid pace. These efforts have been taken to combat systemic racism in America and respond to public outrage over the murders of, among many others, George Floyd, Breonna Taylor, and Ahmaud Arbery.[15] For instance: (1) Microsoft, Intel, and Johnson & Johnson have pledged to tie executive pay to certain diversity figures; (2) Google has pledged to increase the representations of Black and other underrepresented groups at senior employment levels 30% by 2025; (3) Apple has, for the past five years, increased its hiring of women and historically underrepresented groups in tech from 21% in 2014 to 31% in 2018, and has committed to "increase representation in leadership across the company[]"; (4) PepsiCo announced a five-year, $400 million initiative that includes the goal of increasing Black managerial representation by 30% and more than doubling business with Black-owned suppliers; (5) Adidas committed to filling 30% of new positions with Black or Latino workers; and (6) Alexis Ohanian, the co-founder of Reddit, resigned from Reddit's all-Caucasian board, advocated that his seat be filled by a Black individual, and further pledged to use future gains on his Reddit stock to serve the Black community, beginning with Colin Kaepernick's Know Your Rights Camp.

195.    Moreover, earlier this year, Goldman Sachs announced that, effective July 1, 2020, the investment bank would refuse to help companies based in the U.S. or Europe that are without at least one "diverse" board member go public. Further, given the research that shows that

---

[14]    https://www.cio.com/article/3570512/how-top-tech-companies-are-addressing-diversity-and-inclusion.html?page=2. Last visited December 8, 2020.
[15]    https://www.forbes.com/sites/davidhessekiel/2020/06/04/companies-taking-a-public-stand-in-the-wake-of-george-floyds-death/?sh=e62ec4172148. Last visited December 8, 2020.

performance is "significantly better" for companies with at least one diverse board member, David Solomon, Goldman Sachs' CEO, stated that "I think [having a "diverse" board] is the best advice for companies that want to drive premium returns for their shareholders over time."

196.    In blatant contrast, AOI has refused to offer any sort of showing of solidarity with the Black Lives Matter movement. Instead, the Company has remained noticeably on the sidelines amongst the slew of companies that have pledged to implement changes to increase diversity, particularly Black representation, in corporate America.

197.    In fact, on December 1, 2020, the Nasdaq filed a proposal with the SEC which would require all Nasdaq-listed companies to adopt new rules related to board diversity or potentially face delisting. The new rules would require companies to have at least two diverse directors or publicly explain why not.[16] According to *Reuters*, the Nasdaq operator said that "over two dozen studies found an association between diverse boards and better financial performance and corporate governance."[17]

Goldman Sachs' recent policy change and the Nasdaq's recent proposal only serve to emphasize the importance of board diversity and compliance with antidiscrimination policies to maximize shareholder value and investor protection and also improve corporate decision making and the monitoring of management. These market changes therefore highlight the significance of AOI's lack of diversity on its Board resulting from the Discriminatory Misconduct.

---

[16]    https://www.nasdaq.com/press-release/nasdaq-to-advance-diversity-through-new-proposed-listing-requirements-2020-12-01. Last visited December 8, 2020.
[17]    https://www.reuters.com/article/us-nasdaq-sec-diversity/nasdaq-proposes-board-diversity-requirement-for-listed-companies-idUSKBN28B58Q. Last visited December 8, 2020.

### *Lack of Term Limits as Cause for Concern and Method to Discriminate*

198.     According to a report by the Harvard Law School Forum on Corporate Governance, longer-tenured directors do not serve the best interests of the Company. The report stated the following, in relevant part:

> Investor respondents to ISS' 2016–2017 Global Policy Survey (conducted between Aug. 2, 2016 and Aug. 30, 2016) were asked which tenure-related factors — with multiple answers allowed — would give rise to concern about a board's nominating and refreshment processes. ***Among the 120 institutional investors (one-third of whom each own or manage assets in excess of \$100 billion) who responded, 68 percent pointed to a high proportion of directors with long tenure as cause for concern, 53 percent identified an absence of newly-appointed independent directors in recent years as a potential problem, and 51 percent flagged lengthy average tenure as problematic.*** Just 11 percent of the investor respondents said that tenure is not a concern, although even several of those respondents indicated that an absence of newly-appointed directors is a concern.

(Emphasis added.)

199.     Upon information and belief, the Company does not limit the number of consecutive terms that a director is able to serve on the Board. Therefore, contrary to any supposed benefit upon which the Company's antiquated policy is based upon, the benefit to the Company from nominating and electing new directors with new ideas and viewpoints from individuals with diverse backgrounds on the Board far outweigh any potential drawback of losing a longstanding director. Longstanding directors are less likely to ask tough questions and challenge proposals of management and fellow directors, given their long-tenure and personal or professional relationships with executive officers and other directors. In fact, new, diverse directors not only have been found to bring a diversity of opinions and philosophy to the board, but also a diversity of behavior, i.e. a willingness to challenge management and other directors which generates better fact-based decision making. Thus, the Individual Defendants breached their fiduciary duties to the

Company by failing to implement term limits in an effort to maintain control of the Company by avoiding the addition of diverse candidates to the Board to the detriment of the Company.

### April 27, 2018 Proxy Statement

200.    On April 27, 2018, the Company filed the 2018 Proxy Statement with the SEC. Defendants T. Lin, Yeh, Black, Chen, Ignatiev, Moore, and C. Lin, solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions relating to the Discriminatory Misconduct.[18]

201.    The 2018 Proxy Statement was false and misleading because, despite noting that the Company maintains a Code of Conduct that, "applies to all of our employees, officers and directors," the Code of Conduct was not followed, as evidenced by the numerous false and misleading statements relating to the Discriminatory Misconduct as alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

202.    The 2018 Proxy Statement also called for shareholders to: (1) elect two nominees as directors; (2) ratify the appointment of Grant Thornton LLP as the Company's independent auditor for fiscal year 2018; (3) approve, on an advisory basis, the Company's executive compensation; and (4) approve, on an advisory basis, the frequency of future advisory votes on the Company's executive compensation.

203.    The 2018 Proxy Statement stated, in relevant part:

*While we do not have a formal diversity policy for board membership, the nominating and corporate governance committee generally considers the diversity of nominees in terms of knowledge, experience, background, skills, expertise and other demographic factors. When considering nominees for election as directors, the nominating and corporate governance committee*

---

[18] Plaintiffs' allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

*reviews the needs of the board for various skills, background, experience and expected contributions and the qualification standards established from time to time by the nominating and corporate governance committee.*

(Emphasis added.)

204.    The statements contained in the 2018 Proxy Statement were materially false and highly misleading since the Board failed to disclose, *inter alia*, that the Individual Defendants, and particularly, the Nominating and Corporate Governance Committee did not have a goal of increasing the racial or gender diversity of applicants for Board seats or the number of racially or gender diverse members of the Board. Instead, the Individual Defendants and the Nominating and Corporate Governance Committee only had the goal of increasing talent and skills among Board candidates. Despite allegedly including diversity of "background" and "other demographic factors," in the board composition and selection process, the truth is that AOI had no female, Black, Hispanic, or other underrepresented ethnic minority team members on either its Board or its executive management at the time that statement was made and still has no Black individuals on either. Therefore, the unrevealed reality is that AOI may try to incorporate Black or other culturally/racially diverse candidates in its director nominee pool, but it either had no actual intent to nominate Black or other culturally/racially diverse candidates to its Board or the Company endeavors to obstruct the nomination of Black or other culturally/racially diverse candidates in the pool. Either way, it is evident that diversity of "background" and "other demographic factors" such as racial and gender diversity were not among the relevant factors which the Nominating and Corporate Governance Committee considers with respect to determining Board nominees.

205.    Moreover, the 2018 Proxy Statement was also materially false and misleading because it failed to disclose that the Company does not have term limits for its Board members, and that the purpose of the lack of term limits is to cement the current directors in position and

Verified Shareholder Derivative Complaint

inhibit female, Black, and other racially diverse individuals from having adequate prospects to be nominated and elected to the Company's Board.

206.     The Individual Defendants' failure to embrace director term limits and to add new members, including Black or other underrepresented individuals, to AOI's Board represents explicit or implicit racism at the Company, and an improper cause for failing to include Black or other underrepresented individuals as members of the Company's Board.

207.     The 2018 Proxy Statement also failed to disclose that the Company's internal controls were inadequate to protect Black and other underrepresented individuals from discrimination in its Board nomination process and AOI's appointment process to the Company's executive management team. Moreover, the 2018 Proxy Statement failed to disclose that the Individual Defendants failed to maintain internal controls to ensure that the Company's stated policies regarding diversity and providing a workplace free of discrimination were being complied with.

208.     The 2018 Proxy Statement  failed to disclose, *inter alia*, that: (1) the Company had engaged in the Discriminatory Misconduct; (2) the Company does not have term limits due to a desire to keep Black and other underrepresented individuals off of the Board; (3) the Company's Nominating and Corporate Governance Committee did not actually consider diversity of "background" and "other demographic factors" including racial and gender diversity when nominating Board candidates, and (4) the Company failed to maintain adequate internal controls.

209.     As a result of the material misstatements and omissions contained in the 2018 Proxy Statement, Company shareholders, *inter alia*, elected Defendants Yeh and Ignatiev who were allowing the illegal and discriminatory practices to continue, and zero Black individuals, to the Board and ratified the appointment of Grant Thornton LLP as the Company's independent auditor.

*April 19, 2019 Proxy Statement*

210.     On April 19, 2019, the Company filed the 2019 Proxy Statement with the SEC. Defendants T. Lin, Yeh, Black, Chen, Ignatiev, Moore, and C. Lin, solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions relating to the Discriminatory Misconduct.[19]

211.     The 2019 Proxy Statement was false and misleading because, despite noting that the Company maintains a Code of Conduct that, "applies to all of our employees, officers and directors," the Code of Conduct was not followed, as evidenced by the numerous false and misleading statements relating to the Discriminatory Misconduct as alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

212.     The 2019 Proxy Statement also called for shareholders to: (1) elect three nominees as directors; (2) ratify the appointment of Grant Thornton LLP as the Company's independent auditor for fiscal year 2019; (3) approve, on an advisory basis, the Company's executive compensation.

213.     The 2019 Proxy Statement stated, in relevant part:

> *While we do not have a formal diversity policy for board membership, the nominating and corporate governance committee generally considers the diversity of nominees in terms of knowledge, experience, background, skills, expertise and other demographic factors. In addition, our Board is currently considering what approach to take going forward with respect to the diversity of our Board, including, without limitation, whether to adopt a written board diversity policy. When considering nominees for election as directors, the nominating and corporate governance committee reviews the needs of the Board for various skills, background, experience and expected contributions and the qualification standards established from time to time by the nominating and corporate governance committee.*

_____

[19] Plaintiffs' allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

(Emphasis added.)

214.    The statements contained in the 2019 Proxy Statement were materially false and highly misleading since the Board failed to disclose, *inter alia*, that the Individual Defendants, and particularly, the Nominating and Corporate Governance Committee did not have a goal of increasing the racial or gender diversity of applicants for Board seats or the number of racially or gender diverse members of the Board. Instead, the Individual Defendants and the Nominating and Corporate Governance Committee only had the goal of increasing talent and skills among Board candidates. Despite allegedly including diversity of "background" and "other demographic factors," in the board composition and selection process, the truth is that AOI had no female, Black, Hispanic, or other underrepresented ethnic minority team members on either its Board or its executive management at the time that statement was made and still has no Black individuals on either. Therefore, the unrevealed reality is that AOI may try to incorporate Black or other culturally/racially diverse candidates in its director nominee pool, but it either had no actual intent to nominate Black or other culturally/racially diverse candidates to its Board or the Company endeavors to obstruct the nomination of Black or other culturally/racially diverse candidates in the pool. Either way, it is evident that diversity of "background" and "other demographic factors" such as racial and gender diversity were not among the relevant factors which the Nominating and Corporate Governance Committee considers with respect to determining Board nominees.

215.    Moreover, the 2019 Proxy Statement was also materially false and misleading because it failed to disclose that the Company does not have term limits for its Board members, and that the purpose of the lack of term limits is to cement the current directors in position and inhibit female, Black, and other racially diverse individuals from having adequate prospects to be nominated and elected to the Company's Board.

216.     The Individual Defendants' failure to embrace director term limits and to add new members, including Black or other underrepresented individuals, to AOI's Board represents explicit or implicit racism at the Company, and an improper cause for failing to include Black or other underrepresented individuals as members of the Company's Board.

217.     The 2019 Proxy Statement also failed to disclose that the Company's internal controls were inadequate to protect Black and other underrepresented individuals from discrimination in its Board nomination process and AOI's appointment process to the Company's executive management team. Moreover, the 2019 Proxy Statement failed to disclose that the Individual Defendants failed to maintain internal controls to ensure that the Company's stated policies regarding diversity and providing a workplace free of discrimination were being complied with.

218.     The 2019 Proxy Statement failed to disclose, *inter alia*, that: (1) the Company had engaged in the Discriminatory Misconduct; (2) the Company does not have term limits due to a desire to keep Black and other underrepresented individuals off of the Board; (3) the Company's Nominating and Corporate Governance Committee did not actually consider diversity of "background" and "other demographic factors" including racial and gender diversity when nominating Board candidates, and (4) the Company failed to maintain adequate internal controls.

219.     As a result of the material misstatements and omissions contained in the 2019 Proxy Statement, Company shareholders, *inter alia*, elected Defendants T. Lin, Black, and Chen who were allowing the illegal and discriminatory practices to continue, and zero Black individuals, to the Board and ratified the appointment of Grant Thornton LLP as the Company's independent auditor.

### April 24, 2020 Proxy Statement

220. On April 24, 2020, the Company filed the 2020 Proxy Statement with the SEC. Defendants T. Lin, Yeh, Black, Chen, Ignatiev, Moore, and C. Lin, solicited the 2020 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions relating to the Discriminatory Misconduct.[20]

221. The 2020 Proxy Statement was false and misleading because, despite noting that the Company maintains a Code of Conduct that, "applies to all of our employees, officers and directors," the Code of Conduct was not followed, as evidenced by the numerous false and misleading statements relating to the Discriminatory Misconduct as alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

222. The 2020 Proxy Statement also called for shareholders to: (1) elect two nominees as directors; (2) ratify the appointment of Grant Thornton LLP as the Company's independent auditor for fiscal year 2020; (3) approve, on an advisory basis, the Company's executive compensation.

223. The 2020 Proxy Statement stated, in relevant part:

> *While we do not have a formal diversity policy for board membership, the nominating and corporate governance committee generally considers the diversity of nominees in terms of knowledge, experience, background, skills, expertise and other demographic factors. In addition, our Board is currently considering what approach to take going forward with respect to the diversity of our Board, including, without limitation, whether to adopt a written board diversity policy. When considering nominees for election as directors, the nominating and corporate governance committee reviews the needs of the Board for various skills, background, experience and expected contributions and the qualification standards established from time to time by the nominating and corporate governance committee.*

---

[20] Plaintiffs' allegations with respect to the misleading statements in the 2020 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

* * *

*We intend to seek stockholders' perspective on our… ongoing efforts to improve diversity on our Board.*

* * *

*We value our stockholders' perspective on these matters and others and look forward to the information that we will be able to gather through additional stockholder engagement.*

(Emphasis added.)

224.     The statements contained in the 2020 Proxy Statement were materially false and highly misleading since the Board failed to disclose, *inter alia*, that the Individual Defendants, and particularly, the Nominating and Corporate Governance Committee did not have a goal of increasing the racial diversity of applicants for Board seats or the number of racially diverse members of the Board. Instead, the Individual Defendants and the Nominating and Corporate Governance Committee only had the goal of increasing talent and skills among Board candidates. Despite allegedly including diversity of "background" and "other demographic factors," in the board composition and selection process, the truth is that AOI had no female, Black, or other underrepresented ethnic minority members on either its Board or its executive management team at the time that statement was made and still has no Black individuals on either. Therefore, the unrevealed reality is that AOI may try to incorporate Black or other culturally/racially diverse candidates in its director nominee pool, but it either has no actual intent to nominate Black or other culturally/racially diverse candidates to its Board or the Company endeavors to obstruct the nomination of Black or other culturally/racially diverse candidates in the pool. Either way, it is evident that diversity of "background" and "other demographic factors" such as racial diversity

were not among the relevant factors which the Nominating and Corporate Governance Committee considers with respect to determining Board nominees.

225.    Moreover, the 2020 Proxy Statement was also materially false and misleading because it failed to disclose that the Company does not have term limits for its Board members, and that the purpose of the lack of term limits is to cement the current directors in position and inhibit Black and other racially diverse individuals from having adequate prospects to be nominated and elected to the Company's Board.

226.    The Individual Defendants' failure to embrace director term limits and to add new members, including Black or other underrepresented individuals, to AOI's Board represents explicit or implicit racism at the Company, and an improper cause for failing to include Black or other underrepresented individuals as members of the Company's Board.

227.    The 2020 Proxy Statement also failed to disclose that the Company's internal controls were inadequate to protect Black and other underrepresented individuals from discrimination in its Board nomination process and AOI's appointment process to the Company's executive management team. Moreover, the 2020 Proxy Statement failed to disclose that the Individual Defendants failed to maintain internal controls to ensure that the Company's stated policies regarding diversity and providing a workplace free of discrimination were being complied with.

228.    The 2020 Proxy Statement failed to disclose, *inter alia*, that: (1) the Company had engaged in the Discriminatory Misconduct; (2) the Company does not have term limits due to a desire to keep Black and other underrepresented individuals off of the Board; (3) the Company's Nominating and Corporate Governance Committee did not actually consider diversity of

"background" and "other demographic factors" including racial and gender diversity when nominating Board candidates, and (4) the Company failed to maintain adequate internal controls.

229.    As a result of the material misstatements and omissions contained in the 2020 Proxy Statement, Company shareholders, *inter alia*, elected Defendant C. Lin, who was allowing the illegal and discriminatory practices to continue, and zero Black individuals, to the Board and ratified the appointment of Grant Thornton LLP as the Company's independent auditor.

## **DAMAGES TO AOI**

230.    As a direct and proximate result of the Individual Defendants' conduct, AOI will lose and expend many millions of dollars.

231.    Such expenditures include, but are not limited to, legal fees and costs associated with the Securities Class Action filed against the Company, its CEO, and its CFO, which survived a motion to dismiss and recently settled for $15.5 million, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto. Such expenditures include, but are not limited to loss of profits due to Discriminatory Misconduct, costs associated with the costs of defending potential investigations of the Discriminatory Misconduct and for fines paid in connection thereto and any legal fees or costs associated with the SEC investigation.

232.    Additionally, these expenditures include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

233.    As a direct and proximate result of the Individual Defendants' conduct, AOI has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their

misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

234.    Plaintiffs bring this action derivatively and for the benefit of AOI to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of AOI, unjust enrichment, violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof and for contribution under Sections 10(b) and 21D of the Exchange Act.

235.    AOI is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

236.    Plaintiffs are, and have been at all relevant times, shareholders of AOI. Plaintiffs will adequately and fairly represent the interests of AOI in enforcing and prosecuting its rights, and, to that end, have retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

237.    Plaintiffs incorporate by reference and re-allege each and every allegation stated above as if fully set forth herein.

238.    A pre-suit demand on the Board of AOI is futile and, therefore, excused. At the time of the filing of this Verified Consolidated Amended Shareholder Derivative Complaint, the Board consisted of the following seven individuals: Defendants T. Lin, Yeh, Black, Chen, Ignatiev, and C. Lin (the "Director-Defendants"), along with non-party Loboa (together with the Director-Defendants, the "Directors").  Plaintiffs need only to allege demand futility as to four of the seven Directors that were on the Board at the time this action was commenced.

239.     Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, and/or the Discriminatory Misconduct, while five of them engaged in insider sales based on material non-public information, netting proceeds of over $7.8 million, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

240.     Granting a demand to rectify the Discriminatory Conduct would require certain Directors to resign or to diminish their standing on the Board by increasing the number of directors. Such a demand would also require the Directors to acknowledge that they have a limited viewpoint and that the Board would benefit from being exposed to greater diversity. Moreover, the Discriminatory Misconduct comprised an unlawful business strategy, which was not a valid exercise of judgment because it was based on bad faith and intentional, reckless, or disloyal misconduct. Even though they knew about the Discriminatory Misconduct, the Director-Defendants did nothing to correct it.

241.     In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

242.     The Director-Defendants knew of the Company's declining projections for sales revenue attributable to Amazon as well as the decrease in Amazon's orders prior to their public

disclosures of this information and, consequently, knew of the falsity of the misleading statements at the time they were made.  As detailed herein, as of February 28, 2018, internet data center was AOI's largest market and Amazon was the Company's largest internet data customer, representing more than 50% of AOI's revenue immediately prior to and during the beginning of the Initial Relevant Period. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████ Further, the Individual Defendants publicly touted their visibility into AOI's customers' future orders and AOI's forecasts in customer demand. As CW 2 detailed, AOI contractually required its customers to provide projections of their requirements for the coming year.  Moreover, CW 2 explained that AOI's supply agreement required customers to send the Company their projected requirements for a given year "before the beginning of each year." Indeed, the Securities Class Action Order held that, because AOI's customers provided their order forecasts prior to the beginning of each year, "a drop in anticipated future sales would have been preceded by a change in forecasts and committed purchase orders."[21]

243.    As Board members of AOI, charged with overseeing the Company's affairs, the Director-Defendants had knowledge of information pertaining to the Company's key customers, including Amazon, as detailed herein.  Specifically, as Board members of AOI, the Director-Defendants given, among other things, ████████████████████████████

████████████████████████████████████████████████

---

[21] Securities Class Action Order at 19.

████████████████████████████████████

████████████████████████████████

244.     Therefore, the Director-Defendants each knew of the falsity of the statements and misleading omissions detailed herein at the time such statements were made, and further failed to exercise or recklessly disregarded their duty of oversight to stop or correct such misleading statements and omissions.

245.     Demand is also excused as to the Director-Defendants because they were fully aware of the Discriminatory Misconduct throughout the Relevant Period. Nonetheless, the Director-Defendants caused the Company to disseminate the false and misleading statements described herein. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

246.     Additional reasons that demand on Defendant T. Lin is futile follow. Defendant T. Lin is a co-founder of the Company and has served as the Company's President and CEO since its inception.  He also serves as Chairman of the Board.  Thus, as the Company admits, he is a non-independent director. The Company provides Defendant T. Lin with his principal occupation, and he receives handsome compensation, including $5,407,716 in 2017.  Defendant T. Lin was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the foregoing earnings calls and press releases, all of which he personally made statements in, and the 2016 10-K, which he signed and signed a SOX certification for.  Defendant T. Lin was aware of the falsity of these statements and omissions at the time they were made, as evidenced by his position as CEO, the fact that the subject of the misleading statements and omissions pertained to material Company operations and the Company's largest customer, the fact that Defendant T. Lin repeatedly received oral and written reports and attended

Verified Shareholder Derivative Complaint

internal meetings at which the Company's manufacturing problems, including low yield and production issues were discussed ███████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████ Further, Defendant T. Lin's special assistant David Chen, was also in charge of corporate quality assurance, had attended weekly meetings at AOI's Texas facility during which the Company's yield and production issues were a frequent topic of discussion.  As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements and to fail to correct them, the Discriminatory Misconduct, which Defendant T. Lin engaged in and permitted, despite being aware of it, and consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. His insider sales before the fraud was exposed, which yielded at least $729,526 in proceeds, demonstrate his motive in facilitating and participating in the fraud. Moreover, Defendant T. Lin is a defendant in the Securities Class Action. For these reasons, too, Defendant T. Lin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

247.    Additional reasons that demand on Defendant Yeh is futile follow. Defendant Yeh has served as a Company director since May 2000 and serves as lead independent director, Chair of the Compensation Committee, and as a member of the Nominating and Corporate Governance Committee.  Defendant Yeh receives handsome compensation, including $130,000 in 2017. As a long-time Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, the Discriminatory Misconduct, which Defendant Yeh engaged in and permitted, despite being aware of it, and consciously disregarded

his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Yeh signed, and thus personally made the false and misleading statements in, the 2016 10-K.  Defendant Yeh was aware of the falsity of these statements and omissions at the time they were made, as evidenced by the fact that the subject of the misleading statements and omissions pertained to material Company operations and the Company's largest customer and ███████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████  His insider sales before the fraud was exposed, which yielded over $3.9 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. For these reasons, too, Defendant Yeh breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

248.    Additional reasons that demand on Defendant Ignatiev is futile follow. Defendant Ignatiev has served as a Company director since February 2013 and serves as a member of the Audit Committee.  Defendant Ignatiev receives handsome compensation, including $123,000 in 2017. As a long-time Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, the Discriminatory Misconduct, which Defendant Ignatiev engaged in and permitted, despite being aware of it, and consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Ignatiev signed, and thus personally made the false and misleading statements in, the 2016 10-K.  Defendant Ignatiev was aware of the falsity of these statements and omissions at the time they were made, as

evidenced by the fact that the subject of the misleading statements and omissions pertained to material Company operations and the Company's largest customer and ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████ For these reasons, too, Defendant Ignatiev breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

249.    Additional reasons that demand on Defendant Black is futile follow. Defendant Black has served as a Company director since August 2001 and serves as Chairman of the Audit Committee and as a member of the Nominating and Corporate Governance Committee.  Defendant Black receives handsome compensation, including $136,000 in 2017. As a long-time Company director and Chairman of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, the Discriminatory Misconduct, which Defendant Black engaged in and permitted, despite being aware of it, and consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Black signed, and thus personally made the false and misleading statements in, the 2016 10-K.  Defendant Black was aware of the falsity of these statements and omissions at the time they were made, as evidenced by the fact that the subject of the misleading statements and omissions pertained to material Company operations and the Company's largest customer ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████ His

insider sales before the fraud was exposed, which yielded at least $544,600 in proceeds, demonstrate his motive in facilitating and participating in the fraud.  For these reasons, too, Defendant Black breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

250.    Additional reasons that demand on Defendant Chen is futile follow. Defendant Chen has served as a Company director since February 2013 and serves as Chairman of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee.  Defendant Chen receives handsome compensation, including $128,000 in 2017. As a long-time Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, the Discriminatory Misconduct, which Defendant Chen engaged in and permitted, despite being aware of it, and consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Chen signed, and thus personally made the false and misleading statements in, the 2016 10-K.  Defendant Chen was aware of the falsity of these statements and omissions at the time they were made, as evidenced by the fact that the subject of the misleading statements and omissions pertained to material Company operations and the Company's largest customer and the fact that Defendant Chen repeatedly received oral and written reports and ███████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████ His insider sale before the fraud was exposed, which yielded at least $260,000 in proceeds, demonstrates his motive in facilitating and participating in the fraud.  For these reasons, too, Defendant Chen breached his fiduciary duties, faces a substantial

likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

251.    Additional reasons that demand on Defendant C. Lin is futile follow. Defendant C. Lin has served as a Company director since January 2014 and serves as a member of the Compensation Committee.   Defendant C. Lin receives handsome compensation, including $120,000 in 2017. As a long-time Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, the Discriminatory Misconduct, which Defendant C. Lin engaged in and permitted, despite being aware of it, and consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant C. Lin signed, and thus personally made the false and misleading statements in, the 2016 10-K.  Defendant C. Lin was aware of the falsity of these statements and omissions at the time they were made, as evidenced by the fact that the subject of the misleading statements and omissions pertained to material Company operations and the Company's largest customer ███

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████ His insider sales before the fraud was exposed, which yielded at least over $2.3 million in proceeds, demonstrates his motive in facilitating and participating in the fraud.  For these reasons, too, Defendant C. Lin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

252.    Additional reasons that demand on the Board is futile follow.

Verified Shareholder Derivative Complaint

253.    Defendants Black, Ignatiev, and Moore (the "Audit Committee Defendants"), served on the Company's Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants were responsible for overseeing, *inter alia*, the Company's financial reporting process, the integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, and the Company's internal controls over financial reporting.  The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements, as they are charged to do under the Audit Committee Charter, allowing the Company to file false and misleading financial statements with the SEC and to fail to maintain internal controls.  Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them. Further, as discussed above, given the Audit Committee's knowledge, or, at least, that it may be inferred, the Audit Committee Defendants failed in their oversight duties, reflecting clear deficiencies in the Company's ability to adequately implement or oversee its internal controls. ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████     The fact that the Company put together the minimum number of Board-level committees for a publicly traded company fails to establish that the Company maintained an adequate level of internal controls, in light of the misconduct and oversight failures discussed herein. The Company's Nominating and Corporate Governance Committee also failed to appropriately discharge their duties and responsibilities.

254.    Defendants Yeh, Black, and Chen (the "Nominating and Corporate Governance Committee Defendants") served as members of the Nominating and Corporate Governance

Committee during the Relevant Period. Pursuant to the Company's Nominating and Corporate Governance Committee Charter, the Nominating and Corporate Governance Committee Defendants are responsible for, among other things, identifying individuals qualified to become members of the Board, selecting the director nominees, and developing a set of corporate governance principles for the Company. The Nominating and Corporate Governance Committee Defendants engaged or permitted the Company to engage in the Discriminatory Misconduct. Thus, the Nominating and Corporate Governance Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

255.    As described above, five of the Directors on the Board directly engaged in insider trading, in violation of federal law. Defendants T. Lin, Yeh, Black, Chen, and C. Lin collectively received proceeds of over $7.8 million as a result of insider transactions executed during the period when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to them, and thus excused.

256.    Demand in this case is excused because the Director-Defendants, all of whom are named as defendants in this action, control the Company and are beholden to each other. The Director-Defendants have longstanding business and personal relationships with each other, the other Individual Defendants, and Loboa that preclude the Directors from acting independently and in the best interests of the Company and the shareholders. For instance, Defendant T. Lin has served on the University of Missouri's Industrial Advisory Board for the College of Engineering since November 2016 while Loboa served as the Dean and Ketcham Professor of the University of Missouri's College of Engineering from October 2015 until June 2020. Additionally, Defendants T. Lin, Yeh, and Black have served together on the Company's Board for nearly two decades while also serving together on the Company's Board with Defendants Chen, C. Lin, and

Ignatiev for, at least, nearly seven years.  These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

257.    In violation of the Code of Conduct, the Nominating and Corporate Governance Committee Charter, the CSR Policy, and the RBA Code, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to engage in the Discriminatory Misconduct, issue, and fail to correct, materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act. In violation of AOI's governance documents and principles,, the Director-Defendants failed to comply with the law. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

258.    AOI has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for AOI any part of the damages AOI suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

259.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are

self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

260.    The acts complained of herein constitute violations of fiduciary duties owed by AOI's officers and directors, and these acts are incapable of ratification.

261.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of AOI. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of AOI, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

262.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause AOI to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

263.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Securities Exchange Act of 1934

264.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

265.    The claims made pursuant to Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), that are alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

266.    Section 14(a) of the Exchange Act provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

267.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or

which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

268.    Under the direction and watch of the Directors, the 2017 Proxy Statement failed to disclose, *inter alia*, that: (1) the Company did not have the capability nor capacity to quickly transition from 40G manufacturing to 100G manufacturing; (2) the Company could not meet customer demand; (3) to increase manufacturing totals, lower costs, and maintain high gross margins, the Company took manufacturing and quality assurance shortcuts, resulting in undisclosed product quality issues and decreased demand from key customers, including Amazon; (4) due to adoption of the "merchant model" by its customers, the Company was losing market share to rising competition; (5) based on product issues and its customers' minimum purchase obligations and forecasted requirements, demand for the Company's 100G transceivers would not grow at the rate represented; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

269.    The Individual Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements including equity awards designed to "incentivize [executive officers] to act to maximize longer-term stockholder value instead of short-term gain" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

270.    Moreover, the 2017 Proxy Statement was false and misleading when it discussed the Company's adherence to specific governance policies and procedures, including the Code of Conduct, due to the Individual Defendants' failures to abide by them, their insider trading, and

their engagement in the scheme to issue false and misleading statements and omissions of material fact.

271.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2017 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiffs in voting on the matters set forth for shareholder determination in the 2017 Proxy Statement, including election of directors, appointment of an independent auditor, and to approve an amendment to increase the number of shares reserved for issuance under the Company's 2013 Equity Incentive Plan and to extend the term of the incentive plan through 2027.

272.    The false and misleading elements of the 2017 Proxy Statement led to the re-election of Defendants T. Lin, Yeh, Black, Chen, Ignatiev, C. Lin, and Moore during the Relevant Period, which allowed them to continue breaching their fiduciary duties to AOI.

273.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2017 Proxy Statement.

274.    Additionally, under the direction and watch of the Individual Defendants, the 2018, 2019, and 2020 Proxy Statements (the "Proxy Statements") failed to disclose that: (1) the Company had engaged in the Discriminatory Misconduct; (2) the Company does not have term limits due to a desire to keep Black and other underrepresented individuals off of the Board; (3) the Company's Nominating and Corporate Governance Committee did not actually consider racial diversity when nominating Board candidates, and (4) the Company failed to maintain adequate internal controls.

275.    The Individual Defendants also caused the Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-

performance" elements while failing to disclose the Discriminatory Misconduct and that the Company's share price was being artificially inflated by the false and misleading statements related to, *inter alia*, the Discriminatory Misconduct made by the Individual Defendants as alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated.

276.    Moreover, the Proxy Statements were false and misleading when they discussed the Company's Code of Conduct, due to the Individual Defendants' failure to abide by the Code of Conduct, due to the Individual Defendants' failures to abide by them and their engagement in or the tolerance of the Discriminatory Misconduct and the scheme to issue false and misleading statements and omissions of material fact relating to the Discriminatory Misconduct.

277.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiffs in voting on the matters set forth for shareholder determination in the Proxy Statements, including, but not limited to, election of directors and the ratification of the selection of Grant Thornton LLP as the Company's independent auditor.

278.    The false and misleading elements of the Proxy Statements led to, *inter alia*, the re-election of Defendants T. Lin, Murry, Yeh, Black, Chen, Ignatiev, Moore, and C. Lin which allowed them to continue breaching their fiduciary duties to AOI and for AOI to lose profits; indeed, according to a McKinsey report, the most ethically and culturally diverse boards worldwide are 43% more likely to experience higher profits.

279.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

280.     Plaintiffs on behalf of AOI have no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

281.     Plaintiffs incorporate by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

282.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of AOI's business and affairs.

283.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

284.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of AOI.

285.     In breach of their fiduciary duties owed to AOI, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (1) the Company did not have the capability nor capacity to quickly transition from 40G manufacturing to 100G manufacturing; (2) the Company could not meet customer demand; (3) to increase manufacturing totals, lower costs, and maintain high gross margins, the Company took manufacturing and quality assurance shortcuts, resulting in undisclosed product quality issues and decreased demand from key customers, including Amazon; (4) due to adoption of the "merchant model" by its customers, the Company was losing market share to rising competition; (5) based on product issues and its customers' minimum purchase obligations and forecasted requirements, demand for the Company's 100G transceivers would not grow at the rate represented; and (6) the Company failed to maintain

internal controls.  As a result of the foregoing, the Company's public statements, including its financial statements, were materially false and misleading at all relevant times.

286.    The Individual Defendants also failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

287.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

288.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations.  The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of AOI's securities and disguising insider sales.

289.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed

knowingly or recklessly and for the purpose and effect of artificially inflating the price of AOI's securities and engaging in insider sales.

290.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

291.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, AOI has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

292.    Plaintiffs on behalf of AOI have no adequate remedy at law.

## THIRD CLAIM

**Against the Individual Defendants for Breach of Fiduciary Duties
Related to the Discriminatory Misconduct**

293.    Plaintiffs incorporate by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

294.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of AOI's business and affairs.

295.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

296.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of AOI.

297.    In further breach of their fiduciary duties, the Individual Defendants either engaged in, or allowed the Company to engage in the Discriminatory Misconduct.

298.    In breach of their fiduciary duties owed to AOI, certain of the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose the Discriminatory Misconduct.

299.    The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

300.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

301.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements relating to the Discriminatory Misconduct, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of AOI's securities, and disguising insider transactions.

302.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls,

even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of engaging in and concealing the Discriminatory Misconduct and thereby artificially inflating the price of AOI's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

303.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

304.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, AOI has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

305.     Plaintiffs on behalf of AOI have no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Unjust Enrichment

306.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

307.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, AOI.

308.     The Individual Defendants received bonuses, stock options, or similar compensation from AOI that was tied to the performance or artificially inflated valuation of AOI, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

309.     Plaintiffs, as shareholders and representatives of AOI, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, excessive compensation, including any performance-based or valuation-based

compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

310.     Plaintiffs on behalf of AOI have no adequate remedy at law.

## FIFTH CLAIM

**Against Defendants T. Lin and Murry for Contribution
Under Sections 10(b) and 21D of the Exchange Act**

311.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

312.     AOI, along with Defendants T. Lin and Murry are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants T. Lin and Murry's willful and/or reckless violations of their obligations as officers and/or directors of AOI.

313.     Defendants T. Lin and Murry, because of their positions of control and authority as officers and/or directors of AOI, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of AOI, including the wrongful acts complained of herein and in the Securities Class Action.

314.     Accordingly, Defendants T. Lin and Murry are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

315.    As such, AOI is entitled to receive all appropriate contribution or indemnification from Defendants T. Lin and Murry.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiffs demand judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiffs may maintain this action on behalf of AOI, and that Plaintiffs are adequate representatives of the Company;

(b)    Declaring that each of the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to AOI;

(c)    Determining and awarding to AOI the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing AOI and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect AOI and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of AOI to nominate at least four candidates for election to the Board; which should include, at least, one female and two Black individuals;

Verified Shareholder Derivative Complaint

3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

4.  a proposal to ensure the publication of an annual Diversity Report that contains particularized information about the hiring, advancement, promotion, and pay equity of all minorities at AOI;

5.  a proposal to establish a fund to hire Black individuals and other minorities, promote Black individuals and other minorities to more management positions at the Company, establish and maintain a mentorship program at AOI for Black individuals and other minorities that is committed to providing the skills and mentorship necessary to succeed at the Company;

6.  a proposal to establish and require annual training of AOI's entire Board and all executive officers, which training should at a minimum focus on diversity, antidiscrimination, and affirmative action, as well as other relevant topics; and

7.  a proposal to adopt a revised executive compensation program that ties 30% of executives' compensation to the achievement of certain specified diversity goals.

(e)    Awarding AOI restitution from the Individual Defendants, and each of them;

(f)    Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

Dated: January 13, 2021                    Respectfully submitted,

                                           */s/ R. Dean Gresham*
                                           R. Dean Gresham

Verified Shareholder Derivative Complaint

Texas Bar No. 24027215
Southern District of Texas Bar No. 7438
12720 Hillcrest Rd, Suite 1045
Dallas, Texas 75230
Telephone: (972) 387-4040
Facsimile: (972) 387-4041
Email: dean@stecklerlaw.com


**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com


**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Attorneys for Plaintiffs*

Verified Shareholder Derivative Complaint

## **VERIFICATION**

I, Yiu Kwong Ng am a plaintiff in the within action. I have reviewed the allegations made in this verified consolidated shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this day of _____.

1/12/2021

DocuSigned by:

*Yiu Kwong Ng*

90DAEA598488499...

Yiu Kwong Ng